**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **VIRGINIA BROWN**<br>***Plaintiff*** | : | **Civ. Action No.** |
| **V.** | : | **3:15-cv-880 (SRU)** |
| **STATE OF CONNECTICUT,**<br>**LINDA YELMINI, in her individual capacity;**<br>**and BRENDA HALPIN,**<br>**in her individual capacity.**<br>***Defendants*** | : | **JANUARY 15, 2016** |

## FIRST AMENDED COMPLAINT

## I. INTRODUCTION

1. Plaintiff Virginia Brown brings this action against Defendants State of Connecticut, Linda Yelmini, and Brenda Halpin for their actions to illegally retaliate against Plaintiff because of her constitutionally protected speech in violation of the First Amendment to the U.S. Constitution and Section 31-51q of the Connecticut General Statutes. Plaintiff spoke out against, and helped to expose, the improper administration of the public retirement systems administered by the State of Connecticut, including, but not limited to, practices which placed millions of dollars of state funds at risk and resulted in disability retirement and healthcare benefits being paid to individuals who were not eligible to receive benefits under the terms of the State employee retirement plan. Plaintiff also refused to comply with demands that she make false statements which would have misled public officials and concealed and perpetuated the improper administration of the retirement systems.

## II. PARTIES

2. Plaintiff, Virginia Brown, is a resident of the State of Connecticut.

3. Defendant State of Connecticut is Plaintiff's employer. It includes a number of public offices, agencies and departments, including the Office of the State Comptroller (hereinafter

"Comptroller") and the State Employees Retirement Commission (hereinafter "Commission"). At all relevant times, Plaintiff's wages were paid by the State of Connecticut, she participated in retirement plans available to State of Connecticut employees, and she received health insurance available to State of Connecticut employees. In addition, Plaintiff applied for employment by completing the State of Connecticut's application form, and the Employee Service Ratings that Plaintiff received during the relevant time were captioned "State of Connecticut Human Resources." Defendant State of Connecticut is an employer within the meaning of Connecticut General Statutes § 31-51q.

4. At all relevant times, Defendant Linda Yelmini was a Commission Trustee, and also the Director of the Office of Labor Relations for the State of Connecticut. She held those positions for an extended period of time until November of 2014, when she was removed from her position as Director and subsequently resigned as Commission Trustee. At relevant times, Defendant Yelmini also served on the Commission's Personnel and Legal Subcommittee. One of the functions of the Office of Labor Relations is to provide consultation and advice to state agencies regarding labor relations and employment issues. At all relevant times, Defendant Yelmini was acting under the color of State law and was employed by the State of Connecticut.

5. Defendant Brenda Halpin is the Director of the Retirement Services Division of the Comptroller. She has held that position since 2011 and has worked in the Comptroller's office since 1995. She resides in Glastonbury, Connecticut. At all relevant times, Defendant Halpin was acting under the color of State law and was employed by the State of Connecticut.

## III. JURISDICTION

6. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because it asserts federal questions under 42 U.S.C. § 1983 and the First Amendment to the

U.S. Constitution, and because claims under Conn. Gen. Stat. § 31-51q also present a federal question. The complaint was removed to federal court pursuant to 28 U.S.C. §§ 1441, 1443, and 1446, and each of the actions giving rise to this lawsuit occurred in Connecticut. This Court has personal jurisdiction over each of the Defendants.

## IV. BACKGROUND

### A. Comptroller and Commission

7. The Comptroller is the fiscal guardian for the state of Connecticut and is responsible for overseeing state accounting, preparing state financial reports, paying and administering benefits to state employees, administering miscellaneous appropriations for employee taxes, insurance, and health services, and administering grants to police, firefighters, and municipalities.

8. The Commission has general administrative and supervisory responsibility for the proper operation of the State Employees Retirement System, Municipal Employees Retirement System, and other miscellaneous retirement systems (collectively referred to as "Retirement Systems") and the power, duty and responsibility to conduct the business and activities of those Retirement Systems. In accordance with the State Employees Retirement Act, Conn. Gen. Stat § 5-155a(c), each Commission Trustee has a fiduciary duty to the Retirement Systems, and must act in a careful, skillful, prudent and diligent manner in accordance with strict fiduciary standards. The Commission is a public body whose meetings are open to the public.

9. The Comptroller's Retirement Services Division ("Division") administers the provisions of the Retirement Systems under the direction of the Commission. In-line with that dual reporting structure among the Comptroller and Commission, it was a common practice for Defendant Yelmini to share information and make decisions collectively with the leadership of the Comptroller and the Division regarding the administration of the Retirement Systems. Defendant

Yelmini regularly consulted with Deputy Comptroller P. Martha Carlson and routinely gave instructions regarding the administration of the Retirement Systems directly to Defendant Halpin and Division staff. When Defendant Yelmini issued instructions to the Division, those instructions were generally followed. In addition, the day before each monthly Commission meeting, Defendant Yelmini, along with Commission Trustees Peter Blum and Sal Luciano, met privately with Deputy Comptroller Carlson and Comptroller Kevin Lembo to discuss items on the agenda and objectives for the upcoming Commission meeting

**B. <u>The Retirement Systems</u>**

10. Participation in the Retirement Systems is mandatory for all State employees.

11. The State of Connecticut's primary public employee retirement plan is the State Employees Retirement System ("SERS"), which is a defined benefit retirement plan. The cost of retirement and healthcare benefits are paid primarily by the State of Connecticut and its taxpayers. According to 2014 actuarial valuation reports, the actuarial asset value was $10.5 billion and the actuarial accrued liabilities totaled $25.5 billion, resulting in an unfunded actuarial accrued liability of $14.9 billion, or 41.5 percent unfunded obligations. In 2014, SERS had 97,236 members, comprised of 49,976 active state employees, 45,803 retirees receiving benefits and 1,457 inactive vested members.

12. The Connecticut Municipal Employees Retirement System ("CMERS") is a defined benefit retirement plan in which Connecticut municipalities may choose to participate. The cost of retirement benefits are paid primarily by the participating municipalities. Municipalities must also contribute to the administrative cost of the retirement plan.

13. Connecticut's level of unfunded pension liabilities is one of the highest in the nation, and in 2012 was ranked as the second lowest funded pension in the nation.

14. Connecticut's combined fixed costs for debt service, pension, and other post-employment benefits are high and consume a large portion of the State's budget. The soaring cost of retirement and healthcare benefits provided by the Retirement Systems are paid primarily by the State of Connecticut, participating municipalities and taxpayers.

**C. <u>Internal Revenue Service Tax Qualification</u>**

15. The Retirement Systems are government pension plans that must satisfy a number of tax-qualification requirements under the Internal Revenue Code ("IRC"), e.g. benefit limits under IRC § 415; compensation limits under IRC § 401(a)(17). Government plans must also operate in accordance with their written terms to retain their tax-qualified status so that participants receive favorable tax treatment on their benefits and contributions. Qualification under IRC § 401(a) is important to plan members, retirees and beneficiaries in order to maintain favorable federal tax advantages that would generally not apply to a non-qualified plan.

16. There are several key federal tax advantages of maintaining "qualified" status. First, employer contributions are not taxable under the federal law to members as they are made or when vested. Rather, taxation only occurs when plan distributions are made. The State paid over $1.2 billion to SERS in 2014. Second, earnings and income of the trust are not taxed to the trust or to the members until distribution. SERS had retirement investment income of over $1.4 billion in 2014. Third, certain tax favorable treatments may be available under federal law to plan members and beneficiaries when they receive plan distributions, such as the ability to rollover eligible distributions. SERS paid benefits of over $1.5 billion in 2014. Lastly, employers and members do not pay employment taxes on employer contributions when contributions are made to the plan or when benefits are paid from the plan.

17. Retaining "qualified plan" status is a critical requirement for government retirement plans. In order to preserve qualified status, a retirement plan must satisfy the IRC and Treasury Regulations in both form and operation, which means that the provisions in the plan document must satisfy the requirements of the IRC and those plan provisions must be followed.

18. Government retirement plans that are not operated in accordance with their terms and run afoul of state law and federal tax laws are subject to IRS disqualification. Disqualification of the plan would result in the retirement plan's trust losing its tax-exempt status and becoming a nonexempt trust, resulting in serious adverse tax consequences to the plan and its members (employees and retirees). Substantial costs, which would include interest and penalties, would ultimately be passed on to the State and its taxpayers.

**D. SERS and CMERS Disability Retirement Administration**

19. Both SERS and CMERS contain provisions that specify eligibility for disability retirement benefits. Medical eligibility for disability retirement for both retirement plans is determined by a Medical Examining Board ("MEB").

20. The MEB is comprised of doctors from various specialties who perform medical record reviews with regard to initial applications for disability retirement, conduct twenty-four (24) month disability retirement reviews, and may conduct additional reviews as to the continuance of disability. The MEB has the exclusive authority to make findings regarding medical eligibility for disability retirement benefits and reports its findings to the Commission.

**E. Plaintiff's Protected Speech**

21. On September 21, 2012, Plaintiff was hired as a staff attorney II by the State of Connecticut, to provide legal services to the Comptroller's Retirement Services Division and the Commission. Members of the Commission's Legal and Personnel Subcommittee were among the

individuals who interviewed Plaintiff before she was offered the position. Defendant Halpin was Plaintiff's immediate supervisor.

22. In her role as Staff Attorney II, Plaintiff's job duties included providing legal services to the Commission and Comptroller with respect to the administration of the Retirement Systems. Her job duties included, but were not limited to:

a. Working with outside counsel, including but not limited to, Ice Miller, on Internal Revenue Code limitation, plan qualification and tax issues relating to SERS;

b. Providing legal guidance to the MEB regarding the administration of disability retirement;

c. Designing, drafting and implementing corrective policies and procedures for the administration of the Retirement Systems for the Commission;

d. Working with the Commission's Regulations and Overpayments Subcommittee on designing, drafting and implementing overpayment and collection policies and procedures;

e. Providing legal advice to the Commission and the Comptroller with respect to all aspects of the administration of the Retirement Systems, including preparing legal memos, summaries, and analyses;

f. Providing guidance to Division's internal investigator with regards to the disability retirement benefits, including disability fraud investigations, twenty-four (24) months reviews/investigations and collection of overpayments;

g. Drafting proposed legislation;

h. Developing and maintaining guidelines for pension division orders for both SERS and CMERS;

i. Assisting the Office of the Attorney General and outside counsel with cases in litigation, in the role typically played by inside counsel; and

j. Managing Freedom of Information Act requests.

23. While employed by the State of Connecticut in the position providing legal services to the Comptroller and Commission, Plaintiff opposed, both internally and externally, the improper administration of the Retirement Systems that included ignoring the provisions of the Retirement

Systems and violations of state law and federal tax laws. Plaintiff's opposition included complaints and disclosures to the State of Connecticut Office of the Auditors of Public Accounts. This conduct, which is described in more detail throughout this Complaint, continues to cause substantial injury to the State of Connecticut and its taxpayers by adversely affecting the financial stability of the Retirement Systems and the State. In addition to weakening the financial stability of the Retirement Systems and the State, the improper administration of the Retirement Systems is creating additional legal and financial risks associated with potential IRS disqualification for failure to adhere to the terms of the Retirement Systems and violations of state law and federal tax laws. Compounding the legal and financial significance of that improper administration, many of the Defendants' actions were undertaken for purely political reasons.

24. The improper administration of the Retirement Systems is unquestionably an important matter of public concern. In addition to the continued legal and financial harm to the State and its taxpayers, authorizing the payment of retirement and healthcare benefits to persons who are known not to be entitled those benefits is a crime under Connecticut law, Conn. Gen. Stat. § 53a-122(a), § 53a-119(6). As detailed in this Complaint, retirement and healthcare benefits were knowingly provided to individuals who were known not to be entitled to those benefits under the terms of the Retirement Systems.

### i. **<u>Objections to Improper Twenty-four (24) Month Disability Retirement Standard for SERS</u>**

25. In accordance with SERS disability retirement provisions, as codified in the State Employees Retirement System disability statutes, Conn. Gen. Stat. §§ 5-169(a); 5-192p(b), after twenty-four (24) months, certain disability retirement benefits are continued to be paid only to those eligible retirees who are prevented by a disability from working in any "suitable and comparable" position, which is commonly referred to as an "any occupation" standard. In

accordance with the terms of the retirement plan, this twenty-four (24) month review is conducted by the MEB and required for each retiree receiving disability retirement benefits.

26. Beginning in October of 2012, Plaintiff discovered, and then made complaints, to Defendants Yelmini and Halpin, as well as Comptroller Lembo, Deputy Comptroller Carlson, and others, that SERS disability retirement was not being administered in accordance with its written terms, violating state law and federal tax laws. Plaintiff complained that retirees were incorrectly being allowed to continue receiving disability retirement and healthcare benefits after twenty-four (24) months based on an obviously incorrect, and much less stringent, standard of disability, which only required a demonstration that the retiree was disabled from performing his/her "own occupation," instead of "any occupation." The more permissive "own occupation" Standard is significantly easier to satisfy, and thus results in the award of disability benefits to individuals who would not otherwise be entitled to benefits under the correct "any occupation" Standard.

27. The incorrect Standard applied at the twenty-four (24) month disability retirement review had resulted in thousands of retirees who were not "totally disabled for any suitable and comparable job" according to the terms of the retirement plan and state law, improperly receiving disability retirement and healthcare benefits at a substantial cost to the retirement plan, the State of Connecticut and its taxpayers.

28. In communications that were shared with Defendants Yelmini and Halpin, as well as Deputy Comptroller Carlson and Comptroller Kevin Lembo, Plaintiff also provided examples of active disability retirement fraud investigations showing that a significant number of retirees who were receiving disability retirement and healthcare benefits were not totally disabled but were gainfully employed in suitable and comparable positions making significant salaries, resulting in

a projected financial cost to the retirement plan of hundreds of millions of dollars in improperly paid disability retirement and healthcare benefits.

29. Plaintiff also complained to Defendant Halpin, and Deputy Comptroller Carlson and Comptroller Lembo, that the Commission and Comptroller had been improperly extending the time period for SERS twenty-four (24) month disability retirement reviews, which only exacerbated the problem for those cases in which retirees were incorrectly receiving disability benefits. If there is no review conducted by the MEB, there is no opportunity to discontinue disability benefits in cases where the retiree is not disabled within the meaning of the retirement plan. In many cases, the extension was providing retirees an extra three (3) years of improper payments for disability retirement and healthcare benefits.

30. In response to Plaintiff's disclosures and objections, the Commission and Comptroller put all twenty-four (24) month reviews and completed investigations on hold rather than apply the correct "any occupation" Standard. The number of SERS disability retirement retirees who were past the twenty-four (24) month review period and who were potentially receiving an improper retirement disability benefit was growing. In 2012, there were approximately 3,800 retirees receiving SERS disability retirement, and 2,400 were past the twenty-four (24) month period for review. There were significant instances of potential disability retirement fraud - retirees receiving disability retirement and healthcare benefits who are gainfully employed in suitable and comparable positions and not totally disabled. For those reasons, and others, Plaintiff opposed the Commission and Comptroller continuing to put all twenty-four (24) month reviews and disability retirement investigations on hold as a significant number of those retirees were not disabled according to the proper disability retirement Standard.

**ii. <u>Despite Comptroller's Admission of Erroneous Disability Retirement Standard, Actions Persist Amidst Political Pressure From Unions</u>**

31. In response to Plaintiff's disclosures and objections, Defendant Halpin and Comptroller Lembo, as well as Natalie Braswell, who was the Assistant Comptroller, General Counsel, and Ethics Liaison at the Comptroller, admitted that the SERS twenty-four (24) month disability retirement review Standard had been improperly applied and was contrary to the terms of the retirement plan and state law. Nevertheless, the erroneous application was neither disclosed to the full Commission, nor corrected.

32. Rather, all twenty-four (24) month reviews and investigations were put on hold while efforts were made to coerce the Plaintiff into supporting the improper administration and concealing their corruption.

33. Statements made to the Plaintiff and Division staff strongly suggest, if they do not confirm directly, that the Comptroller was knowingly and purposefully administering SERS disability retirement improperly so that more Union members would receive benefits in order to retain the political support of the public employee Union:

a. In February of 2013, Deputy Comptroller Carlson told the Plaintiff that she did not care that the Commission was breaching its fiduciary duty by violating the terms of the retirement plan, state and federal tax laws, and that it was "their problem" as long as the twenty-four (24) month disability Standard supported the Union's interests.

b. On February 12, 2013, Defendant Halpin reported to the Plaintiff that she received a forwarded e-mail from Deputy Comptroller Carlson on February 12, 2013 from a Union leader stating that the Unions put Kevin Lembo in office and they expected him to take care of their interests.

c. On February 12, 2013, Assistant Comptroller Braswell confided to Plaintiff that she was having a tough time ethically with the decisions being made by Deputy Comptroller Carlson and Comptroller Lembo. Braswell admitted that it was improper to have the Unions deciding how to administer the disability retirement benefits, but that Comptroller Lembo needed the Union vote and could not afford to lose their support. Braswell advised the Plaintiff to document everything and make a "memo to the file."

d. In April of 2013, Assistant Comptroller Braswell made the statement to the Plaintiff that the "political climate" was not good for disability retirement fraud investigations and twenty-four (24) month disability retirement reviews and they would likely continue to be stalled.

e. On November 1, 2013, Defendant Halpin told the Plaintiff that "the Unions were very powerful in politics and made up a huge voting pool" and with respect to the corruption in the Comptroller's Office that "things would never change in Connecticut."

f. On March 6, 2014, Defendant Halpin told the Plaintiff and several Division staff members that hundreds of disability retirement fraud investigations and twenty-four (24) month disability retirement reviews, which had been put on hold since October of 2012, would not go forward until Comptroller Lembo was told by the Unions how they wanted him to apply the legal disability retirement Standard.

**iii. Plaintiff Refused to Comply with Demands that She Make False Statements in Order to Conceal, Cover-up, and Perpetuate Illegal Administration of SERS**

34. After October 2012, Plaintiff prepared written materials for the full Commission explaining that the incorrect SERS disability retirement twenty-four (24) month review Standard was being applied. These documents included corrective policies and procedures, summaries, and charts which contained accurate factual statements and were intended to correct the improper administration. The documents Plaintiff prepared, including policies and procedures relating to disability retirement, investigations and the MEB, were to be provided to the full Commission. However, before distribution to the full Commission, they were provided to Defendant Yelmini, and the union's attorney.

35. After the documents that Plaintiff had prepared were shared with Defendant Yelmini, Deputy Comptroller Carlson made it clear to Plaintiff that none of the materials she prepared would be provided to the full Commission unless Plaintiff changed the documents so that they supported the incorrect "own occupation" twenty-four (24) month disability retirement review Standard to align with a political agenda.

36. Carlson instructed Plaintiff to change the documents she prepared in ways that would have (a) concealed facts reflecting the improper administration, and (b) replaced certain accurate factual statements contained in the documents with false statements to conceal the Comptroller's practice of awarding benefits to retirees who were not entitled to the benefit, including certain politically connected employees. Carlson stated that she did not care that the Commission was breaching its fiduciary duty and that it was "their problem" as long as the twenty-four (24) month disability Standard supported the Union's interests.

37. For instance, Deputy Comptroller Carlson - - who is not a lawyer - - ordered Plaintiff to include the false statement that the SERS plan provisions state that after twenty-four (24) months, disability retirement continued if the retiree was disabled from performing his/her "own occupation." In fact, the SERS retirement plan provision specifically states that disability retirement only continues if the retiree is disabled from performing a "any suitable and comparable" job. That correct statement regarding the terms of the plan, and the proper eligibility requirements under the plan, was contained in the various documents and policies and procedures that Plaintiff prepared for disclosure to the full Commission, and which had previously been approved, before political considerations were asserted.

38. In addition, Carlson demanded that Plaintiff alter memoranda that she had prepared for the full Commission which explained that an incorrect disability retirement standard had previously been applied to determine continued entitlement to disability retirement benefits at 24 months, and highlighted reasons why the Commission should apply the correct standard and cease the practice of paying disability benefits to individuals who were not entitled to them. As part of those memoranda, Plaintiff included accurate factual information regarding the financial cost to the State and to the retirement plan and its members, to which the Commission owed a fiduciary

duty. Plaintiff communicated accurate factual information, such as the number of members who were collecting disability retirement benefits who were past their 24-month review period, and that those members collectively received over 7 million dollars a month in benefits. Plaintiff further detailed that ceasing the improper administration of SERS and terminating the continued payment of disability retirement benefits to individuals who were not entitled to receive them would potentially save hundreds of millions of dollars, over the course of time.

39. Carlson demanded that Plaintiff alter these documents to endorse the continuation of the existing practice which violated the terms of the plan, state laws, and federal tax laws, and remove the accurate factual information regarding the cost to the State and to the plan of continuing to apply the improper standard.

40. Plaintiff refused the demands and explained to Defendant Carlson and Assistant Comptroller Braswell that she would not replace accurate statements in the documents she prepared with materially false statements that would have concealed the fact that thousands of employees were incorrectly receiving SERS disability retirement and healthcare benefits, and would also have supported the continuation of that practice at great cost to the State and in violation of the terms of the retirement plan, state law and federal tax laws.

41. On February 14, 2013, two days after being told of political pressure being applied by the unions, Plaintiff attended a meeting with Defendant Halpin, as well as Deputy Comptroller Carlson, Comptroller Lembo, and Assistant Comptroller Braswell, to discuss Plaintiff's opposition to the improper administration of SERS disability retirement and the twenty-four (24) month Standard. Deputy Comptroller Carlson continued to aggressively push for the Plaintiff to make misrepresentations, false statements and omissions in several key documents detailing the

administration of SERS disability retirement to support the more liberal incorrect "own occupation" Standard to be applied to the twenty-four (24) month disability retirement review.

42. Despite the continued pressure and threats to her employment, Plaintiff continued to refuse to alter those documents. Plaintiff refused to provide false legitimacy to a course of conduct that was contrary to the terms of the retirement plan and would violate state law and federal tax laws, subjecting SERS to possible disqualification by the IRS. Plaintiff was being directed to make false written statements that she did not believe to be true for the purpose of misleading the public servants on the Commission in the performance of their official function, and she refused to comply with those demands.

43. At the conclusion of the February 14, 2013 meeting, Carlson told Plaintiff to "take a break from disability retirement," and that there were "other matters to focus on."

44. Defendants Yelmini and Halpin, as well as the Comptroller, had knowledge of Deputy Comptroller Carlson's directions to Plaintiff, as well as Plaintiff refusal to comply with those directives.

**iv. <u>Objections to Improper Disability Retirement Standard for CMERS</u>**

45. Plaintiff also discovered and opposed the improper administration of the other Retirement Systems, including CMERS. On numerous occasions, Plaintiff objected to the improper administration of CMERS, including ignoring the provisions of the retirement plan, violating state law and federal tax laws and putting the qualification of the retirement plan in jeopardy.

46. Under the provisions of the retirement plan, as codified in the CMERS disability statutes, Conn. Gen. Stat. § 7-432, prior to July 1, 2013, an employee was only eligible to receive

disability retirement benefits if he/she was not capable of engaging in any gainful employment (20 hours or more), which is commonly referred to as an "any occupation" Standard.

47. Prior to 2010, an incorrect standard was applied which resulted in people receiving benefits who were not entitled to them. Once the standard was applied properly starting in 2010, CMERS disability retirement benefits were more limited. However, Defendants were working to achieve a reversion back to the incorrect and more generous standard.

48. In early 2013, Plaintiff prepared several documents to provide clarification of CMERS disability retirement administration and the re-employment limitations that were to be provided to the full Commission.

49. However, in February 2013, Carlson instructed Plaintiff to make substantive changes to those documents which would favor the application of an incorrect "own occupation" disability retirement Standard to CMERS before those documents were provided to the full Commission.

50. Defendant Carlson instructed Plaintiff to replace accurate statements contained in the documents that accurately detailed the past and current practice for awarding CMERS disability benefits and applying the re-employment limitation with materially false factual statements on several documents that Plaintiff prepared for the full Commission.

51. For example, the summaries and charts prepared by Plaintiff contained accurate statements that detailed the current practice of the MEB to determine CMERS disability retirement applications using an "any occupation" standard as required by the retirement plan, and as previously advised, in 2010, by the Attorney General's Office and the former Division Counsel. Nevertheless, Deputy Comptroller Carlson ordered Plaintiff to replace those accurate statements with the false statement that the MEB was currently relying on the much more generous "own

occupation" standard to determine disability retirement for CMERS disability retirement applications, which was false.

52. Plaintiff refused to make Carlson's changes, as doing so would have resulted in Plaintiff making knowing false statements to the Commission that were intended to mislead the public servants on the Commission and designed to give false legitimacy to a plan to improperly administer the Retirement systems in violation of the law.

53. Because the Plaintiff would not change the documents, they were never provided to the full Commission.

54. Subsequently, during a February 21, 2013 Commission meeting, Defendant Yelmini and Deputy Comptroller Carlson made gross misrepresentations, false statements and omissions to the Commission in order to persuade them to revert back to applying the incorrect "own occupation" disability retirement Standard, which would increase the number of disability retirements and allow certain individuals who were gainfully employed to continue receiving a disability retirement benefit that they were not entitled to receive under the terms of CMERS. If the documents Plaintiff prepared had been provided to the full Commission as originally intended, the Commission would have been able to understand that Yelmini and Carlson were making statements that were not true.

55. Deputy Comptroller Carlson made repeated threats to the Plaintiff not to make any disclosures regarding CMERS disability retirement and re-employment limitations to the full Commission or to contradict the misrepresentation, false statements and omissions that Carlson and Yelmini made to the full Commission.

### v. Plaintiff Continued Her Refusal to Make Other False Statements

56. The Retirement Systems, as well as state law, and federal tax laws, contain rules prohibiting individuals from receiving retirement benefits while they are still employed by the same employer, under certain circumstances. On numerous occasions, including on April 4, 2013, Plaintiff complained to Defendant Halpin and Assistant Comptroller Braswell that the Commission and Comptroller were administering the Retirement Systems in ways that disregarded these rules. Plaintiff provided examples in which these rules were being violated, including a number of notable political figures and a political appointee, whose retirement benefits were later questioned by the media.

57. In April 2013, Plaintiff had been asked by outside counsel, Ice Miller, to provide accurate information regarding the administration of the Retirement Systems in order to assist in the preparation of documents for submission to the Internal Revenue Service, including an application for an IRS letter of determination for SERS and a voluntary correction plan filing that would identify retirement plan failures and provide corrective measures.

58. In connection with that submission, Plaintiff was asked by outside counsel to identify and disclose any retirement plan failures. Even though numerous retirement plan failures had been identified and needed to be disclosed, and even though outside counsel required accurate information in order to ensure that the documents being prepared for submission to the IRS were truthful and accurate, Defendant Halpin – who is not a lawyer - ordered Plaintiff to make materially false factual statements to Ice Miller to conceal those retirement plan failures, such as the Comptroller's practice of allowing certain retirees, including politically connected retirees, to be re-employed by the State in violation of the terms of the retirement plans, state laws, and federal

tax laws. Plaintiff refused to make those materially false statements to outside tax counsel as ordered by Defendant Halpin.

**vi. <u>Disclosure of IRC Section 415(b) Violations and Refusal to Misrepresent</u>**

59. In July of 2013, Plaintiff reported to Defendant Halpin that the Commission and Comptroller were not properly applying IRC Section 415(b), which imposes a dollar limitation on the annual retirement benefits an individual can receive from a qualified retirement plan. While the Section 415(b) limit was applied for the first time prospectively to all members retiring after 2011, the limit was not applied to those members who retired prior to 2011 going forward. A member who retired in 2010 and whose benefit exceeded the maximum Section 415(b) amount in 2011, 2012 and 2013 was not having his/her benefits reduced. Plaintiff also disclosed that the Commission and Comptroller were not reviewing those retirees impacted by the Section 415(b) limit on a yearly basis as those limits rose resulting in improper calculations of retirement benefits. Failure to comply with Section 415(b) limits, including incorrect calculations and failure to apply the limits for all years, can result in the disqualification of the retirement plan.

60. On September 19, 2013, the Plaintiff further disclosed to Defendant Halpin, Comptroller Lembo, Deputy Comptroller Carlson, and Assistant Comptroller Braswell, that the Section 415(b) limit had not been applied correctly to those members who retired after 2011, which resulted in improper retirement benefit deductions. In addition, Plaintiff disclosed that serious misrepresentations were being made to the full Commission and retirees concerning the Section 415(b) limits, including misrepresentations made to a certain retiree, who was informed by the Division that his retirement benefit was being reduced in accordance with IRC Section 415(b). That retiree had secured legal counsel to fight the erroneous reduction to his retirement benefits. Plaintiff was instructed to make false statements to the retiree regarding the actual calculation

method and to represent that the retiree's benefit had been determined by actuaries, which was not true. Plaintiff refused to make the false statements as instructed.

61. Following the Plaintiff's disclosures and objections, she was excluded from all further discussion/meetings regarding the Section 415(b) issue and was prohibited from providing any legal guidance to the Audit Unit or assistance to correct the application and calculation errors.

62. The Plaintiff subsequently learned that neither the retiree nor the full Commission was informed about the Division's incorrect Section 415(b) application and improper retirement benefit deductions.

**vii. Defendant Yelmini's Unauthorized Retirement Incentive**

63. In March of 2013, Plaintiff also opposed an effort by Defendant Yelmini to create an unauthorized early retirement incentive plan for state employees. Plaintiff complained to Defendant Halpin and Assistant Comptroller Braswell that Defendant Yelmini had improperly instructed the Comptroller to administer an early retirement incentive that conflicted with the provisions of SERS and lacked required legislative approval. Braswell informed Plaintiff that her complaint had been communicated to Defendant Yelmini.

**viii. Plaintiff's July 2013 Disclosures to Auditors**

64. On July 30, 2013, Plaintiff began disclosing the improper administration, violations of state law, and violations of federal tax laws, to the State of Connecticut Office of the Auditors of Public Accounts (the "Auditors").

65. It was not part of Plaintiff's ordinary job duties to disclose improper administration of the Retirement Systems, or violations of state law, or federal tax laws, to the Auditors. In fact, prior to July of 2013, Plaintiff had never communicated with the Auditors.

66. In advance of Plaintiff's scheduled meeting with the Auditors on July 30, 2013, Defendant Halpin told Plaintiff that she should not be meeting with the Auditors. Halpin directed Plaintiff to talk to Natalie Braswell, Assistant Comptroller and General Counsel for the Office of the State Comptroller, about how to handle questions from the Auditors. Braswell advised the Plaintiff that she tells the Auditors that she "has no knowledge" to most questions.

67. In response to pressure from both Defendant Halpin and Assistant Comptroller Braswell to conceal the improper administration of the Retirement Systems from the Auditors, Plaintiff told them that she was "not going to lie to the Auditors."

68. When Plaintiff met with the representative from the Auditors on July 30, 2013, she truthfully disclosed the details of the improper administration of the Retirement Systems, the failure to comply with the terms of the retirement plans, and the violations of state law and federal tax laws.

69. During the Plaintiff's meeting with the Auditors on July 30, 2013, Plaintiff also agreed to provide the Auditors with all of the corrective policies and procedures that she had designed, drafted and attempted to implement in early 2013 concerning the administration of the Retirement Systems, but which were blocked from being presented to the full Commission. On August 1, 2013, Defendant Halpin asked for copies of the policies and procedures before she would allow the Plaintiff to provide them to the Auditors.

70. It became common knowledge at the Comptroller and the Commission that Plaintiff made disclosures to the Auditors.

**ix. <u>Coercive Efforts to Manipulate MEB to Disregard Terms of SERS and Violate State Law and Federal Tax Laws</u>**

71. After months of the Plaintiff opposing the improper efforts to circumvent the terms of SERS and committing gross violations of state law and federal tax laws by refusing to allow the

MEB to conduct twenty-four (24) month reviews, the Commission and Comptroller relented and allowed two (2) meetings to be scheduled for twenty-four (24) month reviews with the MEB – on September 27, 2013 and October 11, 2013. However, because Plaintiff had refused to make the false statements and misrepresentations as instructed, Plaintiff was not permitted to attend those meetings and ordered not to have any further contact with the MEB, despite repeated requests for guidance from the MEB.

72. On September 27, 2013, a group of retirees were reviewed by the MEB according to the proper twenty-four (24) month disability retirement "any occupation" Standard. A significant number of retirees were determined not to be disabled by the MEB. Those determinations should have gone to the full Commission at its next scheduled meeting to approve the cessation of improperly paid benefits. However, Defendant Yelmini, along with Comptroller Lembo and Deputy Comptroller Carlson, blocked the MEB determinations from being presented to the full Commission for approval. Those retirees continued to improperly receive disability retirement and healthcare benefits despite the MEB's medical determination that they were not totally disabled for any suitable and comparable position.

73. In response to the high number of retirees who the MEB determined were not disabled (and improperly receiving disability retirement benefits), and pressure from Union leaders, Defendant Yelmini and Comptroller Lembo instructed Deputy Comptroller Carlson to threaten and coerce Division staff to secretly instruct the MEB doctors to apply the incorrect "own occupation" Standard at the next twenty-four (24) month review meeting scheduled for October 11, 2013.

74. On October 7, 2013, the Plaintiff disclosed to Assistant Comptroller Braswell that Division staff were visibly upset as the result of a meeting that took place on October 2, 2013 with

Defendant Halpin, Deputy Comptroller Carlson, and the Division investigator and supervisor of the Disability Retirement Unit, to discuss disability retirement and the twenty-four (24) month Standard, from which the Plaintiff was excluded. Deputy Comptroller Carlson reportedly instructed the Division staff that they were no longer permitted to seek legal advice and guidance from the Plaintiff concerning the administration of disability retirement and were not permitted to discuss the instructions they were given during the meeting with the Plaintiff, which instructions were contrary to the terms of the retirement plan and violated state law and federal tax laws.

75. The Plaintiff further disclosed to Assistant Comptroller Braswell that at that October 2, 2013 meeting, Deputy Comptroller Carlson reportedly gave the staff the following instructions: (i) not to write down anything that she said and not to take notes at the meeting – in fact Carlson told one staff member that if she wrote anything down she would "have to shoot her;" (ii) to verbally tell the doctors on the MEB during the next scheduled MEB meeting to use an incorrect "own occupation" disability retirement Standard for twenty-four (24) month disability retirement reviews and not the "any occupation" Standard that was required in accordance with the terms of SERS, as codified in the Connecticut disability statute and stated in the approved corrective procedures designed and drafted by the Plaintiff; (iii) that Defendant Yelmini and the Unions wanted the Standard to be applied that way; and (iv) Comptroller Lembo would decide whether healthcare benefits were eliminated for members who were determined by the MEB not to be permanently disabled.

76. In response to Plaintiff's disclosures, Assistant Comptroller Braswell admitted that Comptroller Lembo was aware of the meeting and that Deputy Comptroller Carlson would not be pleased that staff reported the details of the meeting to the Plaintiff. Braswell made the statement

that Carlson "usually goes after the weak ones," and indicated that the Division staff would likely be subjected to retaliatory treatment from Carlson.

77. On October 8, 2013, the Division investigator was threatened and berated by Deputy Comptroller Carlson for reporting the substance of the October 2, 2013 meeting to the Plaintiff and warned not to tell the Plaintiff anything further relating to disability retirement. The investigator reported that, as she walked away from her exchange with Carlson, her name was called and when she turned around, Carlson put her hand to her mouth and made a zipper motion.

78. On October 8, 2013, the Division investigator and supervisor of the Disability Retirement Unit were summoned to a meeting with Defendant Halpin and questioned about the substance of their conversation with the Plaintiff regarding the October 2, 2013 meeting.

79. Deputy Comptroller Carlson and Comptroller Lembo reportedly conspired with Defendant Yelmini about steps that could be taken to threaten and coerce Plaintiff to change her position and support the incorrect "own occupation" disability retirement Standard in advance of the MEB meeting scheduled for October 11, 2013

80. On October 11, 2013, the second MEB meeting was held for twenty-four (24) month reviews. At that meeting, the MEB applied the correct "any occupation" Standard and again determined that a significant number of retirees receiving disability retirement benefits were not disabled. Following the meeting, Defendant Halpin admitted that she had neglected to mail out notice letters to the retirees. So, those retirees would have to go back before the MEB. The meeting was never rescheduled and all twenty-four (24) month reviews and investigations were put back on hold.

81. On October 30, 2013, Deputy Comptroller Carlson and Comptroller Lembo reportedly told staff that all SERS twenty-four (24) month reviews and completed investigations

would not be going forward to the MEB as is required under the terms of the retirement plan and state law, and that Defendant Yelmini would soon provide something in writing to tell Lembo how the Unions wanted the Standard to be applied. As a consequence of this directive, hundreds of retirees who had never been reviewed at twenty-four (24) months, completed investigations that reflected strong indicators of disability retirement fraud, and thousands of twenty-four (24) month reviews that had been completed improperly were not brought to the MEB for review.

**x. 2012 East Haven Disability Retirement Fraud Complaint**

82. On February 16, 2012, the Division received a complaint from an employee with the town of East Haven alleging disability retirement fraud on the part of over forty (40) East Haven retirees who were receiving CMERS disability retirement benefits but were gainfully employed, some with the same municipality and others with participating municipalities, the state and in private employment. Under the correct Standard, most, if not all, of those retirees were not entitled to receive disability retirement benefits. In response to that complaint, former Division counsel began an informal investigation into a select group of those retirees.

83. Deputy Comptroller Carlson and Comptroller Lembo were upset that former Division Counsel had initiated the investigation. In April 2012, former Division counsel was stripped of several of her duties and removed from the CMERS Unit, excluded from all meetings dealing with CMERS disability retirement and investigations and was no longer permitted to provide guidance to the Division investigator.

84. In May and June of 2012, during "working group" meetings with Defendant Halpin, Deputy Comptroller Carlson, and others, the Division investigator was initially instructed to "leave it alone" with respect to certain politically connected individuals in the complaint who were identified as "friends" of Carlson and later ordered to put the entire investigation on "hold."

85. On January 10, 2014, Plaintiff learned of the complaint and opposed its continued concealment and the purposeful efforts to allow certain politically connected retirees to continue receiving retirement benefits that he/she were not entitled to under the terms of the retirement plan.

86. Initially, Defendant Halpin stated that she had no knowledge of the East Haven complaint, the investigation or any of the "working group" meetings. However, after Plaintiff produced the complaint, Halpin admitted that she was involved but claimed that her "head had not been right for the past several years." When Plaintiff attempted to provide Defendant Halpin with the supporting documentation, including the Division investigator's notes, she refused to look at the documents and abruptly left the Plaintiff's office.

87. Once the Division investigator had completed the renewed investigation of the complaint with guidance from the Plaintiff showing a significant number of retirees improperly receiving retirement benefits, including the "friends" of Deputy Comptroller Carlson, the Investigator was told that Plaintiff was no longer to provide guidance to the investigator and that she had to re-do the investigation. The Investigator was instructed to bring any questions, including legal questions, to Defendant Halpin. Eventually, the investigation was halted again.

### xi. Plaintiff's Objection to Defendant Yelmini's Special List

88. In October 2013, Plaintiff communicated her objections to Defendant Halpin and Assistant Comptroller Braswell relating to instructions that Defendant Yelmini had given to Division staff to provide favorable treatment for a "special list" of employees that would be transferred from one retirement plan, the Alternate Retirement Program, to SERS, as part of which contributions would be refunded. Plaintiff objected because the favorable treatment for Defendant Yelmini's "special list" of employees violated the terms of retirement plans, as well as state law and federal tax laws, and could subject the plan to possible disqualification. Plaintiff's disclosures

and objections were then shared with Defendant Yelmini, as well as with Deputy Comptroller Carlson and Comptroller Lembo.

89. In January 2014, in connection with a planned submission to the IRS that was responsive to an earlier IRS audit, Plaintiff advocated to Defendant Halpin that it was necessary to accurately disclose information regarding the "special list" transfers in connection with filing the retirement plan application for a letter of determination and the need to correct those operational failures through the IRS's voluntary correction program.

90. Defendant Halpin became angry and combative and warned Plaintiff not to further disclose those transfers to outside counsel for the third party administrator of the retirement plan at a meeting that had been scheduled to discuss the IRS letter of determination. Plaintiff told Halpin that she would not withhold information and make false statements concerning the "special list" transfers, and resisted Halpin's threats not to disclose those transfers as submitting the retirement plan without correcting and reporting certain operational failures could subject the plan to possible disqualification.

91. Despite the threats from Defendant Halpin, Plaintiff disclosed the retirement plan failures to outside counsel and the Comptroller's assistant director of Healthcare Policy & Benefits, who agreed that such retirement plan failures needed to be disclosed to the IRS. Defendant Halpin had knowledge of Plaintiff's disclosure to the assistant director, and was present when Plaintiff disclosed to outside counsel.

### xii. Ice Miller–Plan Qualification and Voluntary Correction Program

92. From January 2012 through September of 2013, the Comptroller and Commission were utilizing the services of Ice Miller, a national law firm recognized for its government pension plan expertise, with respect to tax issues relating to the administration of the Retirement Systems.

Specifically, Ice Miller was retained to "provide legal advice and services to the State of Connecticut, State Employees Retirement Commission and the Office of the State Comptroller concerning tax, qualification and IRC Section 415 compliance matter with regard to the State Employees Retirement System."

93. While SERS is treated as a "qualified" retirement plan and the State takes advantage of the federal tax benefits of such a plan, qualification is dependent on following the terms of the plan and compliance with state law and federal tax laws. Ice Miller attorneys shared many of Plaintiff's concerns regarding the Commission's and Comptroller's non-compliance and risk of disqualification, which could result in significant costs to the State and taxpayers, including interest and penalties in the millions of dollars.

94. Ice Miller advised making a voluntary correction filing to correct SERS plan failures through the IRS's voluntary correction program, along with a letter of determination application to the IRS. A favorable IRS determination letter would provide assurance that the retirement plan was qualified under IRC 401(a).

95. In April and May of 2013, Plaintiff reported to Defendant Halpin and Assistant Comptroller Braswell that Ice Miller was becoming increasingly concerned about IRS qualification of SERS and the potential legal and financial consequences of a failure to correct the retirement plan failures, which would significantly impact the State and its taxpayers. Plaintiff also reported Ice Miller's concerns that Defendant Yelmini was purposefully withholding critical information that Ice Miller needed to properly submit the SERS plan document to the IRS and correct plan failures.

96. On June 12, 2013, Plaintiff disclosed to Commission Trustees Charles Casella, Michael Carey, Robert Coffey and Laila Mandour that in conjunction with her work with Ice

Miller, the Plaintiff continued to identify many instances of the improper administration of the Retirement Systems that would require implementation of corrective measures and disclosure to the IRS, including ignoring the provisions of the retirement plans and violating state law and federal tax laws, which was putting the qualification of the plans in jeopardy.

97. On June 17, 2013, the Plaintiff disclosed to Assistant Comptroller Braswell concerns expressed by Ice Miller about potential SEC violations, including securities fraud, related to bond offerings and improper and misleading disclosures concerning the Retirement Systems.

98. In August of 2013, Defendant Yelmini and the Comptroller prohibited Plaintiff from continuing to work with Ice Miller. Plaintiff had previously worked with Ice Miller regarding Internal Revenue Code limitation, plan qualification, and tax issues relating to SERS, including identifying compliance failures and violations with the administration of the retirement plan, and submitting corrections under the IRS's voluntary correction program to address all plan failures and violations in order to obtain a determination letter from the IRS.

99. On September 6, 2013, Ice Miller threatened to resign unless the Comptroller and Commission would agree to follow its recommendations with respect to SERS and in conjunction with those recommendations permit its attorneys to continue to "work directly and immediately with the Division to fully describe each [retirement plan] failure and confirm implementation of all recommended actions to correct each failure."

100. Ice Miller subsequently resigned in September of 2013.

101. On March 20, 2014, concerned after learning of Ice Miller's resignation six (6) months earlier and citing to the "significant exposure to our State and its assets," the State Treasurer, Denise Nappier, wrote a letter to Commission Trustee Peter R. Blum, which was copied to Comptroller Lembo, Attorney General George Jepsen, Secretary, Office of Policy and

Management, Benjamin Barnes, and the Auditors, in which she echoed Plaintiff's concerns regarding the legal and financial risks to the State due to the Defendants' failure to follow Ice Miller's recommendation, including "(i) incurring additional costs for excess payments; (ii) potential penalties arising from non-compliance, and (iii) audit or IRS intervention due to lack of resolution." The Treasurer's letter agreed with the Plaintiff that the State was being exposed to "(i) unnecessary cost; (ii) the possibility of IRS fines and penalties and (iii) potential risk of our tax-exempt status."

**xiii. <u>Whistleblower Complaint and Further Disclosure to Auditors</u>**

102. On December 26, 2013, Plaintiff filed a whistleblower complaint in accordance with Connecticut's Whistleblower Statute, Conn. Gen. Stat. § 4-61dd, which was supplemented on January 29, 2014, in which Plaintiff disclosed corruption; unethical practices; violation of state laws and federal tax laws; mismanagement; gross waste of funds and abuse of authority on the part of the Commission and Comptroller in the administration of the provisions of the Retirement Systems.

103. Plaintiff also made additional disclosures to the Auditors on January 16, 2014 and January 26, 2014 regarding the improper administration of the Retirement Systems.

104. On January 28, 2014, Plaintiff met with the Auditors in her office. Plaintiff's meeting with the Auditors in her office was reported on by Mary Lynch, an administrative assistant working in the Retirement Services Division of the Comptroller, who was reportedly instructed to monitor Plaintiff's activities. Specifically, reporting to Defendant Halpin that "when you were in your conference call - The Auditors came and spoke with V. for approx. 10 mon [sic]."

105. Defendants received a copy of Plaintiff's whistleblower complaint in early 2014.

106. On March 13, 2014, several Comptroller staff members asked Plaintiff whether she filed a whistleblower complaint with the Auditors. Outside of Plaintiff's presence, other staff members were told that the Plaintiff filed such a whistleblower complaint.

107. In May of 2014, the Commission made a written inquiry with the Auditors as to whether Plaintiff filed a whistleblower complaint.

108. The Auditors began its review/investigation of the disclosures and objections contained in the Plaintiff's whistleblower complaint in January of 2014, which included numerous interviews with Division staff and the collection of a significant number of internal and external documents from the Comptroller and Commission.

**xiv. <u>Auditors Letter to Governor</u>**

109. On June 17, 2015, the Auditors sent a letter to Governor Malloy validating many of the complaints that Plaintiff had brought to their attention. The Auditors concluded that the issues "constitute a potential breakdown in the safekeeping of SERS resources," which triggered a reporting obligation under Section 2-90 of the Connecticut General Statutes. Among the Auditors' concerns were that: (a) The division stopped the statutory twenty-four month reviews to determine continued entitlement of disability retirees and did not apply the most recent Medical Examining Board's decisions regarding continued entitlement. These actions could have resulted in millions of dollars of payments to retirees who were no longer entitled to a disability retirement.; and (b) The division failed to follow through completely on the results of investigations by its former legal investigator, which may have resulted in significant amounts paid to retirees who were no longer eligible to receive disability retirement benefits.

**F. <u>Defendants Repeatedly Retaliated Against Plaintiff for Her Protected Activity</u>**

110. Over an extended period of time, Defendants systematically retaliated against Plaintiff for her aforementioned constitutionally protected speech, in various ways, including, but not limited to, eliminating her core job duties, isolating her from colleagues and staff, issuing negative service ratings that contained disparaging statements, issuing a disciplinary letter of counseling that was replete with false and baseless accusations, subjecting Plaintiff to unjust monitoring and eventually eliminating the Plaintiff's position.

111. Defendant Yelmini, who was not only a Commission trustee and a member of the Commission's Legal and Personnel Subcommittee, but also the Director of the Office of Labor Relations for the State of Connecticut, used her influence to advocate for, and cause, the elimination of a significant portion of Plaintiff's core job duties.

112. Defendant Halpin repeatedly threatened the Plaintiff's continued employment, including, but not limited to:

a. On February 14, 2013, in referring to the continued improper administration of the Retirement Systems, Defendant Halpin told Plaintiff that "this is how it works in politics," and asked Plaintiff "can you do this - seriously, can you do this?" Plaintiff replied that she could do her job but would not allow Deputy Comptroller Carlson to coerce her into concealing the improper administration of the Retirement Systems or make serious misrepresentations, false statements or omissions to the Commission.

b. Defendant Halpin told the Plaintiff that Division employees who complain about Division practices and do not "play [her] way" will "not play at all," and proceeded to then exclude Plaintiff from a number of meetings dealing with the administration of the Retirement Systems, including meetings that addressed legal issues related to Plaintiff's core job duties in which she had previously been included, including, but not limited to meetings held on February 26, 2013, March 11, 2013 and March 19, 2013.

c. On March 6, 2013, in front of the Plaintiff, Defendant Halpin and Assistant Comptroller Braswell discussed the whistleblower complaint that the former Division Counsel had filed against the Comptroller before leaving the Division in 2012. Braswell and Halpin discussed the former Division

Counsel and her actions in front of the Plaintiff and stated that Comptroller Lembo made a mistake by not firing the former Division counsel before she filed the whistleblower complaint and that Lembo wanted to fire her.

d. On March 20, 2013, before giving the Plaintiff her six (6) month service rating that would end her working test period, Defendant Halpin repeatedly asked the Plaintiff whether she wanted to keep her job.

113. On March 20, 2013, Plaintiff's job description was changed and most references to the Commission were removed from the Plaintiff's core job duties as had been directed by Defendant Yelmini.

114. In August of 2013, Defendant Yelmini and the Comptroller prohibited Plaintiff from working any further with Ice Miller. In September 2013, Defendant Yelmini and the Comptroller prohibited Plaintiff from working any further with the MEB.

115. Plaintiff was also subjected to verbal abuse and hostility. On September 27, 2013, Plaintiff was summoned to a disciplinary meeting with Defendant Halpin, who was threatening, combative, hostile and yelled at the Plaintiff throughout the meeting. At one point, Halpin suddenly and without warning leaned across the table and repeatedly banged her open hands on the table directly in front of Plaintiff in a physically threatening manner as she was yelling. Feeling very threatened, Plaintiff told Halpin that she was not comfortable continuing with the meeting unless a representative was present. Halpin immediately stopped yelling and sat upright. Plaintiff asked her if she wanted to continue the meeting. Halpin said "no." Plaintiff said "then this meeting is over," and stood up and went to open the door. Halpin quickly came up from behind the Plaintiff in a physically threatening manner, and as the Plaintiff walked through the door Halpin made a verbally threatening and derogatory comment to her in front of staff members.

116. On October 7, 2013, Defendant Halpin came into the Plaintiff's office and acknowledged her retaliatory actions during the September 27, 2013 meeting. Halpin made

admissions that she "did not know what came over" her and that she "has never before in [her] life acted in such a way." Halpin then stated that she was not sure "who [she] was at the meeting" and that her behavior was unacceptable. She stated that she was "ashamed" of her behavior. Her admissions were overheard by a Division staff member.

117. Plaintiff was also issued unfavorable performance evaluations and negative comments were included in documents that were placed in the Comptroller's supervisory file. On October 21, 2013, Defendant Halpin delivered Plaintiff's annual service rating, which was not favorable, contained several disparaging comments and was lower than the Plaintiff's previous rating. The rating falsely stated that the Plaintiff had on "several occasions circumvented the chain of command and made inappropriate comments about legal matters." The review also stated that the Plaintiff should bring "forward her opinions to immediate supervisor and accept decisions made by management."

118. Defendants excluded Plaintiff from countless meetings/discussions, and systematically stripped her of job responsibilities involving subjects that were within the scope of her job description, and in which she was involved before her protected activity, including, but not limited to: (a) SERS federal tax compliance, qualification and voluntary correction program; (b) federal and state re-employment limitations; (c) IRC Section 415(b) calculations errors and compliance violations; (d) disability retirement, including the East Haven disability fraud complaint, disability retirement fraud investigations and twenty-four (24) month disability retirement reviews; (e) overpayments and offsets; (f) review of stipulated agreements; (g) review of current case law impacting the administration of the Retirement Systems.

119. Defendants also systematically removed Plaintiff's job duties with respect to those areas about which she complained and isolated her from Commission members to prevent the

Plaintiff from further disclosing Defendants' corruption, including on February 25, 2014, when -- despite previously attending the Commission's Regulations and Overpayment Subcommittee meetings and working with Commission members on designing, drafting and implementing corrective overpayment policies and procedures to ensure proper collection of improper overpayments made to retirees -- Plaintiff was no longer permitted to have any involvement with that Subcommittee.

120. Defendant Halpin repeatedly made false statements and baseless and unsupported accusations against the Plaintiff by accusing her of "circumventing the chain of command," when Plaintiff responded to any request for her assistance from Division staff or attempted to follow-up on any matter in which she had previously been involved. Plaintiff was instructed that she was no longer permitted to speak directly to any assistant directors or follow-up on any matters concerning the administration of the Retirement Systems, in which she was previously involved.

121. Comptroller Lembo also reportedly told a local attorney that Plaintiff was a "thorn in his side" and that he wanted to "fire her but could not." Comptroller Lembo also stated that he was not able to do what he wanted with disability retirement because of Plaintiff's documented corrective policies and procedures that she refused to change.

122. Defendants also acted deliberately to isolate Plaintiff from other employees, going so far as to give explicit instructions to a number of employees that they were not permitted to communicate with Plaintiff about certain subjects concerning the administration of the Retirement Systems and reprimanding certain staff members who needed legal counsel, including, but not limited to:

a. On April 9, 2014, the Division investigator and Investigations and Recovery Unit supervisor were reprimanded by Defendant Halpin for seeking Plaintiff's legal guidance regarding the 2012 East Haven disability retirement fraud complaint. The investigator and her supervisor were instructed to go to Halpin (who is not a lawyer)

with any legal questions and told that they were no longer permitted to seek Plaintiff's legal advice or guidance on any future investigations.

b. On April 15, 2014, a Division staff member from the Municipal Employees Retirement Unit was reprimanded by Defendant Halpin for alerting the Plaintiff to an issue related to disability retirement involving a recent notable political figure whose disability retirement was stopped.

c. On June 11, 2014, a Division staff member from the Disability Retirement Unit was recorded being in Plaintiff's office and later called into a meeting and questioned by his supervisors about the substance of their conversation and cautioned to limit any future absences from his work station.

d. On October 22, 2014, a Division staff member from the Investigations and Recovery Unit was recorded being in Plaintiff's office during a designated break period and later questioned directly by Defendant Halpin about the substance of their conversation.

e. In October of 2014, a staff member in a different Division with the Comptroller was warned by a supervisor not to have any further contact with Plaintiff, and it was implied that his continued employment would be jeopardized if he did have any further contact.

123. Non-attorney staff members complained that they were being forced to make legal decisions and recommendations without the guidance of an attorney.

124. Defendants' removal of Plaintiff's job duties and isolation of Plaintiff was so extreme that the Plaintiff informed her supervisor on numerous occasions that she was without meaningful work to do, and requested that work be assigned to her so that she could be productive. Despite those requests, the Defendants continued to systematically eliminate additional core job duties and limit her involvement with any aspect of the administration of the Retirement Systems.

125. On July 30, 2014, Plaintiff was subjected to further unwarranted discipline when she received a disciplinary "letter of counseling" that was delivered by e-mail. The letter of counseling contained false statements and baseless and unsupported accusations. The letter threatened "disciplinary action up to and including dismissal." While the Plaintiff wrote an

objection and rebuttal letter to dispute the false statements, she was given no meaningful opportunity to defend herself against the baseless and unsupported accusations.

126. Plaintiff was subjected to further retaliation when she received another unfavorable performance evaluation and making negative comments in documents that were placed in Plaintiff's personnel file. On September 29, 2014, Plaintiff received her annual service rating from Defendant Halpin and a human resource specialist with the Comptroller. The rating contained several disparaging comments. The service rating lowered Plaintiff's rating in all categories from her March 2013 rating and referenced the false statements and baseless accusations made in the disciplinary "letter of counseling."

127. Plaintiff's position was further eroded when the Attorney General's Office was informed that Plaintiff was no longer permitted to provide assistance on legal issues concerning the administration of the Retirement Systems despite repeated requests for such assistance and the fact that the Plaintiff had previously been permitted to provide such assistance.

128. By November of 2014, following months of continued and pervasive retaliation against the Plaintiff for engaging in protected activity, Plaintiff was no longer permitted to provide any legal advice or guidance on any of the many issues concerning the administration of the Retirement Systems, forbidden from attending meetings or discussing any of the many on-going Division related projects with staff in which her involvement was permitted prior to engaging in protected activity; threatened with dismissal if she engaged in follow-up of any issues in which she had previously been involved and was being unjustly monitored by the Defendants.

129. On November 4, 2014, Election Day, Plaintiff was notified that her position was being eliminated. Plaintiff's termination letter was copied to the Office of Labor Relations, of

which Defendant Yelmini was the Director, in addition to the State of Connecticut Department of Administrative Services, and Human Resources.

130. In December of 2014, following the elimination of her position, Plaintiff was forced to transfer to another State agency. In connection with the transfer to the new State agency, it was reported to Plaintiff by someone in Human Resources that the decision came from someone "very high up" at the State of Connecticut.

131. Plaintiff lost her years of credited service. Consequently, Plaintiff's ability to advance to higher levels of compensation under collective bargaining agreements and her future retirement benefits are adversely impacted. For instance, on September 21, 2015, Plaintiff should have advanced from "staff attorney II" to "staff attorney III," which would have increased her compensation and subsequent annual increases. However, because her position was eliminated and she was transferred to another state agency, she will not advance to staff "attorney III" until after she completes 3 years of service with the new agency. This loss of service will also impact Plaintiff's future retirement benefits.

132. Plaintiff's reputation was damaged by negative statements made to supervisors at the other Agency to which Plaintiff transferred, prior to her transfer.

133. The Plaintiff's reputation was further damaged by the negative service rating, disparaging false statements and baseless accusations and reference to the "letter of counseling" contained in her personnel file that was transferred to the other State agency without the Plaintiff's objection and rebuttal to those false statement and baseless accusations.

**COUNT ONE:** **VIOLATION OF CONNECTICUT GENERAL STATUTES SECTION 31-51q (as against State of Connecticut)**

134. Based on the foregoing, Defendant State of Connecticut disciplined, discharged, or otherwise discriminated against the Plaintiff because of her protected activity in violation of Conn. Gen. Stat. § 31-51q.

135. Plaintiff spoke as a citizen on matters of public concern, and said speech was protected under the provisions of Conn. Gen. Stat. § 31-51q, including Sections 3, 4, or 14 of Article First of the Connecticut Constitution. Plaintiff's speech also addressed matters relating to official dishonesty, deliberately unconstitutional actions, and/or other serious wrongdoing.

136. Defendant State of Connecticut was aware of Plaintiff's constitutionally protected speech, and retaliated against Plaintiff because of that speech.

137. Defendant's actions have caused Plaintiff to suffer damages, including, but not limited to, lost compensation, wages and benefits, damage to reputation, emotional and physical distress, as well as loss of enjoyment of life.

138. Plaintiff has also incurred, and will continue to incur, attorneys' fees and costs.

139. Defendant exhibited a reckless disregard for Plaintiff's rights, thereby entitling Plaintiff to an award of punitive damages.

**COUNT TWO:** **RETALIATION BASED ON THE EXERCISE OF FREE SPEECH IN VIOLATION OF 42 U.S.C. § 1983 (as against Linda Yelmini and Brenda Halpin)**

140. Based on the foregoing, Defendants Yelmini and Halpin also retaliated against Plaintiff in violation of 42 U.S.C. § 1983 and the First Amendment.

141. Plaintiff engaged in speech protected by the First Amendment to the United States Constitution when she reported corruption and illegal activity to the Auditors, and when she

refused directives to make false statements to the Commission, and others, in situations when Plaintiff was required to be truthful and candid, as alleged above.

142. Plaintiff spoke as a citizen on matters of public concern, and Defendants had knowledge of Plaintiff's constitutionally protected speech.

143. As alleged above, Defendant Halpin, acting under color of State law, retaliated against Plaintiff in various ways, including, but not limited to, eliminating her core job duties, isolating her from colleagues and staff, issuing negative service ratings that contained disparaging statements, issuing a disciplinary letter of counseling that was replete with false and baseless accusations, subjecting Plaintiff to unjust monitoring, and eventually eliminating the Plaintiff's position.

144. As alleged above, Defendant Yelmini, acting under color of State law, retaliated against Plaintiff in various ways either alone, or in conjunction with others, including, but not limited to, eliminating her core job duties, isolating her from colleagues and staff, and eventually eliminating Plaintiff's position. Defendant Yelmini's conduct violated Plaintiff's civil rights guaranteed by the First Amendment to the U.S. Constitution.

145. Defendants' conduct violated Plaintiff's civil rights guaranteed by the First Amendment to the United States Constitution as enforced through 42 U.S.C. § 1983. As a consequence of Defendants' intentional retaliation against Plaintiff, Plaintiff has sustained damages, including, but not limited to, lost compensation, wages and benefits, emotional and physical distress, damage to reputation, and loss of enjoyment of life.

146. Plaintiff has also incurred, and will continue to incur, attorney's fees and litigation costs.

147. In addition, Defendants' reckless indifference to Plaintiff's federally protected rights entitles Plaintiff to an award of punitive damages.

**DEMAND FOR RELIEF**

Plaintiff hereby demands Judgment against Defendants, a Trial by Jury, and other relief, including, but not limited to the following:

1. Compensatory and economic damages, including, but not limited to, lost compensation, wages and benefits, emotional and physical distress, damage to reputation, and loss of enjoyment.

2. Attorney's fees and costs.

3. Statutory and common law punitive damages.

4. Interest.

5. Equitable Relief, including, but not limited to, the removal of all false and negative statements from Plaintiff's personnel file and public documents maintained by Defendants.

6. Other relief that in law or equity may pertain.

PLAINTIFF,
VIRGINIA BROWN

By: *<u>/s/Todd Steigman</u>*______________

Todd D. Steigman (ct26875)
Madsen, Prestley & Parenteau, LLC
402 Asylum Street, Hartford, CT 06103
Tel: (860) 246-2466; Fax: (860) 246-1794
tsteigman@mppjustice.com

**<u>CERTIFICATION OF SERVICE</u>**

I hereby certify that on this 15th day of January 2016, a copy of the foregoing was filed electronically [and served by mail on anyone unable to accept electronic filing]. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system [or by mail to anyone unable to accept electronic filing]. Parties may access this filing through the Court's system.

*/s/ Todd Steigman*