**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

VIRGINIA BROWN,
      Plaintiff,

      v.

OFFICE OF STATE COMPTROLLER, et
al.,
      Defendants.

No. 3:15-cv-880 (SRU)

## RULING ON MOTIONS TO DISMISS

Virginia Brown filed this action in Connecticut Superior Court, Judicial District of

Hartford, against the Office of the State Comptroller, individuals within the Comptroller's

Office, the State Employees Retirement Commission ("SERC"), and individual members of

SERC. The defendants removed the case to this court on June 9, 2015. In her initial complaint,

Brown alleged that she was retaliated against on account of speech protected by the First

Amendment and Connecticut Constitution. On December 10, 2015, I held a hearing on the

defendants' motions to dismiss and dismissed the action. I permitted Brown to file an amended

complaint, which she filed on January 15, 2016. In the Amended Complaint, Brown focuses her

allegations against only two individuals, Brenda Halpin and Linda Yelmini, and the State of

Connecticut. On February 12, 2016, Yelmini filed a motion to dismiss. On February 29, 2016,

the State and Halpin followed with their respective motions to dismiss. For the reasons that

follow, Yelmini's motion to dismiss (doc. # 97) is granted, and the joint motion to dismiss

brought by Halpin and the State of Connecticut (doc. # 98) is denied.

I.      **Standard of Review**

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is designed "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (quotation marks omitted). Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely." *Id.* at 556 (quotation marks omitted).

## II.     Background[1]

Beginning on September 21, 2012, Virginia Brown was employed by the State of Connecticut as a "Staff Attorney II."  Her duty was to provide legal services to the Comptroller's Retirement Services Division ("Division") and the State Employees Retirement Commission ("SERC").  At all relevant times, Brown was supervised by Brenda Halpin, the director of the Division.

Beginning in October 2012, Brown discovered that the State Employees Retirement System ("SERS") was not being administered in accordance with its written terms.  Brown believed that the improper administration was in violation of state and federal law, and reported the alleged misconduct to her supervisors.  Brown also prepared legal memoranda that identified the mismanagement of SERS and disclosed the possibility that such mismanagement was in violation of state and federal law.  Upon seeing her memoranda, Deputy Comptroller Martha Carlson instructed Brown to alter her memoranda in a manner that would, inter alia, replace certain accurate factual statements with false statements in an attempt to conceal the Comptroller's practice of awarding benefits to retirees, including certain politically connected employees, who were not entitled to the benefits.  Subsequently, other members of the Division, including Halpin, instructed Brown to alter her legal memoranda, and Brown refused each of their requests.  Brown also alleges that Yelmini, a SERC trustee, instructed her to alter her legal memoranda.

Finding that her superiors were not receptive to her grievances, Brown reported the alleged misconduct to the State of Connecticut Office of the Auditors of Public Accounts (the "Auditors").  Brown made substantially the same disclosures to the Auditors that she had made

---

[1] The following facts are drawn from the Amended Complaint (doc. # 86) and are taken as true for the purposes of the motions to dismiss.

to Comptroller employees.  In December 2013, Brown took the additional step of filing a whistleblower complaint in accordance with Conn. Gen. Stat. § 4–61dd, in which she disclosed corruption, unethical practices, and violations of state and federal law.

Brown alleges that both Halpin and Yemini were aware of Brown's repeated efforts to disclose what she believed to be the improper administration of the State retirement system. Further, Brown alleges that Haplin and Yelmini both participated in, and were aware of others' attempts to force Brown to alter her legal memoranda in a false and misleading manner.

Subsequent to her reports to the Auditors and refusals to alter her legal memoranda, Brown alleges that she was retaliated against by both Halpin and Yelmini.  Brown contends that Halpin and Yelmini both took action to eliminate her core job duties and isolate her from her colleagues and staff, and were responsible for the issuance of negative service ratings, including a letter of counseling.  In November 2014, Brown was notified that her position was being eliminated and she was given the option to transfer to another State agency.  She accepted the opportunity to transfer and then filed the instant action, which was removed to this court on June 9, 2015.

On December 10, 2015, I held a motion hearing and ruled from the bench, dismissing all of Brown's federal and state claims against five individual defendants, the Comptroller's Office, and SERC.  In permitting Brown to amend her complaint, I instructed her to clarify her allegations regarding which portion of her speech was protected and which defendant did what action that constitutes a violation of her federal and/or state law rights.  In her Amended Complaint, filed on January 15, 2016, Brown brings both federal (42 U.S.C. § 1983) and state law (Conn. Gen. Stat. § 31–51q) claims against the State of Connecticut, Halpin, and Yelmini.

4

Brown alleges that she was retaliated against for engaging in speech that was protected by either the First Amendment or the Connecticut Constitution.

Though Brown's complaint is still lengthy and vague at times, she has narrowed her claims and provided more detail to her allegations. Brown's allegations remain centered around the manner in which the Division and SERC were applying the law governing Connecticut state disability and retirement benefits. Brown complains that she engaged in two types of protected speech: (1) she reported the alleged misconduct to the Auditors; and (2) she refused to alter her legal memoranda in a manner that would cause her to make false statements and issue knowingly false and erroneous legal memoranda.

The major difference between Brown's initial complaint and the amended version is that the Amended Complaint makes clear that she is alleging intentional unlawful conduct rather than a mere disagreement with her supervisors over the correct application of a legal standard. Am. Compl. at ¶¶ 31, 36, 37, 39, 58. Rather than alleging that there was a dispute over the correct application of the legal standard, Brown now contends that the defendants "ordered Plaintiff to make materially false factual statements . . . ," Am. Compl. at ¶ 58, and "instructed Plaintiff to change the documents she prepared in ways that would have (a) concealed facts reflecting the improper administration, and (b) replaced certain accurate factual statements contained in the documents with false statements . . . ," Am. Compl. at ¶ 36.

Similarly, Brown clarifies that her reports to the Auditors included reports of violations of state and federal law. Am. Compl. at ¶ 64. She alleges that reporting to the Auditors was not part of her ordinary job duties and that, in fact, she had never communicated with the Auditors prior to her first disclosure of the alleged wrongful conduct on July 30, 2013. After that date,

Brown continued to disclose alleged "corruption; unethical practices; [and] violation of state laws and federal tax laws" to the Auditors.  Am. Compl. at ¶ 102.

Defendants move to dismiss the First Amendment claim, brought against the Halpin and Yelmini, on largely the same grounds.  First, defendants argue that any of Brown's alleged complaints to the Auditors were made pursuant to her official duties and thus are unprotected under *Garcetti v. Ceballos*, 547 U.S. 410 (2006).  Second, defendants dispute Brown's allegation that she was forced to make "materially false statements."  Defendants argue that the dispute at issue related to the interpretation of a legal standard that, as a matter of law, could not be either factually false or true, per se.  If Brown's interpretation could not be factually true or false, any request for her to alter her interpretation could not be held to be a forced false statement.  Accordingly, her refusal to alter her legal interpretations would not be protected by the First Amendment.  Third, defendants contend that, even if Brown's speech was protected by the First Amendment, the law at issue is not clearly established and thus they are protected under the doctrine of qualified immunity.

Recognizing that state law does not insulate an employer from liability to an employee who speaks pursuant to his or her official duties, the State of Connecticut moves to dismiss the state law claim on the grounds that Brown's speech was not a comment on "official dishonesty" or "serious wrongdoing," and thus is not protected by the State Constitution.  Furthermore, even if it were protected, the State of Connecticut argues that it did not violate section 31–51q because its action did not constitute "discipline or discharge," and thus does not rise to the level of actionable conduct under state law.

### III.     Discussion

The claims against Yelmini and Halpin are brought under 42 U.S.C. § 1983 ("section 1983") based on alleged violations of the First Amendment.  The claim against the State of Connecticut is based on an alleged violation of the Conn. Gen. Stat. § 31–51q, which requires a predicate violation of the First Amendment or the Connecticut Constitution.  First, I consider whether Brown engaged in speech protected by the First Amendment.  Second, I will determine whether the individual defendants can be held liable for the alleged First Amendment violation.  Finally, regardless of whether Brown's speech was protected by the First Amendment, I determine the State's potential liability under section 31–51q.

### A.   Section 1983 claims against Yelmini and Halpin

A defendant will be liable under section 1983 if the defendant took adverse action against a plaintiff on account of the plaintiff's speech that is protected by the First Amendment.  Adverse action is "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights."  *Zelnik v. FIT*, 464 F.3d 217, 225 (2d Cir. 2006).  Under section 1983, the standard for adverse action is relatively low and is less demanding than the standard for Title VII actions.  *Id.*; *Oliphant v. Connecticut Dep't of Transp.*, 2006 WL 3020890, at *9 (D. Conn. Oct. 23, 2006); s*ee also O'Neill v. City of Bridgeport Police Dept.*, 719 F. Supp. 2d 219, 229 (D. Conn. 2010) (temporary assignment to less desirable shift, denial of requests for reassignment, and examples of petty harassment and discipline sufficient to deny summary judgment).  Adverse action may include "negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods . . . [or] transfer from library to classroom teaching as an alleged demotion . . . ."  *Id.* at 226.  An allegation of "significantly diminished material responsibilities" is the type of employment

action that is "sufficiently disadvantageous to constitute an adverse employment action" under Title VII, *see Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (citing *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)), and therefore it meets the standard for retaliation under section 1983. *See Zelnik*, 464 F.3d at 225; *Oliphant*, 2006 WL 3020890, at *9.

Brown alleges that, as a result of her speech, defendants removed "virtually all" of her job responsibilities and have isolated her as punishment for speaking out. Am. Compl. at ¶ 124. Defendants do not raise any argument that the alleged retaliatory action taken against Brown is insufficient to amount to an adverse action under section 1983. Accordingly, the only question is whether Brown's speech was protected by the First Amendment.

It is well established that the government, as an employer, has substantial ability to control the words and actions of its employees. *Jackler v. Byrne*, 658 F.3d 225, 234 (2d Cir. 2011). The Court has held that government employers "need a significant degree of control over their employees' words and actions" in order to maintain "the proper performance of governmental functions." *Garcetti*, 547 U.S. at 418. Nevertheless, a government employee retains his or her First Amendment right to speak out, as a citizen, against the government. *Jackler*, 658 F.3d at 234. "So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Id.* at 235 (emphasis omitted).

The Court in *Jackler* emphasized the difference between an employee's affirmative speech and the employee's refusal to be compelled into delivering certain statements. *Id.* at 241. In *Jackler*, the employee was asked "to retract his truthful statements and make statements that were false." *Id.* The Court held that the employee's "refusals to accede to those demands

constituted speech activity that was significantly different from the mere filing of [a complaint]." *Id.* Thus, it is necessary to separate Brown's alleged complaints to the Auditors and her alleged refusal to be compelled into making false statements.

### 1.   Complaints to the Auditors

A public employee receives the full protections under the First Amendment if she speaks as a citizen on a matter of public concern.[2]  *See Garcetti*, 547 U.S. at 410.  The Court in *Garcetti* placed significant limits on when an employee can be considered to be speaking "as a citizen." *Id.*  The Court held that, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens" and thus are not protected by the First Amendment.  *Id.* at 421.[3]  In analyzing whether an employee's affirmative speech is spoken as a citizen or an employee, the Second Circuit has focused on two questions:  "(A) did the speech fall outside of the employee's official responsibilities, and (B) does a civilian analogue exist?" *Matthews v. City of New York*, 779 F.3d 167, 173 (2d Cir. 2015) (*Matthews I*) (internal quotation marks and citations omitted).

### a.   Official Duties

The Court in *Ross* outlined the factual inquiry required to determine whether a public employee is speaking pursuant to her official duties:

---

[2] Speech is considered "on a matter of public concern" if it relates to "any matter of political, social, or other concern to the community."  *Jackler*, 658 F.3d at 236.  The parties do not dispute that Brown's speech was on a matter of public concern.

[3] Brown argues that the Supreme Court's recent decision in *Lane v. Franks*, 134 S. Ct. 2369 (2014), rejected a broad interpretation of *Garcetti*'s "official duties" standard.  *See Hagan v. City of New York*, 39 F. Supp. 3d 481, 510 (S.D.N.Y. 2014).  *Lane*'s use of the phrase "ordinary responsibilities" arguably reduces the amount of speech that is left unprotected by *Garcetti* by affording First Amendment protection any time an employee speaks outside her *ordinary* responsibilities.  *Id.*  That interpretation of *Lane* is too broad.  The Court in *Lane* did not retreat from *Garcetti*'s "official duties" standard, but rather clarified that an employee does not lose First Amendment protection simply by virtue of the fact that he or she spoke about the nature of his official duties.  *Id.* at 2379 ("The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.").

> The inquiry into whether a public employee is speaking pursuant to her official duties is not susceptible to a brightline rule.  Courts must examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two.  Other contextual factors, such as whether the complaint was also conveyed to the public, may properly influence a court's decision.

*Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012) (internal citations omitted).  Whether an employee spoke as an employee or as a citizen is generally a question of law for the court.  *Cf. O'Connor v. Huntington U.F.S.D.*, 2014 WL 1233038, at *7 (E.D.N.Y. Mar. 25, 2014).  However, that question of law is highly fact-dependent and is often not ripe for resolution until summary judgment.  *Cf. id.*

When evaluating the nature of the plaintiff's job responsibilities, the court is not confined to an analysis of the employee's job description.  *See Garcetti*, 547 U.S. at 424 (rejecting "the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions").  The relevant inquiry is a "practical one."  *Id.*  Speech may be considered pursuant to an employee's official duties even if it is technically outside the scope of her job description.  *Id.* at 425; *see also Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York*, 593 F.3d 196, 203 (2d Cir. 2010).  Moreover, an employee may be considered to be speaking as a citizen even though the speech is to a supervisor, relates to her employment, and was spoken in the workplace.  *See Ross*, 693 F.3d at 307.  Indeed, courts have noted the importance of permitting employees to speak about information gained through the course of their employment.  *See Griffin v. City of New York*, 880 F. Supp. 2d 384, 400 (E.D.N.Y. 2012) ("The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it.") (internal quotation marks and citations omitted).  The unique nature of their positions as public employees enables them to have access to information that other citizens do not have.  *See id.*

It is important not to focus too much on the form of the communication or to whom the communication was directed. *Matthews v. Lynch*, 2011 WL 1363783, at \*4–5 (D. Conn. Apr. 11, 2011), *aff'd*, 483 F. App'x 624 (2d Cir. 2012) (*Matthews II*). Though a report to an agency outside of the chain of command may be evidence that the report was made outside of one's official duties, *see Griffin*, 880 F. Supp. 2d at 399, the fact of reporting outside one's chain of command does not always merit protection, *see Anemone v. Metropolitan Transp. Authority*, 629 F.3d 97, 116 (2d Cir. 2011) (report by MTA's Director of Security to the Queens District Attorney, someone outside of Director's chain of command and housed in entirely different agency, held to be not protected). The court must analyze the substance of the speech and ask whether the employee was speaking because he was in an official position that required him to do so. *Looney v. Black*, 702 F.3d 701, 712–13 (2d Cir. 2012).

The Court in *Weintraub* perhaps sets the clearest distinction between speech spoken pursuant to one's official duties and that spoken as a citizen. *See Weintraub*, 593 F.3d at 203. In *Weintraub*, the Court held that a teacher's union grievance regarding the school's decision not to discipline a student was unprotected by the First Amendment because the complaint "was a means to fulfill and undertaken in the course of performing his primary responsibility of teaching." *Id.* The teacher's core job responsibilities included maintaining classroom discipline and the grievance was filed in order to further the teacher's desire to ensure proper discipline. *Id.* The fact that the teacher was not required, pursuant to her official job duties, to file a grievance does not mean that the speech was automatically protected. Rather, the speech remained unprotected because it was made in order to further her responsibilities. *Id.* The Court recognized that any action taken for the purpose of furthering one's job responsibilities must be seen as action taken as an employee, not a citizen. *Id.*

11

The Court contrasted the teacher's filing of a grievance related to classroom discipline with another teacher who was protected by the First Amendment when she "internally aired her grievances regarding the placement of black people working in the cafeteria," which she complained operated to reinforce racial stereotypes. *Id.* The teacher in that case was protected, notwithstanding the fact that her complaint was aired internally, because her complaint about the enforcement of racial stereotypes was not sufficiently related to her core responsibilities as an English teacher. *Id.*; *see also Matthews I*, 779 F.3d at 175 (police officer did not speak as employee when he voiced concerns about a broad policy issue—racial quotas—because, though he had a duty to identify individual violations of the law, his speech was merely "expressing an opinion on a policy which he believed [could lead to violations of the law]").

Though certain factors can suggest that someone is acting pursuant to his employment responsibilities, the ultimate inquiry is whether the employee is speaking in order to further his goal as an employee or as a citizen. *See Weintraub*, 593 F.3d at 203. Unfortunately, due to inherently factual nature of the inquiry, such an inquiry is often premature at the motion to dismiss stage. *See Hagan v. City of New York*, 39 F. Supp. 3d 481, 513 (S.D.N.Y. 2014). Prior to summary judgment, courts are often unable to determine whether an employee's speech is pursuant to her "official duties." *Compare Jackler*, 658 F.3d 225, *Griffin*, 880 F. Supp. 2d 384, *and Hagan*, 39 F. Supp. 3d 481(cases holding that it was improper to dismiss the complaint at such an early stage in the litigation), *with Anemone*, 629 F.3d at 115–16, *Ross*, 693 F.3d 300, *and Weintraub*, 593 F.3d 196 (cases that ultimately held that there was no First Amendment protection, but did so at summary judgment stage).

b.   Civilian Analogue

Although it is not clear that a comparable civilian analogue is a prerequisite to First Amendment protection under *Garcetti*, the Second Circuit has held that the existence or absence of a civilian analogue is often determinative.  *See Matthews I*, 779 F.3d at 176.  In *Weintraub*, the Court held that an employee's filing of a union grievance was not protected because such action was "not a form or channel of discourse available to non-employee citizens."  *Weintraub*, 593 F.3d at 204.  After *Weintraub*, the availability of a civilian analogue was seen as relevant to, but not dispositive of, whether an employee spoke as a citizen.  *See Ross*, 693 F.3d at 307 ("Speech to a supervisor even in the workplace can be protected as that of a private citizen if it is not made pursuant to the employee's official duties as an employee."); *Matthews II*, 2011 WL 1363783, at *4 ("The chief focus was not whether the avenue was open to all—citizens and employees—but rather on why the plaintiff utilized that avenue.").  However, the recent decision in *Matthews I* makes it clear that the existence of a civilian analogue is typically a prerequisite to a holding that the employee was speaking as a citizen.  *Matthews I*, 779 F.3d at 176.

The existence of a civilian analogue is satisfied so long as the employee "chose a path that was available to ordinary citizens."  *Matthews I*, 779 F.3d at 176.  The fact that the employee might have better access to that path than would an ordinary citizen does not weigh against the finding of a civilian analogue.  *Id.*  No doubt, a public employee often can speak to public officials "more readily, more frequently, and more privately than could an average citizen."  *Id.* (internal quotations and citations omitted).  The relevant inquiry is not the "degree of access" that an employee has to the relevant public official, but rather "whether the same or a similar channel exists for the ordinary citizen."  *Id.*  As long as the employee pursues an avenue that an ordinary citizen could when complaining to a governmental actor or entity, the employee's actions will be deemed to have the requisite civilian analogue.

In *Matthews I*, the Court held that a police officer's complaint to the Precinct commander had a civilian analogue because ordinary citizens had similar access to raise their grievances over police department policy with the commander.  *Matthews I*, 779 F.3d at 176.  The fact that Matthews might have had better access to the Precinct commander, though it might weigh in the analysis of whether his speech was pursuant to his official duties, was not relevant to the finding of an existing civilian analogue.  *Id.*

### c.   Complaints to the Auditors

Brown alleges that she first contacted the Auditors to voice her concerns about the administration of the state retirement system on July 30, 2013.  Am. Compl. at ¶ 64.  According to the Amended Complaint, Brown informed the Auditors about what she believed to be violations of state and federal law arising out of the improper administration of the state retirement fund.  *Id.*  Subsequent to her July 2013 statements, Brown made additional disclosures to the Auditors, and filed a whistleblower complaint on December 26, 2013, which was supplemented on January 29, 2014.  Am. Compl. at ¶ 102.  She alleges that she disclosed corruption, unethical practices, and violation of state laws and federal tax laws.  *Id.*  Further, she alleged that none of those reports was made pursuant to her official duties because it was not part of her official duties to report to the Auditors.  Am. Compl. at ¶ 65; *see also* Am. Compl. at ¶ 22 (list of Brown's self-described official duties).

Defendants argue that Brown's complaints are not protected because they all were made pursuant to her official duties as a compliance attorney for the Division.  Defendants contend that her duty to provide legal services regarding compliance with state law amounts to an admission that it was her responsibility to report noncompliance of such laws to the Auditors.  Furthermore, defendants assert that Brown's initial contact with the Auditors was pursuant to an audit that the

Auditors initiated and in which it was Brown's duty to participate. If that is the case, defendants may be correct in arguing that her complaints to the Auditors are unprotected.

Brown's responsibilities vis-à-vis the Auditors, however, remain unclear. In her complaint, she admits that it was her duty to provide legal services to the Division and SERC. A portion of those legal services related to advising those agencies concerning their compliance with state and federal law. Am. Compl. at ¶ 22. Brown does not, however, admit that she is under an employment obligation to report misconduct to the Auditors. Am. Compl. at ¶ 65 ("It was not part of Plaintiff's ordinary job duties to disclose improper administration of the Retirement Systems, or violations of state law, or federal tax laws, to the Auditors."). It is possible, for example, that Brown is only under a duty to advise the Division, and it is the responsibility of other members of the Division to report misconduct to the Auditors. If that is the case, Brown's decision to report the alleged misconduct to the Auditors was a decision she made as a citizen, not an employee.

Brown's argument that she was speaking as a citizen is supported by the fact that ordinary citizens may similarly report public misconduct to the Auditors. *See* Conn. Gen. Stat. § 4–61dd (conferring right to file reports with Auditors on "any person"). The existence of a civilian analogue to Brown's conduct strengthens her allegations that her speech was as a citizen and thus protected by the First Amendment. *See Matthews I*, 779 F.3d at 176.

The instant case is not similar to other cases of its type that were dismissed at the motion to dismiss stage. In many of those cases, the plaintiff-employee had made an admission that the alleged speech was made, at least in part, pursuant to his or her official duties. *See Matthews v. Lynch,* 483 F. App'x 624, 626 (2d Cir. 2012) (*Matthews III*) (holding that speech was pursuant to official duties because plaintiff "conceded at oral argument that, as an Internal Affairs officer, he

had a broad responsibility to investigate and report police misconduct"); *Anemone*, 629 F.3d at 116. Here, there is no such admission.[4] Thus, I cannot say at this early stage whether or not the reports to the Auditors were made pursuant to her official duties. *See Hagan*, 39 F. Supp. 3d at 513.

Assuming that Brown's reports to the Auditors were outside the scope of her official duties, I need not balance Brown's interest in making the speech and the defendants' interest in regulating it, *see Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968), because the defendants have failed to argue that they had a strong interest in regulating Brown's conduct. Accordingly, though they may raise it at a later stage in the litigation, they are presently foreclosed from arguing that they had such an interest in regulating Brown's speech.

Finally, I am not persuaded by the argument that Brown admitted she was speaking pursuant to her official duties when she stated that she was ethically bound as an attorney, under the Rules of Professional Conduct, to report the alleged misconduct. That argument has been raised and rejected in *Flora v. Cty. of Luzerne*, 776 F.3d 169, 180 (3d Cir. 2015), where the Court held that *Garcetti*'s conception of "official duties" included only duties arising out of plaintiff's employment. *Id.* In *Flora*, the Court held that the Chief Public Defender did not speak pursuant to his official duties even though he admitted that his obligations as an "officer of the court" compelled him to make the statements at issue. *Id.* The Court distinguished between plaintiff's official duties as an employee of the State and his unrelated duties as an attorney. *Id.* Speech made pursuant to an attorney's obligation as an attorney under the Rules of Professional Conduct does not, alone, transform that speech into speech made pursuant to his official employment duties.

---

[4] Defendants argue that Brown made an admission in court filings in a state-law action. *See* Def.'s Mem. in Support of Mot. Dismiss at 4 (doc. # 99-1). However, the so-called admissions do not amount to an admission that the specific reports she alleges were made pursuant to her job responsibilities. *See id.*

In sum, Brown has adequately alleged that she spoke on matters of public concern and her speech was made outside of her official duties. Accordingly, for the purposes of the motion to dismiss, Brown has established that her speech was protected by the First Amendment.

2. *Refusal to be Compelled to Make False Statements*

The Second Circuit has been quick to identify the difference between an employee's affirmative speech—typically in the form of a complaint—and an employee's refusal to be compelled to speak in a certain manner. *Ross*, 693 F.3d at 307–08 (holding that a refusal to make false statements that no misconduct occurred is a "very different circumstance[]" than an affirmative statement of misconduct); *see also Jackler*, 658 F.3d at 238. Both *Jackler* and *Ross* identified the issue of compelled speech as an outlier among the typical First Amendment claims that are brought by public employees. *Jackler*, 658 F.3d at 238; *Ross*, 693 F.3d at 307–08. Accordingly, the refusal to make false statements must be treated differently.

As a preliminary matter, "in the context of protected speech," there is no difference between "compelled speech and compelled silence." *Jackler*, 658 F.3d at 238. The First Amendment protects both the "right to speak freely and the right to refrain from speaking at all." *Id.* Such a right includes the "right to reject government efforts to require [the employee] to make statements he believes are false." *Id.* at 241. No entity has the "authority to require a witness to retract his true statements and make statements that are false." *Id.* at 240. Accordingly, making compelled false statements—which often are prohibited by law—can never be part of a public employee's official duties, and thus the refusal to make false statements is protected by the First Amendment. *See id.* at 241.

In *Jackler*, a probationary police officer was terminated because he refused to make false statements in a report related to another officer's alleged use of excessive force against an

17

arrestee. *Id.* at 229.  The Court held that the officer had a First Amendment right to refuse to alter his report as requested by his commanding officer, notwithstanding the fact that the report was made pursuant to his official duties. *Id.* at 240.  In explaining the difference between an affirmative statement and a refusal to speak dishonestly, the Court highlighted the fact that a refusal to speak dishonestly could never be part of his job responsibilities. *Id.* at 241–42. Furthermore, the Court pointed out that an employee who accedes to such demands might subject himself to criminal liability. *Id.* at 240.  Surely, an employer does not have a protectable interest in forcing its employees to commit a crime.  Accordingly, the Court held that a public employee has a First Amendment right "to refuse to retract a report he believes is true, to refuse to make a statement that he believes is false, and to refuse to engage in unlawful conduct" under the guise of his job responsibilities. *Id.* at 241.

Brown makes numerous references to instances in which she was directed to alter her legal memoranda in connection with the administration of the state disability and retirement systems.  Am. Compl. at ¶¶ 36, 37, 39–40, 58.  In those allegations, she alleges that she was directed to make false statements and replace accurate information with inaccurate information. Brown alleges that she refused to alter her memoranda because doing so would have resulted in her providing false statements, in potential violation of state and federal law.  Brown alleges that she was subsequently retaliated against through threats, the reduction of her job responsibilities, and her ultimate forced transfer to another state agency.

The First Amendment protects Brown's right to refuse to be compelled into misrepresenting facts and protects Brown's right to be free from compelled silence.  When Brown's superiors attempted to force her to alter her legal memoranda in a manner that she believed involved misrepresentation, they acted outside the scope of discretion afforded to public

employers.  Compelled false statements cannot be part of a public employee's official duties.

Moreover, as a citizen, Brown had a legal duty to avoid making false statements to a public

body.[5]  Thus, when Brown refused to alter her legal memoranda, she was speaking as a citizen

and not a public employee.  The First Amendment protects Brown's right to speak as a citizen

and thus prohibits the defendants from taking adverse employment action against her on account

of her speech.

       In support of their motions to dismiss, the defendants argue that they cannot be held

liable for attempting to force Brown to alter her legal memoranda because Brown, as an attorney,

had an obligation to comply with her client's requests.  The defendants cite to case law

indicating that government attorneys occupy a special place in the eyes of the First Amendment

and thus can be fired with impunity based on their refusal to sign onto certain legal opinions.

*See Hommel v. City of Long Beach*, 2014 WL 1010654, at *5 (E.D.N.Y. Mar. 14, 2014)

(discussing *Branti* exception to the First Amendment).  In *Branti*, the Court held that government

attorneys who occupy positions inherently demanding in political loyalty may be fired based on

speech, such as opposing certain governmental policies, which would otherwise be protected by

the First Amendment.  *Branti v. Finkel*, 445 U.S. 507, 518 (1980).

       Though the *Branti* exception to First Amendment protection is well-established, it is not

applicable to this case.  Brown is not alleging that she was fired because she took a different

political position than her employer.  Rather, Brown is alleging that she was fired because she

---

[5] Yelmini cites to *Chatel v. Carney*, 2012 WL 1439051, at *6 (D.N.H. Apr. 26, 2012), for the proposition that an employee can be fired for refusing to alter reports in a manner that the employee believes is false or misleading.  In *Chatel*, the Court held that there was no civilian analogue to the plaintiff's speech because such speech "concerned the preparation of case reports and forwarding the reports to the county attorney's office."  *Id.*  The Court attempted to distinguish its facts from *Jackler* by holding that there was no civilian analogue to the refusal to prepare case reports in an untruthful manner.  *Id.*  I disagree with that conclusion and hold that *Jackler*'s interpretation of a civilian analogue is not so narrow.  "A citizen has a First Amendment right . . . to reject governmental efforts to require him to make statements he believes are false."  *Jackler*, 658 F.3d at 241.  An employee who refuses to accede to a governmental demand to make false statements to a public body is no different from a private citizen who refuses to do the same.  *See id.* at 241–42.

was voicing concerns over and refused to be complicit in alleged government misconduct.  There is no *Branti* exception to that conduct.  Moreover, it is not clear that Brown occupied a position that required political loyalty.

Taking the allegations of the Amended Complaint as true—that the defendants retaliated against Brown when she refused to comply with requests to alter her legal memoranda in a way that all parties knew would be materially false and/or misleading—Brown's refusal to alter her legal memoranda is protected by the First Amendment.  Such a holding does not open the door to government attorneys suing their employers over policy disagreements.  In the Amended Complaint, Brown alleges that the defendants *knew* that they were misstating the law.  Misstating the law or surrounding facts involves more than a mere policy dispute.  To the extent that Brown can prove that the defendants took adverse action because Brown refused to misrepresent the law or applicable facts, Brown has alleged a valid claim under section 1983.

### B.  Claims against Individual Defendants (Section 1983)

For the purposes of the motion to dismiss, Halpin does not contest her ability to be held individually liable for retaliating against Brown.  Halpin was Brown's immediate supervisor at the Division and had the ability to take adverse employment actions against her.  On the other hand, Yelmini contends that she was never in a position to take adverse employment actions against Brown because she was neither an employer nor supervising employee within the Division.  As a result, Yelmini contends that she cannot be held individually liable under section 1983.

Both Yelmini and Halpin contend that, regardless of their respective positions of authority over Brown, they should not be held liable for retaliation against Brown because Brown has not adequately alleged that she engaged in protected speech.  Furthermore, even if

Brown did engage in protected speech, Yelmini and Halpin contend that they are entitled to qualified immunity for any actions they took as a result of such speech.

1. *Claims against Halpin*

a. Violation of Brown's Rights

Having concluded that Brown's speech was protected, it is necessary to evaluate whether Brown has adequately alleged that Halpin took adverse action against Brown on account of that speech. First, Brown alleged that Halpin "had knowledge of Deputy Comptroller Carlson's directions to [Brown], as well as [Brown's] refusal to comply with those directives." Am. Compl. at ¶ 44. Brown also alleged that Halpin herself had "ordered [Brown] to make materially false factual statements to [outside counsel] to conceal [misconduct that was] in violation of the terms of the retirement plans, state laws, and federal tax laws." *Id.* at ¶ 58. Though many allegations of retaliation are not specific to Halpin, *see, e.g.*, Am. Compl. at ¶¶ 113, 118, 124, it is apparent elsewhere in the Amended Complaint that Brown alleges Halpin to have participated in the retaliatory actions. Am. Compl. at ¶¶ 112, 115, 117. Accordingly, Brown has sufficiently alleged that Halpin violated her First Amendment rights.

b. Qualified Immunity

Having concluded that there are sufficient allegations that Halpin violated Brown's First Amendment rights, I must next determine whether Halpin is entitled to qualified immunity. The doctrine of qualified immunity enables governmental officials who perform discretionary functions to be shielded from liability for civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The defendant bears the burden

of establishing that he or she is entitled to qualified immunity. *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (citing *Vincent v. Yelich,* 718 F.3d 157, 166 (2d Cir. 2013)).

A defendant seeking to dismiss a complaint under Rule 12(b)(6) on the basis of a qualified immunity defense "will generally face a difficult road." *Garcia*, 779 F.3d at 97.  It is often the case that a court will be unable to rule on a qualified immunity defense until discovery has been completed or the factual issues have been resolved at trial. *See, e.g.*, *Southerland v. City of New York*, 680 F.3d 127, 161 (2d Cir. 2012).  Nevertheless, it is proper—and desirable—to resolve the issue of qualified immunity at the motion to dismiss stage when it can be established by relying solely on the facts alleged in the complaint. *Garcia*, 779 F.3d at 97. "Because qualified immunity is an immunity from suit rather than a mere defense to liability it is effectively lost if a case is erroneously permitted to go to trial." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal citations, alterations omitted).

Courts typically frame the qualified immunity analysis by requiring the defendant to establish one of two conditions: that "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Garcia*, 779 F.3d at 92 (quoting *Russo v. City of Bridgeport,* 479 F.3d 196, 211 (2d Cir. 2007)).

A right is considered "clearly established" when "the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Southerland*, 680 F.3d at 141.  The Second Circuit has also held that a defendant may be shielded by qualified immunity notwithstanding the fact that a right is clearly established, so long as the defendant can show that it was "objectively reasonable" for the defendant to believe, at the time of the alleged action, that his or her actions were lawful. *Id.*  In that circumstance, a defendant is

entitled to qualified immunity "if officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context." *Id.*

### i.  Clearly Established

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Taylor*, 135 S. Ct. 2042, 2044 (2015) (quoting *Reichle*, 132 S. Ct. at 2093); *see also McGowan v. United States*, 825 F.3d 118, 124 (2d Cir. 2016) ("For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.").  The right must be evaluated in the context of Supreme Court and Second Circuit precedent "as it existed at the time of the challenged conduct." *McGowan*, 825 F.3d at 124 (quoting *Garcia*, 779 F.3d at 92).  That said, "the absence of a decision by [the Second Circuit] or the Supreme Court directly addressing the right at issue will not preclude a finding that the law was clearly established so long as preexisting law clearly foreshadows a particular ruling on the issue." *Id.* (quoting *Garcia*, 779 F.3d at 92 (internal quotation marks, alterations, and citations omitted)).  Though there need not be a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Taylor*, 135 S. Ct. at 2044 (internal quotation marks and citations omitted).

### ii.  Objectively Reasonable Employer

Even if a court determines that a right is clearly established, qualified immunity will protect a government official "if it was objectively reasonable for the official to believe that his acts did not violate those rights." *Tellier v. Fields*, 280 F.3d 69, 84 (2d Cir. 2000) (quoting *Russell v. Coughlin,* 910 F.2d 75, 78 (2d Cir. 1990)) (alterations omitted).  The inquiry is "not whether the [official] *should have* acted as he did . . . [i]t is instead whether *any* reasonable

[official], out of the wide range of reasonable people . . . *could have* determined that the challenged action was lawful." *Figueroa*, 825 F.3d at 100.

To determine whether it was objectively reasonable for an employer to believe that his or her actions did not violate the plaintiff's First Amendment rights, the court must ask—"not what a lawyer would learn or intuit from researching case law"—but what a "reasonable person" in the defendant's position would have known about the constitutionality of his or her conduct. *McCullough v. Wyandanch Union Free Sch.*, 187 F.3d 272, 278 (2d Cir. 1999). "When properly applied, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Taylor*, 135 S. Ct. at 2044.

### iii. Reports to the Auditors

Halpin argues that she is entitled to qualified immunity for taking adverse action against Brown because of her reports to the Auditors. Brown alleges that she first reported violations of state and federal law to the Auditors in July 2013, and subsequently made additional disclosures in January 2014. Am. Compl. at ¶¶ 64, 103. Though she alleges that she was subject to pervasive retaliation beginning in 2013, the last alleged retaliatory act was in December 2014, when she was "forced to transfer to another State agency." At that time, the clearest statement of First Amendment law in the public employee context was set forth in *Garcetti v. Ceballos*. After *Garcetti*, all reasonable officials were put on notice that a public employee's speech on a matter of public concern would be protected so long as the speech was made as a citizen and not pursuant to the employee's official duties. *See Garcetti*, 547 U.S. at 421.

In 2012, still prior to the alleged retaliatory actions, the Second Circuit held that "the inquiry into whether a public employee is speaking pursuant to her official duties is not susceptible to a bright line rule." *Ross*, 693 F.3d at 306. In *Ross*, the Court held that an

employee may be considered to be speaking as a citizen even though the speech was made to a supervisor, relates to her employment, and was spoken in the workplace. *See Ross*, 693 F.3d at 307. Thus, under clearly established Second Circuit precedent, an employer was on notice that he or she could not fire an employee simply because the alleged speech was related to the employee's employment and spoken in the workplace. *See id.*

The fact that *Garcetti*'s "official duties" standard is difficult to apply does not prevent the underlying right from being clearly established. The difficulty in applying *Garcetti* relates to the factual inquiry regarding what types of speech will be found to be "pursuant to official responsibilities." *See Weintraub*, 593 F.3d 196; *Matthews I*, 779 F.3d at 176. That difficulty is not present at the motion to dismiss stage, where I must take as true the allegations that Brown was not speaking pursuant to her official duties. *Cf. Garcia*, 779 F.3d at 97; *see also Carollo v. Boria*, --- F.3d ----, 2016 WL 4375009, at *9 (11th Cir. Aug. 17, 2016).

At the time of Brown's reports to the Auditors, the law was clearly established that an employer could not retaliate against an employee who speaks as a citizen on a matter of public concern. Furthermore, it was clear that an employee who spoke outside of her official duties would be considered to be speaking as a citizen. No reasonable employer in Halpin's shoes would have believed that she would be permitted to take adverse action against Brown for statements made to the Auditors that were made outside Brown's official duties. Though discovery will show whether Brown's statements were made within the scope or outside of her official duties, at this point I must take the allegations of the Amended Complaint as true. Accordingly, at the current stage of the litigation, Halpin is not entitled to qualified immunity for taking adverse action against Brown because of her complaints to the Auditors.

iv. <u>Refusal to Make False Statements</u>

Halpin is similarly not entitled to qualified immunity for taking adverse action against Brown on account of Brown's unwillingness to alter her legal memoranda to include false statements of fact and law.  Prior to Halpin's conduct, the Second Circuit had made it clear that an employee has a First Amendment right "to refuse to retract a report he believes is true, to refuse to make a statement that he believes is false, and to refuse to engage in unlawful conduct" under the guise of the employee's job responsibilities.  *Jackler*, 658 F.3d at 241.  Accordingly, at least after *Jackler* was decided on July 22, 2011, public employers were on notice that they did not have the discretion to punish their employees for a refusal to make false statements.  After *Jackler*, it was clearly established that a public employee could not be punished for refusal to make a statement on a matter of public concern that the employee believed was false.  *See id.*

In an attempt to cast doubt on whether the right as set forth in *Jackler* is clearly established, the defendants cite to *Chatel v. Carney*, 2012 WL 1439051, at *6 (D.N.H. Apr. 26, 2012).  In *Chatel*, the Court held that a public employee's refusal to alter his report in a manner he believed would be misleading was not protected by the First Amendment.  *Id.*  Though the Court attempted to distinguish *Jackler* from its set of facts, it also held that it found the Second Circuit's analysis in *Jackler* "unpersuasive," and would accordingly "decline to follow it."  *Id.* n.6.  Though the Court in *Chatel* may decline to follow *Jackler*, the defendants do not have that option.  Because *Jackler* established the law in the Second Circuit, the defendants were on notice that they must adjust their conduct accordingly.

In the Amended Complaint, Brown alleges that persons within the Division and SERC attempted to force her to alter her legal memoranda in a manner that would cause her to make false and/or misleading statements.  Am. Compl. at ¶ 40.  Those attempts to force Brown into making false statements occurred after *Jackler* was decided.  Brown alleges that Halpin retaliated

against her when she refused to accede to the pressure to alter her legal memoranda.  Am.

Compl. at ¶¶ 112, 115, 117.  Halpin was on notice that she was not permitted to punish Brown

for Brown's refusal to accede to her superiors' demands.  Even if Halpin was not the one who

directed Brown to make false statements, she is alleged to be one who retaliated against Brown

for failure to make such statements.  Because *Jackler* was decided prior to Halpin's conduct, her

decision to take adverse action against Brown was not objectively reasonable based on clearly

established Second Circuit precedent.  Accordingly, taking Brown's allegations as true, Halpin is

not entitled to qualified immunity for her alleged retaliation based on Brown's refusal to alter her

legal memoranda.

> 2.  *Claims against Yelmini*

Yelmini does not concede that she was involved in the alleged adverse action against

Brown.  Rather, Yelmini points to the fact that she was neither Brown's employer nor her

supervisor and thus cannot be held liable for any alleged retaliation that occurred.

> a.  Law on Individual Responsibility

An individual defendant may not be held liable under section 1983 unless that defendant

is personally involved in the alleged deprivation of a constitutional right.  *McKinnon v.*

*Patterson*, 568 F.2d 930, 934 (2d Cir. 1977).  To establish individual liability under section

1983, a plaintiff must show that a particular defendant (a) "is a 'person' acting 'under the color

of state law,'" and (b) "caused the plaintiff to be deprived of a federal right."  *Back v. Hastings*

*on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004) (citing *Monroe v. Pape*, 365

U.S. 167 (1961)).

There is no dispute that Yelmini, to the extent she participated, acted under color of state law.  Accordingly, the only issue is whether she was personally involved in the alleged deprivation.

A plaintiff must demonstrate a "causal connection between the defendant's action and the plaintiff's injury[.]"  *Back*, 365 F.3d at 125 (quoting *Gierlinger v. Gleason*, 160 F.3d 858, 872 (2d Cir. 1998).  "Ordinary principles of causation apply to this inquiry into proximate cause."  *Id.* (internal quotation marks and alterations omitted).

A defendant will have caused plaintiff to be deprived of a federal right if the defendant (1) directly participated in the infraction; (2) as a supervisor, failed to remedy the wrong; (3) as a supervisor, created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue; or (4) as a supervisor, was grossly negligent in managing subordinates who caused the unlawful condition or event.  *See Williams v. Smith*, 781 F.2d 319 (2d Cir. 1986).  A party may directly participate in the alleged infraction even if that party was not responsible for the ultimate adverse action; the defendant will be liable so long as she "played a meaningful role in the [employment decision]."  *Back*, 365 F.3d at 125–26 (internal citations and quotation marks omitted).

Although neither the parties nor I have found a case in which the Second Circuit has explicitly addressed the issue, other circuits have held that a non-employer may be held liable for First Amendment retaliation if the plaintiff can show that the non-employer caused the adverse employment action.  *See Worrell v. Henry*, 219 F.3d 1197, 1212–13 (10th Cir. 2000) (collecting cases).  In *Worrell*, the Court held that there was sufficient evidence for a factfinder to conclude that statements and recommendations made by the non-employer defendant "caused the withdrawal of a job offer . . . ."  *Id.* at 1213.

*Worrell*'s analysis derives from the prohibition on state interference in a private at-will employment relationship. *See Helvey v. City of Maplewood*, 154 F.3d 841, 844 (8th Cir. 1998). In *Helvey*, a state official was held liable for using his "position of authority to cause [the employer] to fire [plaintiff] in retaliation for her [protected speech.]" *Id.* at 844. Similarly, a state official may be held liable for retaliating against an employee outside of her agency so long as the official used a position of authority to cause the adverse action. *Cf. Worrell*, 219 F.3d 1197; *Helvey*, 154 F.3d at 844.

That said, there must be sufficient factual allegations tying the state official to the alleged adverse employment action. *See Gagliardi v. Sullivan*, 513 F.3d 301, 307 (1st Cir. 2008). That is especially true in the context of a state official who concededly has no actual authority over the plaintiff's employment status. *See id.*; *Vahos v. Gen. Motors Corp.*, 2008 WL 2439643, at *6 (E.D.N.Y. June 16, 2008) (lack of meaningful role absolved defendant of liability).

In *Gagliardi*, the Court granted the city official's motion to dismiss because plaintiff failed to adequately allege that the official was directly responsible for the adverse action. *Gagliardi*, 513 F.3d at 307. Despite the allegations that the mayor has "fired," "terminated," or "disbanded" the Board, and thus "fired" or "terminated" its members, the Court held that dismissal was proper because it was "clear that only the governor and those acting with authority delegated by him were empowered to certify or decertify [the Board]." *Id.* Furthermore, the Court pointed to the fact that there were no plausible allegations that the governor delegated his authority to the mayor, or that the mayor otherwise "twisted the arm of [the decision-making] officials . . . to persuade them to decertify the Board." *Id.* Any allegation to the contrary was held to be "conclusory and not substantiated by reasonable inference from the well-pleaded facts." *Id.* In conclusion, the Court held that the "well-pleaded facts do not demonstrate that

either [the mayor] or any other [city] official made or directly compelled the state officials to make the [adverse employment] decision[.]" *Id.*

The context of *Gagliardi* was quite different from other cases in which the court permitted a retaliation action against a non-employer defendant. *See Martinez v. Connecticut Dep't of Corr.*, 125 F. Supp. 3d 397, 419 (D. Conn. 2015) (person within agency had de facto control over process even though he did not have de jure authority); *Geras v. Hempstead Union Free Sch. Dist.*, 149 F. Supp. 3d 300, 329 (E.D.N.Y. 2015) (evidence showed that defendant dominated the Board, which was responsible for the adverse action). In sum, the ability to hold a defendant liable under section 1983 will be determined by that defendant's level of authority over and involvement in the adverse employment action.

### b.   Allegations of Yelmini's Conduct

Yelmini argues that she cannot be held liable for violating Brown's First Amendment rights because Brown does not specifically allege that Yelmini took any adverse action against her. Yelmini also contends that she cannot be held liable because there is no allegation that she was the one who directed Brown to falsify her legal memoranda.

First and foremost, the fact that Yelmini did not actually instruct Brown to falsify her legal memoranda does not preclude her liability under section 1983. All Brown needs to allege is that Yelmini was aware of Brown's protected speech—i.e., Yelmini knew of Brown's refusal to comply with Halpin's request to falsify her legal memoranda—and took adverse action on account of that speech. Brown sufficiently alleges that Yelmini had the requisite knowledge of Brown's protected speech. *See* Am. Compl. at ¶ 44.

Yelmini's argument is stronger with respect to her contention that the well-pleaded facts fail to establish that Yelmini directly participated in the adverse action against Brown. Brown

alleges that, at all relevant times, Yelmini was a SERC trustee and the Director of the Office of Labor Relations for the State of Connecticut.  Am. Compl. at ¶ 4.  One of the functions of the Office of Labor Relations is to provide consultation and advice to state agencies regarding labor relations and employment issues.  *Id.*  Brown alleges that, as a member of SERC, Yelmini "regularly consulted with Deputy Comptroller P. Martha Carlson and routinely gave instructions regarding the administration of the Retirement Systems . . . ."  Am. Compl. at ¶ 9.  Further, Brown alleges that when Yelmini issued instructions to the Division, they "were generally followed."  *Id.*

Such allegations merely support the fact that Yelmini was involved in the administration of the retirement system and would advise on issues of labor relations and employment.  Those allegations do not support Brown's subsequent vague allegation that Yelmini "used her influence to advocate for, and cause, the elimination of a significant portion of [Brown's] core job duties."  Am. Compl. at ¶ 111.  Further, allegations that Yelmini "prohibited [Brown] from working any further with [outside counsel]," *id.* at ¶ 114, or that Yelmini retaliated against Brown by "eliminating her core job duties, isolating her from colleagues and staff, and eventually eliminating [Brown's] position," are conclusory and not plausible, given Yelmini's position as SERC trustee.

At no point in the Amended Complaint does Brown make an allegation regarding a specific direction of Yelmini to a particular individual within the Comptroller's Office, directing that individual to take adverse action against Brown.  The absence of specific factual allegations against Yelmini stands in stark contrast to the allegations against the other individual defendant, Halpin.  Am. Compl. at ¶¶ 112, 115–17.  Furthermore, there are no facts alleged that would make it plausible that Yelmini was in the position to directly compel employment decisions within the

Comptroller's Office.  At most, it is plausible that Yelmini recommended taking adverse

employment action against Brown in retaliation for her protected speech.  That is not a sufficient

allegation that Yelmini directly participated in the retaliation.  *See Gagliardi*, 513 F.3d at 307.

Accordingly, the claims against Yelmini fail.[6]

### C.  Claims against State of Connecticut

In addition to bringing claims against Yelmini and Halpin, Brown also brings a Conn.

Gen. Stat. § 31–51q claim against the State of Connecticut.  Section 31–51q of the Connecticut

General Statutes is a cause of action for violation of the right to free speech under both the

United States and Connecticut Constitutions.  It reads, in relevant part:

> Any employer . . . who subjects any employee to discipline or discharge on
> account of the exercise by such employee of rights guaranteed by the first
> amendment to the United States Constitution or section 3, 4, or 14 of article first
> of the Constitution of the state, provided such activity does not substantially or
> materially interfere with the employee's bona fide job performance or the
> working relationship between the employee and the employer, shall be liable to
> such employee . . . .

Conn. Gen. Stat. § 31–51q.  To succeed on a claim under this statute, a plaintiff must

demonstrate that:

> (1) [S]he was exercising rights protected by the First Amendment to the United
> States Constitution (or an equivalent provision of the Connecticut Constitution);
> (2)[s]he was fired [or otherwise disciplined] on account of [her] exercise of such
> rights; and (3)[her] exercise of [her] First Amendment rights did not substantially
> or materially interfere with [her] bona fide job performance or with [her] working
> relationship with [her] employer.

*Ozols v. Town of Madison*, 2012 WL 3595130, at *3 (D. Conn. Aug. 20, 2012) (internal citations

and quotations omitted).  Defendants do not contest the third element of Brown's state law claim.

---

[6] Brown seeks permission to "Supplement the Record" to include allegations of Yelmini's involvement that she did
not include in her Amended Complaint.  That motion (doc. # 124) is granted, though it has no effect on my ruling
that Brown has failed to allege Yelmini's direct involvement.  The supplemental allegations only serve to confirm
my conclusion that Yelmini, at most, served an advisory role and cannot be held responsible for the adverse actions
taken against Brown.

Accordingly, the only questions before me are whether Brown was exercising rights protected by the First Amendment or Connecticut Constitution, and whether she was "disciplined or discharged" as a result of the exercise of such rights.

1.  *Exercising rights protected by First Amendment or Connecticut Constitution*

I have already held that Brown's speech was protected by the First Amendment. Nevertheless, I also note that, even if it were not, her state law claims would survive as long as her speech was protected by the Connecticut Constitution.  *See id.* at *4.

Under the Connecticut Constitution, a public employee's speech is protected so long as the employee "speaks on a matter of unusual importance and satisfies high standards of responsibility in the way [s]he does it."  *Trusz*, 319 Conn. at 204.  Thus, even when an employee speaks pursuant to her official duties, the employee's speech will be protected so long as it is a "comment on official dishonesty, deliberately unconstitutional action, other serious wrongdoing, or threats to health and safety. . . ."  *Trusz*, 319 Conn. at 211 (quoting *Garcetti*, 547 U.S. at 435 (Souter, *J.*, dissenting)).

"Although the issue of whether speech concerns official dishonesty or serious wrongdoing is a question of law, it nonetheless requires a fact-intensive inquiry."  *Trusz v. UBS Realty*, 2016 WL 1559563, at *9 (D. Conn. Apr. 18, 2016).  Examples of official dishonesty and/or serious wrongdoing include: "when . . . a public auditor speaks on his discovery of embezzlement of public funds, when a building inspector makes an obligatory report of an attempt to bribe him, or when a law enforcement officer expressly balks at a superior's order to violate constitutional rights he is sworn to protect."  *Trusz*, 319 Conn. at 199 (quoting *Garcetti*, 547 U.S. at 433 (Souter, *J.*, dissenting)).  The fact that the alleged violation of the law is regulatory or civil, not criminal, does not prevent it from being considered a "serious

wrongdoing." *See id.* No doubt, the severity of the wrongdoing is fact-dependent and generally not subject to resolution at the motion to dismiss stage unless the alleged wrongdoing is not sufficiently serious as a matter of law.

In the instant case, Brown has specifically alleged that her reports to the Auditors and her failure to change her legal memoranda were both actions that attempted to uncover what she describes as corruption, unethical practices, and violation of state and federal tax laws. That is a sufficient allegation of official dishonesty to survive a motion to dismiss on the ground that her speech was unprotected.

### 2. *Discipline or Discharge*

Even if Brown's speech is protected as a comment on "official dishonesty" or "serious wrongdoing," the State asserts that it is not liable because it neither "discharged" nor "disciplined" Brown. If there was neither discipline nor discharge, Brown has failed to establish a section 31–51q claim.

In perhaps the most thorough examination of the terms "discipline or discharge" in the context of section 31–51q, the Connecticut Superior Court held that "the language of § 31–51q, which . . . is restrictive even by Connecticut standards, simply cannot compare with the expansive texts of these asserted federal counterparts." *Bombalicki v. Pastore*, 2000 WL 726839, at *5 (Conn. Super. Ct. May 10, 2000). Rather, under section 31–51q, the term "discipline" contemplates "an affirmative act of deprivation that diminishes the status or happiness of the recipient rather than a failure to enhance that status or happiness." *See Burdick v. Clouet*, 2011 WL 2739557, at * 7 (Conn. Sup. Ct. June 14, 2011) (citing *Bombalicki*, 2000 WL 726839, at *3).

Examples of discipline include a change in an employee's salary or fringe benefits. *See id.* (holding that "transfer was not discipline" because transfer neither altered salary nor fringe benefits). A transfer will generally not be considered discipline if it results in no "loss of rank or base pay[.]" *D'Angelo v. McGoldrick*, 1995 WL 476843, at *4. On the other hand, a transfer "to a position that is so objectively undesirable it could be considered a demotion" could qualify as discipline. *Matthews v. Dep't of Pub. Safety*, 2013 WL 3306435, at *14 (Conn. Super. Ct. May 31, 2013) (*Matthews IV*). Unlike a mere withholding of a benefit, such as a denial of tenure, a transfer is an affirmative act that, under certain circumstances, has the ability to "diminish the happiness and status of an employee." *Id.*

At oral argument, Brown conceded that in fact she was not discharged but rather offered the opportunity to transfer to another state agency—an offer which she accepted. Accordingly, Brown cannot make out a section 31–51q claim based on a claim that she was discharged.

Brown can, however, make out a section 31–51q violation if she can show she was disciplined as a result of her protected speech. The Amended Complaint makes numerous references to the fact that the defendants eliminated her job responsibilities, isolated her from her colleagues, issued a negative performance review rating, and issued her a letter of counseling. Am. Compl. at ¶¶ 122, 124–26. None of those allegations rises to the level of discipline or discharge as contemplated by the Connecticut courts. Perhaps, the closest call is the issuance of a letter of counseling. If the letter of counseling will remain in Brown's personnel file and negatively affect the terms or conditions of her employment in the future, it may constitute discipline.

Brown makes one other allegation that warrants further exploration. She alleges that her transfer to another state agency resulted in the loss of benefits and eligibility for future pay

raises.  *See* Am. Compl. at ¶¶ 130, 131.  Unlike a transfer that does not affect the plaintiff's rank, salary, or fringe benefits, a transfer that inhibits the plaintiff's ability to receive certain benefits or takes away her eligibility for future promotions and/or pay raises may very well diminish the plaintiff's state of happiness.  *See Matthews IV*, 2013 WL 3306435, at *14 (though mere denial of promotion was not discipline, affirmative act depriving plaintiff of fair chance of promotion was discipline).  In that respect, Brown's transfer could be more than the mere withholding of a promised future benefit.  Accordingly, because Brown has alleged that her transfer caused her a loss of benefits and prevented her from being eligible for a promotion, the transfer can be considered an affirmative act of "discipline" under section 31–51q.

At summary judgment, it is possible that Brown will be unable to support the claim that her transfer actually caused a loss of benefits and/or prevented her from being eligible for a promotion.  That question, however, is not before me at this time.  Brown has adequately alleged a violation of section 31–51q against the State.

## IV.    Conclusion

For the foregoing reasons, Yelmini's motion to dismiss (doc. # 97) is granted, and the joint motion to dismiss brought by Halpin and the State of Connecticut (doc. # 98) is denied.  Yelmini is terminated from the case.  Finally, though it does not affect my ruling on the motions to dismiss, Brown's motion for permission to supplement the record (doc. # 124) is granted.

So ordered.

Dated at Bridgeport, Connecticut, this 29th day of September 2016.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge