# EXHIBIT D

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **VIRGINIA BROWN,** | : | **CIVIL ACTION NO.** |
| **Plaintiff,** | : | |
| | : | **3:15cv00880 (SRU)** |
| **v.** | : | |
| | : | |
| **STATE OF CONNECTICUT, et al.,** | : | |
| **Defendants.** | : | |
| | : | **JULY 22, 2019** |

### DECLARATION OF VIRGINIA BROWN IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

1. I, Virginia Brown, am the Plaintiff in the above-captioned lawsuit. I am older than 18 years of age and I believe in the obligations of an oath.

2. I declare that the statements contained in this declaration are true and accurate to the best of my knowledge and belief.

### Background Regarding Connecticut Retirement Systems

3. The State of Connecticut's primary public employee retirement plan is the State Employees Retirement System ("SERS"), which is a defined benefit retirement plan. The cost of retirement and healthcare benefits are paid primarily by the State of Connecticut and its taxpayers.

4. The Connecticut Municipal Employees Retirement System ("CMERS") is a defined benefit retirement plan in which Connecticut municipalities may choose to participate. The cost of retirement benefits are paid primarily by the participating municipalities. Municipalities must also contribute to the administrative cost of the retirement plan.

5. Connecticut's level of unfunded pension liabilities is one of the highest in the nation, and in 2012 was ranked as the second lowest funded pension in the nation.

6.  The Retirement Systems are government pension plans that must satisfy a number of tax-qualification requirements under the Internal Revenue Code ("IRC"), e.g. benefit limits under IRC § 415; compensation limits under IRC § 401(a)(17).  Government plans must also operate in accordance with their written terms to retain their tax-qualified status so that participants receive favorable tax treatment on their benefits and contributions. Qualification under IRC § 401(a) is important to plan members, retirees and beneficiaries in order to maintain favorable federal tax advantages that would generally not apply to a non-qualified plan.

7.  There are several key federal tax advantages of maintaining "qualified" status.  First, employer contributions are not taxable under the federal law to members as they are made or when vested.  Rather, taxation only occurs when plan distributions are made.  According to reports, the State paid over $1.2 billion to SERS in 2014.  Second, earnings and income of the trust are not taxed to the trust or to the members until distribution.  According to reports, SERS had retirement investment income of over $1.4 billion in 2014.  Third, certain tax favorable treatments may be available under federal law to plan members and beneficiaries when they receive plan distributions, such as the ability to rollover eligible distributions.  According to reports, SERS paid benefits of over $1.5 billion in 2014. Lastly, employers and members do not pay employment taxes on employer contributions when contributions are made to the plan or when benefits are paid from the plan.

8.  Retaining "qualified plan" status is a critical requirement for government retirement plans. In order to preserve qualified status, a retirement plan must satisfy the IRC and Treasury Regulations in both form and operation, which means that the provisions in the plan

2

document must satisfy the requirements of the IRC and those plan provisions must be followed.

9. Government retirement plans that are not operated in accordance with their terms and run afoul of state law and federal tax laws are subject to IRS disqualification. Disqualification of the plan would result in the retirement plan's trust losing its tax-exempt status and becoming a nonexempt trust, resulting in serious adverse tax consequences to the plan and its members (employees and retirees). Substantial costs, which would include interest and penalties, would ultimately be passed on to the State and its taxpayers.

**My Background**

10. I am an attorney admitted to practice in the State of Connecticut.

11. I graduated from the University of Connecticut School of Law in 2003.

12. Following my graduation from law school, I worked at the Eaton Peabody law firm in Maine until I began working as a judicial law clerk at the Connecticut Superior Court.

13. After working as a law clerk at the Connecticut Superior Court, I was hired as a law clerk at the Connecticut Appellate Court, where I worked for approximately two years. During my appellate court clerkship, I was assigned to Judges DiPentima, Dranginis, and Lavine.

14. After completing my appellate court clerkship, I was hired as an associate attorney at Day Pitney. While at Day Pitney, I worked in wealth management, trusts and estates, tax, bankruptcy, and corporate matters.

15. I was laid off from Day Pitney and was hired as an associate attorney at Morrison Mahoney, where I focused on insurance defense litigation.

16. I was then recruited by The Hartford to join the company as an associate counsel in corporate compliance where I addressed various legal and compliance issues, including

ensuring compliance with federal rules and regulations.  While I was at The Hartford, there was a restructuring and I moved to a different position at The Hartford.

17. In September 2012, I started working for the State of Connecticut as a staff attorney 2 at the Office of the State Comptroller ("OSC").

18. Before I was offered the position as a staff attorney 2 at OSC, I was interviewed by members of the Retirement Commission's Legal and Personnel Subcommittee.

19. When I worked at OSC, my supervisor was Brenda Halpin, the Director of the Retirement Services Division at OSC.

20. After I was hired for the staff attorney 2 position at OSC, I opposed, both internally and externally, the improper administration of the Retirement Systems that included ignoring the provisions of the Retirement Systems and violations of state law and federal tax laws. Plaintiff's opposition included complaints and disclosures to the State of Connecticut Office of the Auditors of Public Accounts.

21. The improper administration of the Retirement Systems that I opposed caused substantial injury to the State of Connecticut and its taxpayers by adversely affecting the financial stability of the Retirement Systems and the State, and created additional legal and financial risks associated with potential IRS disqualification for failure to adhere to the terms of the Retirement Systems and violations of state law and federal tax laws.

**Opposition to Improper Administration of SERS Disability Retirement**

22. In accordance with SERS disability retirement provisions, as codified in the State Employees Retirement System disability statutes, Conn. Gen. Stat. §§ 5-169(a); 5-192p(b), after twenty-four (24) months, certain disability retirement benefits are continued to be paid only to those eligible retirees who are prevented by a disability from working in any

4

"suitable and comparable" position, which is commonly referred to as an "any occupation" standard. In accordance with the terms of the retirement plan, this twenty-four (24) month review is conducted by the MEB and required for each retiree receiving disability retirement benefits.

23. Beginning in October of 2012, I discovered and then complained to Brenda Halpin, Comptroller Lembo, Deputy Comptroller Carlson, and others, that SERS disability retirement was not being administered in accordance with its written terms, violating state law and federal tax laws.

24. I complained that retirees were incorrectly being allowed to continue receiving disability retirement and healthcare benefits after twenty-four (24) months based on an obviously incorrect, and much less stringent, standard of disability, which only required a demonstration that the retiree was disabled from performing his/her "own occupation," instead of "any occupation." The more permissive "own occupation" Standard is significantly easier to satisfy, and thus results in the award of disability benefits to individuals who would not otherwise be entitled to benefits under the correct "any occupation" Standard.

25. The incorrect Standard applied at the twenty-four (24) month disability retirement review had resulted in thousands of retirees who were not "totally disabled for any suitable and comparable job" according to the terms of the retirement plan and state law, improperly receiving disability retirement and healthcare benefits at a substantial cost to the retirement plan, the State of Connecticut and its taxpayers.

26. In communications that were shared with Brenda Halpin, as well as Deputy Comptroller Carlson and Comptroller Kevin Lembo, I also provided examples of active disability

5

retirement fraud investigations showing that a significant number of retirees who were receiving disability retirement and healthcare benefits were not totally disabled but were gainfully employed in suitable and comparable positions making significant salaries, resulting in a projected financial cost to the retirement plan of hundreds of millions of dollars in improperly paid disability retirement and healthcare benefits.

27. I also complained to Brenda Halpin, and Deputy Comptroller Carlson and Comptroller Lembo, that the Commission and Comptroller had been improperly extending the time period for SERS twenty-four (24) month disability retirement reviews, which only exacerbated the problem for those cases in which retirees were incorrectly receiving disability benefits. If there is no review conducted by the MEB, there is no opportunity to discontinue disability benefits in cases where the retiree is not disabled within the meaning of the retirement plan. In many cases, the extension was providing retirees an extra three (3) years of improper payments for disability retirement and healthcare benefits.

28. Following my disclosures and objections, the Commission and Comptroller put all twenty-four (24) month reviews and completed investigations on hold rather than apply the correct "any occupation" Standard. The number of SERS disability retirement retirees who were past the twenty-four (24) month review period and who were potentially receiving an improper retirement disability benefit was growing. In 2012, there were approximately 3,800 retirees receiving SERS disability retirement, and 2,400 were past the twenty-four (24) month period for review. There were significant instances of potential disability retirement fraud - retirees receiving disability retirement and healthcare benefits who are gainfully employed in suitable and comparable positions and not totally disabled. For those reasons, and others, I opposed the Commission and Comptroller continuing to put all

twenty-four (24) month reviews and disability retirement investigations on hold as a significant number of those retirees were not disabled according to the proper disability retirement Standard.

29. In response to my disclosures and objections, Brenda Halpin, Marti Carlson, and Comptroller Lembo, as well as Natalie Braswell, who was the Assistant Comptroller, General Counsel, and Ethics Liaison at the Comptroller, admitted that the SERS twenty-four (24) month disability retirement review Standard had been improperly applied and was contrary to the terms of the retirement plan and state law. Nevertheless, the erroneous application was neither disclosed to the full Commission, nor corrected.

30. Rather, all twenty-four (24) month reviews and investigations were put on hold while efforts were made to coerce me into supporting the improper administration.

**Admissions Relating to Political Considerations and Retention of Union Support**

31. Based on statements that were made to me at the time, I concluded that the Comptroller was knowingly and purposefully administering SERS disability retirement in a manner that was contrary to the law so that more Union members would receive benefits in order to retain the political support of the public employee Unions.

32. For instance, in February of 2013, Deputy Comptroller Carlson told me that she did not care that the Commission was breaching its fiduciary duty by violating the terms of the retirement plan, state and federal tax laws, and that it was "their problem" as long as the twenty-four (24) month disability Standard supported the Union's interests.

33. On February 12, 2013, Brenda Halpin reported to me that she received a forwarded e-mail from Deputy Comptroller Carlson on February 12, 2013 from a Union leader stating that the Unions put Kevin Lembo in office and they expected him to take care of their interests.

7

When she made that statement to me, Brenda Halpin pointed at her computer while we were in her office.

34. On February 12, 2013, Assistant Comptroller Braswell confided to me that she was having a tough time ethically with the decisions being made by Deputy Comptroller Carlson and Comptroller Lembo. Braswell admitted that it was improper to have the Unions deciding how to administer the disability retirement benefits, but that Comptroller Lembo needed the Union vote and could not afford to lose their support. Braswell advised me to document everything and make a "memo to the file."

35. In April of 2013, Assistant Comptroller Braswell stated to me that the "political climate" was not good for disability retirement fraud investigations and twenty-four (24) month disability retirement reviews and they would likely continue to be stalled.

36. On November 1, 2013, Brenda Halpin told me that "the Unions were very powerful in politics and made up a huge voting pool" and that "things would never change in Connecticut."

37. On March 6, 2014, Brenda Halpin told me and several Division staff members that hundreds of disability retirement fraud investigations and twenty-four (24) month disability retirement reviews, which had been put on hold since October of 2012, would not go forward until Comptroller Lembo was told by the Unions how they wanted him to apply the legal disability retirement Standard.

**I Refused to Comply with Demands that I Make False Statements in Order to Conceal, Cover-up, and Perpetuate Illegal Administration of SERS**

38. After October 2012, I prepared written materials for the full Commission explaining that the incorrect SERS disability retirement twenty-four (24) month review Standard was being applied. These documents included corrective policies and procedures, summaries, and

8

charts which contained accurate factual statements and were intended to correct the improper administration. The documents I prepared, including policies and procedures relating to disability retirement, investigations and the MEB, were to be provided to the full Commission.

39. However, Deputy Comptroller Carlson made it clear to me that none of the materials I prepared would be provided to the full Commission unless I changed the documents so that they supported the incorrect "own occupation" twenty-four (24) month disability retirement review Standard.

40. Carlson instructed me to change the documents I prepared in ways that would have (a) concealed facts reflecting the improper administration, and (b) replaced certain accurate factual statements contained in the documents with false statements to conceal the Comptroller's practice of awarding benefits to retirees who were not entitled to the benefit, including certain politically connected employees. Carlson stated that she did not care that the Commission was breaching its fiduciary duty and that it was "their problem" as long as the twenty-four (24) month disability Standard supported the Union's interests.

41. Deputy Comptroller Carlson - - who is not a lawyer - - ordered me to include the false statement that the SERS plan provisions state that after twenty-four (24) months, disability retirement continued if the retiree was disabled from performing his/her "own occupation." In fact, the SERS retirement plan provision specifically states that disability retirement only continues if the retiree is disabled from performing "any suitable and comparable" job. That correct statement regarding the language of the statute, the terms of the plan, and the proper eligibility requirements under the plan, was contained in the various documents and

policies and procedures that I prepared for disclosure to the full Commission, and which

had previously been approved, before political considerations were asserted.

42. In addition, Carlson demanded that I alter memoranda that I had prepared for the full

Commission which explained that an incorrect disability retirement standard had

previously been applied to determine continued entitlement to disability retirement benefits

at 24 months, and highlighted reasons why the Commission should apply the correct

standard and cease the practice of paying disability benefits to individuals who were not

entitled to them. As part of those memoranda, I included accurate factual information

regarding the financial cost to the State and to the retirement plan and its members, to

which the Commission owed a fiduciary duty. I included accurate factual information,

such as the number of members who were collecting disability retirement benefits who

were past their 24-month review period, and that those members collectively received over

7 million dollars a month in benefits. I further detailed that ceasing the improper

administration of SERS and terminating the continued payment of disability retirement

benefits to individuals who were not entitled to receive them would potentially save

hundreds of millions of dollars, over the course of time.

43. Carlson demanded that I alter these documents to endorse the continuation of the existing

practice which violated the terms of the plan, state laws, and federal tax laws, and remove

the accurate factual information regarding the cost to the State and to the plan of continuing

to apply the improper standard.

44. I refused the demands and explained to Deputy Comptroller Carlson and Assistant

Comptroller Braswell that I would not replace accurate statements in the documents I

prepared with materially false statements that would have concealed the fact that thousands

of employees were incorrectly receiving SERS disability retirement and healthcare benefits, and would also have supported the continuation of that practice at great cost to the State and in violation of the terms of the retirement plan, state law and federal tax laws.

45. On February 14, 2013, two days after being told of political pressure being applied by the unions, I attended a meeting with Brenda Halpin, as well as Deputy Comptroller Carlson, Comptroller Lembo, and Assistant Comptroller Braswell, to discuss my opposition to the improper administration of SERS disability retirement and the twenty-four (24) month Standard.  Deputy Comptroller Carlson continued to aggressively push me to make misrepresentations, false statements and omissions in several key documents detailing the administration of SERS disability retirement to support the more liberal incorrect "own occupation" Standard to be applied to the twenty-four (24) month disability retirement review.

46. Despite the pressure, I continued to refuse to alter those documents in ways that I felt would provide false legitimacy to a course of conduct that was contrary to the terms of the retirement plan and would violate state law and federal tax laws, subjecting SERS to possible disqualification by the IRS.  I refused to make false written statements that I did not believe to be true because those false statements would have misled the public servants on the Commission in the performance of their official function.

47. At the conclusion of the February 14, 2013 meeting, Carlson told me to "take a break from disability retirement," and that there were "other matters to focus on."

48. Since they were at the meeting, Brenda Halpin, as well as the Comptroller, had knowledge of Deputy Comptroller Carlson's directions to me, as well as my refusal to comply with those directives.

11

49. When I was employed at the Comptroller's office, I had knowledge of a case involving Gina Layman, an individual who was criminally prosecuted under Conn. Gen. Stat. § 53a-122, larceny in the first degree, for disability retirement fraud. (A copy of the criminal docket for the Layman case is submitted as Exhibit W.) I also knew that Conn. Gen. Stat. § 53a-119(6) defined larceny to include defrauding a public community, and I refused to alter any documents, or make false statements or misrepresentations, for the purposes of helping to authorize claims for benefits for individuals who I knew should not be entitled to receive those benefits under the law, or to aid in procuring any fraudulent claims to be allowed. I was particularly not willing to make false statements or misrepresentations to the Commission in order to accommodate what were clearly political considerations and when Comptroller Lembo, Deputy Comptroller Carlson, Assistant Comptroller Braswell, and Brenda Halpin all agreed on the correct standard, and that it was not being properly applied.

**I Refused to Make False Statements to Commission Regarding Disability Retirement for CMERS**

50. I also discovered and opposed the improper administration of the other Retirement Systems, including CMERS. I objected to the improper administration of CMERS, including ignoring the provisions of the retirement plan, violating state law and federal tax laws and putting the qualification of the retirement plan in jeopardy.

51. Under the provisions of the retirement plan, as codified in the CMERS disability statutes, Conn. Gen. Stat. § 7-432, prior to July 1, 2013, an employee was only eligible to receive disability retirement benefits if he/she was not capable of engaging in any gainful employment (20 hours or more), which is commonly referred to as an "any occupation" Standard.

12

52. Prior to 2010, an incorrect standard was applied which resulted in people receiving benefits who were not entitled to them. Once the standard was applied properly starting in 2010, CMERS disability retirement benefits were more limited.

53. In early 2013, I prepared several documents to provide clarification of CMERS disability retirement administration and the re-employment limitations that were to be provided to the full Retirement Commission.

54. However, in February 2013, Deputy Comptroller Carlson instructed me to make substantive changes to those documents which would favor the application of an incorrect "own occupation" disability retirement Standard to CMERS before those documents were provided to the full Commission.

55. Deputy Comptroller Carlson instructed me to replace accurate statements contained in the documents that accurately detailed the past and current practice for awarding CMERS disability benefits and applying the re-employment limitation with materially false factual statements on several documents that I prepared for the full Retirement Commission.

56. For example, the summaries and charts that I prepared contained accurate statements that detailed the current practice of the MEB to determine CMERS disability retirement applications using an "any occupation" standard as required by the retirement plan, and as previously advised, in 2010, by the Attorney General's Office and the former Division Counsel. Nevertheless, Deputy Comptroller Carlson ordered me to replace those accurate statements with the false statement that the Medical Examining Board was currently relying on the much more generous "own occupation" standard to determine disability retirement for CMERS disability retirement applications, which was false.

13

57. I refused to make Carlson's changes, as doing so would have resulted in me making knowing false statements to the Commission that were intended to mislead the public servants on the Commission and designed to give false legitimacy to a plan to improperly administer the Retirement systems in violation of the law.

58. Subsequently, during a February 21, 2013 Commission meeting, Linda Yelmini and Deputy Comptroller Carlson made gross misrepresentations, false statements and omissions to the Commission in order to persuade them to revert back to applying the incorrect "own occupation" disability retirement Standard, which would increase the number of disability retirements and allow certain individuals who were gainfully employed to continue receiving a disability retirement benefit that they were not entitled to receive under the terms of CMERS. If the documents that I prepared had been provided to the full Commission as originally intended, the Commission would have been able to understand that Yelmini and Carlson were making statements that were not true.

59. Deputy Comptroller Carlson repeatedly told me not to make any disclosures regarding CMERS disability retirement and re-employment limitations to the full Commission or to contradict the statements that Carlson and Yelmini made to the full Commission.

**I Refused to Make False Statements To Counsel in Connection with IRS Filings**

60. The Retirement Systems, as well as state law, and federal tax laws, contain rules prohibiting individuals from receiving retirement benefits while they are still employed by the same employer, under certain circumstances. On numerous occasions, including on April 4, 2013, I complained to Brenda Halpin and Assistant Comptroller Braswell that the Commission and Comptroller were administering the Retirement Systems in ways that disregarded these rules. I provided examples in which these rules were being violated,

14

including involving political figures and a political appointee, whose retirement benefits were later questioned by the media.

61. In April 2013, I had been asked by outside counsel, Ice Miller, to provide accurate information regarding the administration of the Retirement Systems in order to assist in the preparation of documents for submission to the Internal Revenue Service, including an application for an IRS letter of determination for SERS and a voluntary correction plan filing that would identify retirement plan failures and provide corrective measures.

62. In connection with that submission, I was asked by outside counsel to identify and disclose any retirement plan failures. Even though numerous retirement plan failures had been identified and needed to be disclosed, and even though outside counsel required accurate information in order to ensure that the documents being prepared for submission to the IRS were truthful and accurate, Brenda Halpin – who is not a lawyer - ordered me to make materially false factual statements to Ice Miller to conceal those retirement plan failures, such as the Comptroller's practice of allowing certain retirees, including politically connected retirees, to be re-employed by the State in violation of the terms of the retirement plans, state laws, and federal tax laws. Brenda Halpin told me to exclude information and falsely represent to Ice Miller that there were not any instances of non-compliance with re-employment rules, when I knew that there was information which required disclosure.

63. I refused to make those materially false statements to outside tax counsel as ordered by Brenda Halpin. Outside counsel concurred that the plan failures required disclosure.

64. I understood that federal law requires that the documents being filed with the IRS were truthful and accurate, and that submissions relating to letters of determination and

voluntary correction plans require a certification that "[u]nder penalties of perjury, . . . [the documents being submitted] are true, correct and complete." (IRS Form 8950, Application for Voluntary Correction Program, *available at* https://www.irs.gov/pub/irs-pdf/f8950.pdf) (IRS Form 5300, Application for Determination for Employee Benefit Plan, *available at* https://www.irs.gov/pub/irs-pdf/f5300.pdf.)

**Disclosure of IRC Section 415(b) Violations and Refusal to Misrepresent**

65. In July of 2013, I reported to Brenda Halpin that the Commission and Comptroller were not properly applying IRC Section 415(b), which imposes a dollar limitation on the annual retirement benefits an individual can receive from a qualified retirement plan. While the Section 415(b) limit was applied for the first time prospectively to all members retiring after 2011, the limit was not applied to those members who retired prior to 2011 going forward. A member who retired in 2010 and whose benefit exceeded the maximum Section 415(b) amount in 2011, 2012 and 2013 was not having his/her benefits reduced. I also disclosed that the Commission and Comptroller were not reviewing those retirees impacted by the Section 415(b) limit on a yearly basis as those limits rose resulting in improper calculations of retirement benefits. Failure to comply with Section 415(b) limits, including incorrect calculations and failure to apply the limits for all years, can result in the disqualification of the retirement plan.

66. On September 19, 2013, I further disclosed to Brenda Halpin, Comptroller Lembo, Deputy Comptroller Carlson, and Assistant Comptroller Braswell, that the Section 415(b) limit had not been applied correctly to those members who retired after 2011, which resulted in improper retirement benefit deductions. In addition, I disclosed that serious misrepresentations were being made to the full Commission and retirees concerning the

Section 415(b) limits, including misrepresentations made to a certain retiree, who was informed by the Division that his retirement benefit was being reduced in accordance with IRC Section 415(b). That retiree had secured legal counsel to fight the erroneous reduction to his retirement benefits. I was instructed to make false statements to the retiree regarding the actual calculation method and to represent that the retiree's benefit had been determined by actuaries, which was not true. I refused to make the false statements as instructed.

67. Following my disclosures and objections, I was excluded from all further discussion/meetings regarding the Section 415(b) issue and was prohibited from providing any legal guidance to the Audit Unit or assistance to correct the application and calculation errors.

68. I subsequently learned that neither the retiree nor the full Commission was informed about the Division's incorrect Section 415(b) application and improper retirement benefit deductions.

**My July 2013 Disclosures to Auditors**

69. On July 30, 2013, I began disclosing the improper administration, violations of state law, and violations of federal tax laws, to the State of Connecticut Office of the Auditors of Public Accounts (the "Auditors").

70. It was not part of my ordinary job duties to disclose improper administration of the Retirement Systems, or violations of state law, or federal tax laws, to the Auditors. In fact, prior to July of 2013, I had never communicated with the Auditors.

71. In July of 2013, Jessica Parent from the Auditors contacted me and indicated that she would like to speak with me.

17

72. In advance of my scheduled meeting with the Auditors on July 30, 2013, Brenda Halpin told me that I should not be meeting with the Auditors and that I did not have any information which related to the subject matter of the financial audit that the Auditors were conducting.  Brenda Halpin directed me to talk to Natalie Braswell, Assistant Comptroller and General Counsel for the Office of the State Comptroller, about how to handle questions from the Auditors.  Braswell advised me that she tells the Auditors that she "has no knowledge" to most questions.

73. I told Halpin and Braswell that I was "not going to lie to the Auditors."

74. On July 30, 2013, I met with Jessica Parent from the Auditors.

75. The first portion of the meeting was a series of questions related to financial matters dealing with other areas of the Comptroller's responsibilities about which I had no knowledge.

76. When Jessica Parent finished with the questions about financial matters for which I had no knowledge, I understood the portion of the meeting relating to the audit to have concluded.  Jessica Parent told me that she was concluded with her questions about the audit and she put away her audit questionnaire.

77. At that point, Ms. Parent asked me if there was any information that I wanted to share with her outside of the audit.  I then began voluntarily disclosing various information to Ms. Parent about the improper administration of the retirement systems, which was not related to the audit that she was conducting.  I was not required or obligated by my job duties to disclose the improper administration of the Retirement Systems to Ms. Parent at that time, and I did not disclose the improper administration of the Retirement Systems to

the Auditors at that time because it was necessary to do so in order to fulfill the duties of my job.

78. When I voluntarily reported my concerns about the improper administration of the retirement systems to the Auditor on July 30, 2013, I did so as a citizen and because I was very concerned about how the Comptroller's office was improperly administering the retirement systems and engaging in what I considered to be governmental misconduct and unlawful activities, for what seemed like political reasons, at tremendous financial cost to the State and its taxpayers, - - all of which are matters of significant public concern.

79. After Jessica Parent was finished asking questions that were related to the audit, I voluntarily disclosed to Jessica Parent my concerns about a number of issues, including, but not limited to, the Comptroller failing to comply with the terms of the retirement plans and federal and state law and (1) knowingly failing to apply the correct standard for disability retirement for 24-month reviews, and then putting the 24-month reviews on hold instead of applying the correct standard; (2) failing to comply with the re-employment limitations of the plan; (3) the directions to change documents that I had prepared and make misrepresentations, and my refusal to alter documents and make misrepresentations; (4) providing incorrect information to the Retirement Commission about how the CMERS plan was being administered relating to disability retirement and re-employment.

80. On July 30, 2013, I also agreed to provide the Auditors with documents that I had prepared, but which were blocked from being presented to the full Retirement Commission.

19

*81.* On August 1, 2013, Brenda Halpin asked for copies of those documents before she would allow me to provide them to the Auditors. Thus, Brenda Halpin had knowledge that I was providing information to the Auditors following the July 30, 2013 meeting.

**Events Related to Fall 2013 MEB Meetings**

82. On September 27, 2013, the Medical Examining Board met and conducted 24 month reviews for disability retirement. It is my understanding that the Board applied the standards and policies and procedures that I had helped to develop, and which were approved by Brenda Halpin earlier in 2013. In advance of the September 27, 2013 meeting, I met with the Medical Examining Board with Natalie Braswell, Brenda Halpin, and Colin Newman to explain the applicable standard and the policies and procedures for 24 month reviews and investigations. The MEB sought assurances that I would be present at the upcoming meetings relating to 24 month reviews.

83. At the September 27, 2013 meeting, the Board determined that a number of retirees were not entitled to receive disability retirement benefits.

84. In early October 2013, I received information about a meeting at which Marti Carlson provided direction to Division staff about how she wanted disability retirement 24 month review cases presented to the MEB based on the standard and interpretation desired by the parties, which included the public employee unions, and at which Carlson instructed people to not take notes of what was said during the meeting.

85. On October 7, 2013, I disclosed to Assistant Comptroller Braswell that Division staff had reported information to me about this meeting, and they were upset by what happened during the October 2, 2013 meeting.

86. In response, Assistant Comptroller Braswell admitted that Comptroller Lembo was aware of the meeting and that Deputy Comptroller Carlson would not be pleased that staff reported the details of the meeting to me.  Braswell made the statement that Carlson "usually goes after the weak ones," and indicated that the Division staff would likely be subjected to retaliatory treatment from Carlson.

87. The following day, October 8, 2013, the Division investigator reported to me that she was reprimanded by Deputy Comptroller Carlson for reporting the substance of the meeting to me and warned not to tell me anything further relating to disability retirement.  The investigator reported to me that, as she walked away from her exchange with Carlson, her name was called and when she turned around, Carlson put her hand to her mouth and made a zipper motion.

88. It was also subsequently reported to me by the Division investigator that, on October 8, 2013, the Division investigator and supervisor of the Disability Retirement Unit were summoned to a meeting with Brenda Halpin and questioned about the substance of their conversation with me regarding the meeting.

89. On October 11, 2013, another MEB meeting was held for twenty-four (24) month reviews. It is my understanding that the MEB again applied the correct "any occupation" Standard and again determined that a number of retirees receiving disability retirement benefits were not disabled.

90. However, none of the 24 month review cases that were decided by the Board on September 27, 2013 and October 11, 2013 were presented to the Retirement Commission for approval, and the individuals continued receiving disability retirement benefits.

91. Shortly thereafter, the decision was made by the Comptroller's office to place all 24 month reviews on hold until Linda Yelmini and the unions provided further information about how the 24 month review standard should be applied.

92. For the remainder of my employment at the Comptroller's office, no more 24 month reviews were conducted by the Medical Examining Board.

93. The failure to conduct 24 month reviews was not only problematic because it defied the requirements of the terms of the plan and the law, but also because it meant retirees would continue receiving benefits in the absence of compliance with the required process to determine whether they are entitled to those benefits under the law. As a consequence, people who should not have been receiving benefits because they did not satisfy the standard for continued benefits, as well as completed investigations involving credible evidence of disability retirement fraud, were not brought to the Medical Examining Board for review.

**Additional Refusal to Withhold Information Necessary for Accurate IRS Filings**

94. In October 2013, I communicated objections to Brenda Halpin and Assistant Comptroller Braswell relating to instructions that Linda Yelmini had given to Division staff to provide favorable treatment for a "special list" of employees that would be transferred from one retirement plan, the Alternate Retirement Program, to SERS, as part of which contributions would be refunded. I objected because the favorable treatment for this "special list" of employees violated the terms of retirement plans, as well as state law and federal tax laws, and could subject the plan to possible disqualification.

95. In January 2014, in connection with a planned submission to the IRS that was responsive to an earlier IRS audit, I advocated to Brenda Halpin that it was necessary to accurately

disclose information regarding the "special list" transfers in connection with filing the retirement plan application for a letter of determination and the need to correct those operational failures through the IRS's voluntary correction program.

96. Brenda Halpin became angry and combative and warned me not to further disclose those transfers to outside counsel for the third party administrator of the retirement plan at a meeting that had been scheduled to discuss the IRS letter of determination.  I told Halpin that I would not withhold information and make false statements concerning the "special list" transfers, and I resisted Halpin's threats not to disclose those transfers as submitting the retirement plan without correcting and reporting certain operational failures could subject the plan to possible disqualification.

97. Despite the threats from Brenda Halpin, I disclosed the retirement plan failures to legal counsel and assistant director for the Comptroller's Healthcare Policy & Benefits division, who agreed that such retirement plan failures needed to be disclosed to the IRS.  Brenda Halpin had knowledge of my disclosure to the assistant director, and was present on the call with me and the assistant director when the information was disclosed to outside counsel.  Following that disclosure, I was excluded from any meetings relating to the Alternate Retirement Program and this issue.

**Ice Miller–Plan Qualification and Voluntary Correction Program**

98. From January 2012 through September of 2013, the Comptroller and Commission were utilizing the services of Ice Miller, a national law firm recognized for its government pension plan expertise, with respect to tax issues relating to the administration of the Retirement Systems.  Specifically, Ice Miller was retained to "provide legal advice and services to the State of Connecticut, State Employees Retirement Commission and the

Office of the State Comptroller concerning tax, qualification and IRC Section 415 compliance matter with regard to the State Employees Retirement System."

99. While SERS is treated as a "qualified" retirement plan and the State takes advantage of the federal tax benefits of such a plan, qualification is dependent on following the terms of the plan and compliance with state law and federal tax laws. Ice Miller attorneys shared many of my concerns regarding the Commission's and Comptroller's non-compliance and risk of disqualification, which could result in significant costs to the State and taxpayers, including interest and penalties in the millions of dollars.

100. Ice Miller advised making a voluntary correction filing to correct SERS plan failures through the IRS's voluntary correction program, along with a letter of determination application to the IRS. A favorable IRS determination letter would provide assurance that the retirement plan was qualified under IRC 401(a).

101. In April and May of 2013, I reported to Brenda Halpin and Assistant Comptroller Braswell that Ice Miller was becoming increasingly concerned about IRS qualification of SERS and the potential legal and financial consequences of a failure to correct the retirement plan failures, which would significantly impact the State and its taxpayers. I also reported Ice Miller's concerns that Linda Yelmini was purposefully withholding critical information that Ice Miller needed to properly submit the SERS plan document to the IRS and correct plan failures.

102. On June 12, 2013, I disclosed to Commission Trustees Charles Casella, Michael Carey, Robert Coffey and Laila Mandour that in conjunction with my work with Ice Miller, I continued to identify many instances of the improper administration of the Retirement Systems that would require implementation of corrective measures and disclosure to the

24

IRS, including ignoring the provisions of the retirement plans and violating state law and federal tax laws, which was putting the qualification of the plans in jeopardy.

103.     On June 17, 2013, I disclosed to Assistant Comptroller Braswell concerns expressed by Ice Miller about potential SEC violations, including securities fraud, related to bond offerings and improper and misleading disclosures concerning the Retirement Systems.

104.     Shortly before Ice Miller resigned, I was told that I would be prohibited from continuing to work with Ice Miller.  I had previously worked with Ice Miller regarding Internal Revenue Code limitation, plan qualification, and tax issues relating to SERS, including identifying compliance failures and violations with the administration of the retirement plan, and submitting corrections under the IRS's voluntary correction program to address all plan failures and violations in order to obtain a determination letter from the IRS.

105.     On September 6, 2013, Ice Miller threatened to resign unless the Comptroller and Commission would agree to follow its recommendations with respect to SERS and in conjunction with those recommendations permit its attorneys to continue to "work directly and immediately with the Division to fully describe each [retirement plan] failure and confirm implementation of all recommended actions to correct each failure."

106.     Ice Miller subsequently resigned in September of 2013.  It is my understanding that Ice Miller's decision to resign, was at least in part related to the recent direction that I would be prohibited from working any further with Ice Miller.

107.     On March 20, 2014, concerned after learning of Ice Miller's resignation six (6) months earlier and citing to the "significant exposure to our State and its assets," the State Treasurer, Denise Nappier, wrote a letter to Commission Trustee Peter R. Blum, which was

copied to Comptroller Lembo, Attorney General George Jepsen, Secretary, Office of Policy and Management, Benjamin Barnes, and the Auditors, in which she echoed many of the concerns regarding the legal and financial risks to the State that I had raised. A copy of that letter is submitted as Exhibit V.)

**Whistleblower Complaint and Further Disclosure to Auditors**

108.    On December 26, 2013, I filed a whistleblower complaint in accordance with Connecticut's Whistleblower Statute, Conn. Gen. Stat. § 4-61dd, which was supplemented on January 29, 2014, in which I disclosed corruption; unethical practices; violation of state laws and federal tax laws; mismanagement; gross waste of funds and abuse of authority on the part of the Commission and Comptroller in the administration of the provisions of the Retirement Systems. I made this whistleblower complaint as a citizen because I was incredibly concerned about the governmental misconduct and unlawful activities that had occurred, and were continuing to occur, and were causing significant harm to the State and its taxpayers. The fact that governmental officials were abusing their authority and taking retaliatory actions against me for my opposition to misconduct and unlawful activities represented additional acts of governmental misconduct and unlawful activities that I felt needed to be reported to a public agency and addressed.

109.    I also made additional disclosures to the Auditors on January 16, 2014 and January 26, 2014 regarding the improper administration of the Retirement Systems.

110.    On January 28, 2014, I met with the Auditors in my office.

111.    On March 13, 2014, several Comptroller staff members asked me whether I filed a whistleblower complaint with the Auditors.

**Defendants Repeatedly Retaliated Against Me**

26

112.     After I opposed the improper administration of the Retirement Systems, made disclosures and complaints to the Auditors, and refused to make false statements and misrepresentations, I was subjected to various acts of retaliation and discipline, including, but not limited to, eliminating my core job duties, isolating me from colleagues and staff, issuing inaccurate service ratings that contained negative disparaging statements, issuing a disciplinary letter of counseling that contained with false and disparaging accusations, and subjecting me to unjust monitoring and eventually eliminating my position.

113.     Brenda Halpin subjected me to intimidation on several occasions.  In February 2013, in referring to the continued improper administration of the Retirement Systems, Brenda Halpin told me that "this is how it works in politics," and asked me "can you do this - seriously, can you do this?" I replied that I could do my job but would not allow Deputy Comptroller Carlson to coerce me into concealing the improper administration of the Retirement Systems or make serious misrepresentations, false statements or omissions to the Commission.

114.     Brenda Halpin told me that Division employees who complain about Division practices and do not "play [her] way" will "not play at all," and proceeded to then exclude me from a number of meetings dealing with the administration of the Retirement Systems, including meetings that addressed legal issues related to my core job duties in which I had previously been included, including, but not limited to meetings held on February 26, 2013, March 11, 2013 and March 19, 2013.

115.     On March 6, 2013, while in my presence, Brenda Halpin and Assistant Comptroller Braswell discussed the whistleblower complaint that the former Division Counsel, Helen Kemp, had filed against the Comptroller before leaving the Division in 2012.  Braswell and

Halpin discussed the former Division Counsel and her actions in front of me and stated that Comptroller Lembo made a mistake by not firing the former Division counsel before she filed the whistleblower complaint and that Lembo wanted to fire her.

116.     On March 20, 2013, before giving me my six (6) month service rating that would end my working test period, Brenda Halpin repeatedly asked me whether I wanted to keep my job. During that meeting, Brenda Halpin held the performance review in her hand and stated to me that if I wanted to stay employed, then I would have to do what they were telling me to do, and that I would not have a job if I did not do what they told me to do.

117.     On March 20, 2013, my job description was changed and most references to the Commission were removed from my core job duties.

118.     After September 2013, I was prohibited from working any further with the MEB.

119.     I was also subjected to verbal abuse and hostility by Brenda Halpin. On September 27, 2013, I was summoned to a disciplinary meeting with Brenda Halpin, who was threatening, combative, hostile and yelled at me throughout the meeting. At one point, Halpin suddenly and without warning leaned across the table and repeatedly banged her open hands on the table directly in front of me in a physically threatening manner as she was yelling. Feeling very threatened, I told Halpin that I was not comfortable continuing with the meeting unless a representative was present. Halpin immediately stopped yelling and sat upright. I asked her if she wanted to continue the meeting. Halpin said "no." I said "then this meeting is over," and stood up and went to open the door. Halpin quickly came up from behind me in a physically threatening manner, and as I walked through the door Halpin made a verbally threatening and derogatory comment to me in front of staff members.

120.     On October 7, 2013, Brenda Halpin came into my office and acknowledged her actions during the September 27, 2013 meeting were improper. Halpin made admissions that she "did not know what came over" her and that she "has never before in [her] life acted in such a way." Halpin then stated that she was not sure "who [she] was at the meeting" and that her behavior was unacceptable. She stated that she was "ashamed" of her behavior.

121.     On October 21, 2013, Brenda Halpin delivered my annual service rating, which was not favorable, contained several disparaging comments and was lower than my previous rating. The rating falsely stated that I had on "several occasions circumvented the chain of command and made inappropriate comments about legal matters." The review also stated that I should bring "forward [my] opinions to immediate supervisor and accept decisions made by management."

122.     I was also excluded from countless meetings/discussions, and systematically stripped me of job responsibilities involving subjects that were within the scope of my job description, and in which I was involved before my protected activity, including, but not limited to: (a) SERS federal tax compliance, qualification and voluntary correction program; (b) federal and state re-employment limitations; (c) IRC Section 415(b) calculations errors and compliance violations; (d) disability retirement, including the East Haven disability fraud complaint, disability retirement fraud investigations and twenty-four (24) month disability retirement reviews; (e) overpayments and offsets; (f) review of stipulated agreements; (g) review of current case law impacting the administration of the Retirement Systems.

123.     Brenda Halpin also prevented me from being involved in the work of the Division

investigator, and from being involved in the development, oversight, and pursuit of the

matters being investigated by the Division investigator.  Some of the cases on which I was

prohibited from working with the investigator related to a complaint involving employees

in East Haven that were receiving benefits under MERS even though it appeared that they

were not entitled to those benefits.

124.     Brenda Halpin repeatedly made negative comments accusing me of "circumventing

the chain of command," when I responded to any request for my assistance from Division

staff or attempted to follow-up on any matter in which I had previously been involved.  I

was instructed by Brenda Halpin that I was no longer permitted to speak directly to any

assistant directors or follow-up on any matters concerning the administration of the

Retirement Systems, in which I was previously involved.

125.     A number of Division employees told me that they were prohibited from

communicating with me about certain subjects concerning the administration of the

Retirement Systems.  On April 9, 2014, the Division investigator and Investigations and

Recovery Unit supervisor told me that they were reprimanded by Brenda Halpin for

seeking my legal guidance regarding the 2012 East Haven disability retirement fraud

complaint.  The investigator and her supervisor told me that they were instructed to go to

Halpin (who is not a lawyer) with any legal questions and told that they were no longer

permitted to seek my legal advice or guidance on any future investigations.

126.     On April 15, 2014, a Division staff member from the Municipal Employees

Retirement Unit told me that she was reprimanded by Brenda Halpin for alerting me to an

issue related to disability retirement involving a recent notable political figure whose disability retirement was stopped.

127.     On October 22, 2014, a Division staff member from the Investigations and Recovery Unit was recorded being in my office during a designated break period and later told me about being questioned directly by Brenda Halpin about the substance of the conversation with me.

128.     In October of 2014, a staff member in a different Division with the Comptroller told me about being warned by a supervisor not to have any further contact with me, and it was implied that his continued employment would be jeopardized if he did have any further contact me.

129.     Non-attorney staff members complained to me that they were being forced to make legal decisions and recommendations without the guidance of an attorney.

130.     On July 30, 2014, I was subjected to further unwarranted discipline when I received a disciplinary "letter of counseling" that was delivered by e-mail. The letter of counseling contained false statements and baseless and unsupported accusations. The letter threatened "disciplinary action up to and including dismissal."

131.     On September 29, 2014, I received my annual service rating from Brenda Halpin and a human resource specialist with the Comptroller. The rating contained several disparaging comments. The service rating lowered my rating in categories from my March 2013 rating and referenced the false statements and baseless accusations made in the disciplinary "letter of counseling." That document, and those disparaging statements, was placed in my official personnel file.

132.    By November of 2014, I was no longer permitted to provide any legal advice or

guidance on any of the many issues concerning the administration of the Retirement

Systems, forbidden from attending meetings or discussing any of the many on-going

Division related projects with staff in which my involvement was permitted prior to

engaging in protected activity, and threatened with dismissal if I engaged in follow-up of

any issues in which I had previously been involved and was being unjustly monitored.

133.    On November 4, 2014, Election Day, I was notified that my position was being

eliminated.

134.    Even though the notice of termination said that my position was being eliminated

for a lack of work, there was plenty of work that I could have been doing within the scope

of my job duties. I was just not permitted to do it. In the last several months of my

employment at the Comptroller's office, I submitted job status reports to Brenda Halpin

which identified various work that needed to be performed. One illustrative example of

such a document is submitted as Exhibit O. Brenda Halpin never spoke with me about my

contention that I should be allowed to perform those duties, and never allowed me to

perform any of those duties during that period of time.

135.    It is not correct that my position was eliminated because my job duties were

assumed by outside counsel for the Commission. From the beginning of my employment,

outside counsel was in place and I worked with several firms who were outside counsel to

the Commission and/or the Comptroller. For instance, Ice Miller was already in place as

outside counsel when I was hired in September 2012, and I continued working with Ice

Miller until I was prohibited from doing so in 2013, shortly before Ice Miller resigned in

September 2013. As I detailed in my previously filed Declaration in this case, dated April

13, 2016, (Exhibit U), it is also not correct that my job duties were assumed by the Rose Kallor law firm after it began performing certain work for the Commission.  In fact, after Rose Kallor was retained, part of my job included providing in-house counsel services and working with Rose Kallor and supporting Rose Kallor on the litigation matters that they were handling for the Commission.  Thus, while a decision was made that I would not be providing direct representation to the Commission, I continued serving in the role of in-house counsel who worked with and supported the law firms who had been retained and were representing the Commission on various matters.  Also, until approximately January 2014, I also continued providing assistance to the Commission's Subcommittee on Regulations and Overpayments.

136.    In December of 2014, following the elimination of my position, I was forced to transfer to another State agency in order to avoid becoming unemployed and losing benefits and the salary that I needed to support my family.

137.    The position to which I transferred at the Freedom of Information Commission was not related to any of my prior legal experience or interests, and it was a departure in my legal career.  Since losing my job at the Comptroller's office, I have not been able to practice in the areas of the law in which I had worked up to that point, and in which I was interested in practicing and in which I had been trained.

138.    When I lost my position at the Comptroller's office, I also lost my years of credited service towards advancement.  Consequently, my ability to advance to higher levels of compensation under collective bargaining agreements and my future retirement benefits were adversely impacted.  For instance, if I had remained at the Comptroller's office, then on September 21, 2015, I would have automatically advanced from "staff attorney II" to

33

"staff attorney III" which would have increased my compensation and subsequent annual increases. However, because my position was eliminated and I was transferred to another state agency, I did not advance to staff attorney III and receive a corresponding pay increase until I completed three years of service at the agency to which I transferred in December 2017. This loss of service will also impact my future retirement benefits.

139.     After I transferred to the Freedom of Information Commission, I was told that Comptroller Lembo made negative statements about me to a supervisor at my new agency, prior to my transfer.

140.     My reputation was further damaged by the negative and disparaging documents contained in my personnel file that was transferred to the other State agency.

141.     The retaliation I experienced caused me to suffer emotionally and physically and medically.

**Whistleblower Complaint Filed by Predecessor as Division Counsel**

142.     The attorney who served as Division Counsel before me, Helen Kemp, also filed a whistleblower complaint against the Comptroller. Based on statements made to me by Brenda Halpin and Natalie Braswell, it is my understanding that Helen Kemp raised concerns about the improper administration of CMERS, including a failure to comply with the rules regarding disability and re-employment which apply to that retirement plan.

34

I declare under the penalties of perjury under the laws of the United States of America that the foregoing is true and correct.

_____          _____
Virginia Brown                                                  7-22-2019
                                                                        Date