## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| VIRGINIA BROWN,<br>        Plaintiff, | | No. 3:15-cv-880 (SRU) |
| v. | | |
| OFFICE OF THE STATE<br>COMPTROLLER, et al.,<br>        Defendants. | | |

## <u>ORDER</u>

This is a case about a Connecticut state employee—Virginia Brown ("Brown")—who uncovered what she believed to be corruption in the Connecticut state government within the Office of the State Comptroller ("OSC") and the State Employees' Retirement Commission ("Commission").  At this point, the remaining defendants in this case are (1) the State of Connecticut and (2) Brenda Halpin ("Halpin"), an OSC employee (collectively, the "Defendants").  Brown believes that her complaints regarding the alleged corruption she uncovered were protected speech under the First Amendment and the Connecticut Constitution, and so the Defendants' retaliation against her—culminating in their eliminating her position and transferring her to another state agency—was illegal.

Simply put, Brown believed that certain state and municipal retirees were being significantly overpaid at an enormous cost to Connecticut's taxpayers.  More specifically, Brown believed that individuals within the OSC and Commission were intentionally advocating that incorrect legal standards should be applied to certain eligibility determinations regarding state and municipal employees' retirement benefits.  Brown discovered that those OSC and Commission employees supported such overly generous policies because doing so placated politically powerful public sector unions.  Although Brown initially brought her discoveries to

the attention of her supervisors at the OSC, she also told Connecticut's Auditors of Public Accounts (the "Auditors"), an outside law firm that worked with the OSC, and employees in other parts of Connecticut's government.

For the following reasons, the Defendants' motion for summary judgment, doc. no. 189, is **denied in substantial part and granted in part**.

## I.      Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of the pleadings, but must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247–48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322–23. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.*; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

Although a nonmovant's deposition testimony or affidavits might be self-serving, they may nonetheless support or defeat a motion for summary judgment so long as they do not merely reiterate allegations made in the complaint and, rather, contain specific facts of which the

nonmovant has personal knowledge.  *See, e.g.*, *Betancourt v. Slavin*, 676 F. Supp. 2d 71, 75 (D.

Conn. 2009); *Page v. Connecticut Dep't of Pub. Safety*, 185 F. Supp. 2d 149, 153 (D. Conn.

2002); *Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc.*, 473 F.3d 11, 18 (1st Cir. 2007).

## II.     Background

### A.  Procedural Background

Brown filed the instant action in Connecticut state court on May 14, 2015.  *See* Compl.,

Doc. No. 1-1.  The defendants[1] removed the case to this court on June 9, 2015.  *See* Notice,

Doc. No. 1.  On December 10, 2015, I dismissed the action but permitted Brown to file an

amended complaint.  *See* Min. Entry, Doc. No. 80.  Brown's amended complaint, filed on

January 15, 2016, named three defendants: the Defendants here and Linda Yelmini ("Yelmini"),

a Commission trustee and the head of Connecticut's Office of Labor Relations.  *See* Am.

Compl., Doc. No. 86.  All three defendants made motions to dismiss.  *See* Mot. to Dismiss, Doc.

No. 97 (Yelmini); Mot. to Dismiss, Doc. No. 98 (Halpin and State of Connecticut).  On

September 29, 2016, I granted Yelmini's motion to dismiss but denied the Defendants' motion to

dismiss.  *See* Order, Doc. No. 127.  The Defendants filed an interlocutory appeal.  *See* Am.

Notice of Appeal, Doc. No. 129.  On March 15, 2018, the Second Circuit affirmed part of my

ruling and dismissed the rest for lack of jurisdiction.[2]  *See* Mandate of USCA, Doc. No. 147.

The case returned to me, and the Defendants filed a motion for summary judgment on June 10,

---

[1]  At that time, the defendants were the State of Connecticut, the OSC, the Commission, the Comptroller (Kevin Lembo) in his individual capacity, three employees at the OSC (P. Martha Carlson, Natalie Braswell, and Brenda Halpin) in their individual capacities, and one Commission trustee (Linda Yelmini) in her individual capacity.  *See* Compl., Doc. No. 1-1, at 3.

[2]  More specifically, the Second Circuit held that it lacked jurisdiction to decide whether Halpin was entitled to qualified immunity as a matter of law and affirmed my decision with respect to the State of Connecticut.  *See Brown v. Halpin*, 885 F.3d 111, 114 (2d Cir. 2018).

2019.  *See* Mot. for Summ. J., Doc. No. 189.  On December 10, 2019, I held a hearing on the

Defendants' motion for summary judgment.  *See* Min. Entry, Doc. No. 200.

B.  Factual Background

1.  *Hiring and General Work Duties*

On September 21, 2012, Brown began her employment with the OSC as a "Staff

Attorney II."  Defendants' Local Rule 56(a)1 Stmnt. of Undisputed Facts ("56(a)1 Stmnt."), Doc.

No. 189-2, at ¶ 5.  Brown's duties included providing legal services to the OSC's Retirement

Services Division ("Division") and the Commission.  *Id.* at ¶¶ 5, 8–11.  The Division administers

Connecticut retirement systems, including the State Employees Retirement System ("SERS")

and the Connecticut Municipal Employees Retirement System ("CMERS").  *Id.* at ¶ 2.  The

Commission is a separate entity from the Division that is also charged with administering SERS

and CMERS.  *See* Conn. Gen. Stat. § 5-155a(c).

When Brown was hired as a Staff Attorney II, it was contemplated that she would work

as counsel for both the Division and the Commission; indeed, both Division employees and

Commission members interviewed Brown.  *See* 56(a)1 Stmnt., Doc. No. 189-2, at ¶¶ 8–10.

Traditionally, the Division had provided some "legal support" to the Commission.  *See* Halpin

Depo. Tr., Ex. 2 to Defs.' Mem. in Supp. Mot. for Summ. J. ("Halpin Depo."), Doc. No. 189-5,

at 41:23–42:8.  However, the Defendants claim that Brown's duties vis-à-vis the Commission

ended just weeks into her job, in October 2012.  *See* 56(a)1 Stmnt., Doc. No. 189-2, at ¶¶ 12–13.

Yelmini explained that the Commission did not want Brown to work for them because Brown

was a Staff Attorney II, which was a bargaining unit position; that status might create conflicts of

interest because almost half of the Commission's members were from unions.  *See* Yelmini Aff.,

Ex. 4 to Defs.' Mem. in Supp. Mot. for Summ. J. ("Yelmini Aff."), Doc. No. 189-7, at ¶¶ 8–10;

Conn. Gen. Stat. § 5-155a(a).  According to Yelmini, before Brown's hiring, the Division

counsel who had provided legal support to the Commission was *not* a Staff Attorney II.  *See*

Yelmini Aff., Doc. No. 189-7, at ¶ 9.   Also before Brown's hiring, the Commission had retained

Ice Miller, an outside law firm, to help it comply with state and federal tax laws.  *See id.* at ¶ 16–

17.  Ice Miller continued to work with the Commission until Ice Miller resigned in September

2013.  *See* 56(a)1 Stmnt., Doc. No. 189-2, at ¶ 55.  The Commission also worked with outside

counsel Rose Kallor beginning in June 2013.  *See* Yelmini Aff., Doc. No. 189-7, at ¶ 12.  Brown

concedes that the Commission decided to hire its own legal counsel; however, Brown explains

that no one told Brown until March 2013 that her duties vis-à-vis the Commission had been

eliminated, and, even past March 2013, Brown was intimately involved with the Commission's

work, including by helping outside counsel.  *See* Pl.'s Local Rule 56(a)2 Resp. to Defs.' Rule

56(a)1 Stmnt. ("56(a)2 Stmnt."), Doc. No. 195-1, at ¶¶ 12–14.

The parties agree that Brown's duties at the OSC included the following:

- Working with outside counsel, including, but not limited to, Ice Miller, on
  Internal Revenue Code limitation, plan qualification, and tax issues related to
  SERS;
- Providing legal guidance to the Medical Examining Board ("MEB") regarding
  the administration of disability retirement;
- Designing, drafting, and implementing corrective policies and procedures for
  the administration of the Retirement Systems for the Commission;
- Working with the Commission's Regulations and Overpayments Subcommittee
  on designing, drafting, and implementing overpayment and collection policies
  and procedures;
- Providing legal advice to the Commission and the Comptroller with respect to
  all aspects of the administration of the Retirement Systems, including preparing
  legal memos, summaries, and analyses;
- Providing guidance to the Division's internal investigator regarding disability
  retirement benefits, including disability fraud investigations, twenty-four (24)
  month reviews/investigations, and collection of overpayments; and
- Developing and maintaining guidelines for pension division orders for both
  SERS and CMERS.

56(a)1 Stmnt., Doc, No. 189-2, at ¶ 17.  A Staff Attorney II "[p]erforms [the] advanced and complex legal work of an agency" and "researches, interprets, analyzes and applies complex and conflicting laws and regulations, case law and legal principles."  *Id.* at ¶ 18.  At all relevant times, Halpin—who was the Division's director—supervised Brown.  *Id.* at ¶ 6.  Halpin, in turn, reported to the Deputy Comptroller, Martha Carlson.  *Id.* at ¶ 7.

### 2.  *Brown's Initial Complaints about SERS and CMERS*

Beginning in October 2012, the month following her hiring, Brown began making complaints that SERS was being improperly administered.  *See* 56(a)2 Stmnt., Doc. No. 195-1, at ¶ 66.  In particular, Brown believed that numerous disabled former state employees were receiving excess benefits because they had been subjected to an unlawfully lenient standard 24 months after they became permanently disabled.  *See* Conn. Gen. Stat. §§ 5-169(a); 5-192p(b).  Connecticut law requires that to continue receiving disability payments past 24 months, the MEB—a group of physicians appointed by the Commission—must find the disabled former employee "totally disabled for any suitable and comparable job."  *Id.*  For over 20 years before the fall of 2013, the MEB had used an "own occupation" standard to define "suitable and comparable job"; that is, the MEB evaluated "suitable and comparable job" by considering whether the employee could return to his or her former job.  *See* Lembo Letter, Ex. I to Pl.'s Opp'n to Mot. for Summ. J. ("Lembo Letter"), Doc. No. 195-10, at 3.  Brown believed that the "own occupation" standard was legally incorrect, and that an "any occupation" standard was correct; that is, the MEB should have been evaluating "suitable and comparable job" by considering whether the employee was totally disabled for *any other* suitable and comparable job.  *See* Brown Decl., Ex. D to Pl.'s Opp'n to Mot. for Summ. J. ("Brown Decl."), Doc. No. 195-5, at ¶¶ 22–25.  Brown believed that applying the "own occupation" standard violated state

and federal law, and she told that to her supervisors, including Halpin, Carlson, and Comptroller

Kevin Lembo ("Lembo").  *See id.* at ¶ 23.

Brown believed that a similar problem existed with respect to CMERS.  *See* 56(a)2

Stmnt., Doc. No. 195-1, at ¶¶ 77–80; Brown Decl., Doc. No. 195-5, at ¶¶ 50–59.  In particular,

until 2013, Conn. Gen. Stat. § 7-432(a) allowed retirement benefits to municipal employees who

had completed at least ten years of continuous service and became "permanently and totally

disabled from engaging in any gainful employment in the service of the municipality."  *See*

Attorney General's Letter, Ex. 10 to Defs.' Mem. in Supp. Mot. for Summ. J. ("AG's Letter"),

Doc. No. 189-13, at 2 (quoting section 7-432(a) as it then existed (November 2012)).  From the

1990s to about 2011, the MEB had interpreted "any gainful employment" to incorporate an "own

occupation" standard.  *See id.* at 3–4.  But in May 2011, the MEB altered its interpretation and

began employing an "any occupation" standard, which Brown thought was the correct legal

interpretation.  *See* Brown Decl., Doc. No. 195-5, at ¶ 52; AG's Letter, Doc. No. 189-13, at 1, 5.

In early 2013, Brown prepared some legal materials simply to clarify the standard already in

place.  But Carlson directed Brown to alter her materials so that they supported the old, incorrect,

"own occupation" standard; Brown resisted that pressure.  *See* Brown Decl., Doc. No. 195-5, at

¶¶ 53–54.

### 3.  *Supervisory Reaction to Brown's Complaints*

Brown quickly reached her conclusion that the improper administration of SERS (and the

potentially improper administration of CMERS) violated state and federal law and reported that

to her supervisors at the Division, including Halpin, Carlson, and Lembo.  *See* Brown Decl.,

Doc. No. 195-5, at ¶ 23.  Brown's supervisors were, in some ways, receptive to her claims.

Indeed, the parties do not dispute that at a certain point Lembo, Carlson, Halpin, and Natalie

Braswell (the OSC's General Counsel) all agreed with Brown's legal interpretations. *See* 56(a)1 Stmnt., Doc. No. 189-2, at ¶ 42. More specifically, in July 2013, Halpin approved Brown's proposal to require the MEB to use the "any occupation" standard in its 24-month evaluations of disabled retirees under SERS. *See id.* at ¶ 40. As a result, at two meetings on September 27 and October 11, 2013, the MEB applied the "any occupation" standard to such evaluations. *See* Schwarzkopf Decl., Ex. E to Pl.'s Opp'n to Mot. for Summ. J. ("Schwarzkopf Decl."), Doc. No. 195-6, at ¶¶ 19–21. At those two meetings, the number of disabled retirees who qualified for continued benefits past 24 months dramatically decreased. *See* Emails, Ex. H to Pl.'s Opp'n to Mot. for Summ. J. ("MEB Emails"), Doc. 195-9.

In other ways, though, Brown's supervisors were dismissive of her claims. For instance, on October 3, 2013—between the two above-referenced MEB meetings—Carlson called a meeting with Halpin, Amy Schwarzkopf (the Division's internal investigator), and another individual. *See* Schwarzkopf Decl., Doc. No. 195-6, at ¶ 22. Brown was specifically excluded from that meeting, and participants were told not to take notes. *See id.* Carlson made clear to participants that "she wanted [them] presenting 24 month review cases to the MEB based on the interpretation . . . that was desired by the parties, which included the public employee unions." *See id.* Although the MEB applied the "any occupation" standard at the October 11, 2013 meeting—and numerous retirees were thus denied benefits—the outcomes that resulted from the September 27 and October 11, 2013 MEB meetings were never finalized, and further MEB 24-month evaluations were put on hold. *See* 56(a)1 Stmnt., Doc. No. 189-2, at ¶ 43; Lembo Letter, Doc. No. 195-10, at 3.[3]

---

[3] The Defendants explain that MEB hearings were put on hold after October 11 not for improper political reasons, but rather because Connecticut's Office of Labor Relations and the State Employee Bargaining Agent Coalition ("SEBAC")—the parties to the relevant collective bargaining agreement—informed the OSC that "the interpretation of a disability statute was a matter for collective bargaining." *See* Lembo Letter, Doc. No. 195-10, at 3; Lembo

Brown believed that—although they knew that Brown's legal interpretation was correct and they agreed with her—her supervisors resisted further implementing the "any occupation" standard for SERS 24-month reviews because such a standard would result in fewer benefits going to retired public employees, and that result would antagonize public employee unions. Indeed, several facts seem to substantiate Brown's theory. For instance, on October 18—after learning that the MEB had applied the "any occupation" standard at its September 27 and October 11 meetings and had concluded that far fewer disabled retirees were entitled to benefits past 24 months under SERS than usual—one Commission trustee asked six others: "Are we prepared for the fallout?" *See* MEB Emails, Doc. No. 195-9, at 4. Brown herself also reports that on multiple occasions between February 2013 and March 2014, she directly observed or heard Halpin, Carlson, or Braswell commenting on the importance of union support to Lembo. *See* Brown Decl., Doc. No. 195-5, at ¶¶ 32–37; 56(a)2 Stmnt., Doc. No. 195-1, at ¶ 67.

Indeed, even before the MEB meetings in the fall of 2013, Brown highlights significant tension between her and her supervisors regarding the appropriate standard for SERS 24-month disabled retiree evaluations. Although unclear exactly when, Brown attended a Commission meeting and told the Commission that the improper standard was being applied. *See* Yelmini Aff., Doc. No. 189-7, at ¶ 11. Sometime after that,[4] Brown points out that Carlson told Brown that Brown's legal materials would be presented to the Commission only if they supported an

---

Depo. Tr., Ex. C. to Pl's Opp'n to Mot. for Summ. J., Doc. No. 195-4, at 115:16–19; Yelmini Aff., Doc. No. 189-7, at ¶ 18. Indeed, in August 2015, the State of Connecticut and SEBAC entered into a memorandum of understanding that articulates the correct standard for "suitable and comparable" as "a job paying a rate that is substantially equivalent to the salary range of the position the individual held at the time the individual's disability occurred and which is of a similar type to the job performed or work for which s/he is qualified in keeping with the individual's prior work experience, education or training received by the retiree while in state employment." Mem. of Understanding, Ex. 8 to Defs.' Mem. in Supp. Mot. for Summ. J., Doc. No. 189-11, at 2. Thus, the Defendants argue that their hesitations were legitimate.

[4] Although there is an unfortunate lack of precision regarding this date, logically it must have been after Brown presented her "unpopular" views to the Commission.

"own occupation" standard.  *See* 56(a)2 Stmnt., Doc. No. 195-1, at ¶ 69.  Brown did not present

such materials because, in Brown's view, Carlson's instruction was tantamount to requiring

Brown to falsify accurate statements.  *See* Brown Decl., Doc. No. 195-5, at ¶ 42.  The "accurate

statements" to which Brown apparently refers are Brown's statements indicating that the "any

occupation" standard was the correct legal standard under the circumstances; Brown does not

identify any other "accurate statements" that Carlson instructed Brown to "falsify."  Although

Brown told Carlson that she would not edit her legal materials to support the "own occupation"

legal standard because it was incorrect, Carlson said that she did not care if the Commission was

applying the incorrect standard—that was "their problem"—so long as the 24-month standard

supported union interests.  *See id.* at ¶ 40.

Brown explains that Carlson asked Brown to "falsify" legal materials with respect to

CMERS, too.  Recall that from the 1990s to about 2011, the MEB had used an "own occupation"

standard to determine the retirement benefits of certain disabled, former municipal employees,

but, in 2011, the MEB began using something more like an "any occupation" standard.  *See id.* at

¶¶ 51–52; Lembo Letter, Doc. No. 195-10, at 1–3.  Brown believed that the "any occupation"

standard was the correct legal interpretation.  When, in early 2013, Brown prepared some legal

materials simply to clarify the standard already in place, Carlson directed Brown to alter her

materials such that they "would favor the application of an incorrect 'own occupation' standard."

*See* Brown Decl., Doc. No. 195-5, at ¶¶ 53–54.  Brown refused to do so.[5]

---

[5]  The Defendants retort that neither the "any occupation" nor the "own occupation" standard was the clearly correct
or incorrect legal standard under section 7-432 because that standard was a complicated legal question.  Indeed, in a
2012 letter, the Attorney General of Connecticut concluded that both standards represented permissible readings of
section 7-432 and that the legislature was best equipped to clarify the correct standard.  *See* AG's Letter, Doc. No.
189-13, at 7–9.  The legislature amended section 7-432 in 2013 and installed an "own occupation" standard (the
standard Brown believed was "incorrect").  *See* Conn. Gen. Stat. § 7-432(a) ("Any member shall be eligible for
disability retirement and for a disability retirement allowance who has completed at least ten years of continuous
service if such member becomes permanently and totally disabled from rendering service in the position in which
such member has been employed.").

4. *Brown's Statements to the Auditors*

On July 16, 2013, the Auditors reached out to Brown to interview Brown as part of a routine audit of the Division.  *See* 56(a)1 Stmnt., Doc. No. 189-2, at ¶ 19; Whistleblower Compl., Ex. 6 to Defs.' Mem. in Supp. Mot. for Summ. J. ("Whistleblower Compl."), Doc. No. 189-9, at ¶ 8; Brown Depo. Tr., Ex. 3 to Defs.' Mem. in Supp. Mot. for Summ. J., Doc. No. 189-6, at 189:8–15.  Before July 16, 2013, Brown had never spoken to the Auditors.  *See* Brown Decl., Doc. No. 195-5, at ¶ 70.  Assisting the Auditors was not included in Brown's formal job description.  *See, e.g.*, Defs.' Reply, Doc. No. 198, at 4 (conceding as much).  Indeed, Halpin was surprised that the Auditors would want to speak with Brown—even during the Division's routine audit—because by July 2013, Brown had been working at the Division for only about ten months.  *See* Halpin Depo. Tr., Ex. B to Pl.'s Opp'n to Mot. for Summ. J., Doc. No. 195-3, at 87:22–88:5.

On July 30, 2013, an Auditor—Jessica Parent ("Parent")—met Brown in Brown's office during work hours.  *See* 56(a)1 Stmnt., Doc. No. 189-2, at ¶ 22.[6]  I will refer to that meeting as the "July 30 meeting."  The July 30 meeting lasted more than an hour and a half.  *See id.* at ¶ 24.  The July 30 meeting had essentially two parts.  In the first part, which lasted about an hour, Parent asked Brown about the OSC's internal finances—a subject about which Brown had no knowledge.  *See id.* at ¶¶ 25–26.  Parent then asked Brown if Brown had anything to discuss "outside of the audit."  *See id.* at ¶ 27.  Brown told Parent about the issues with SERS and CMERS, detailed above.  *See id.* at ¶¶ 28–34.

Brown followed up with the Auditors and met with them on several more occasions.  For instance, on August 15, 2013—after obtaining permission from Halpin—Brown sent Parent legal

---

[6] Parent also met with other OSC employees that day.  *See* 56(a)1 Stmnt., Doc. No. 189-2, at ¶ 23.

materials that Brown had prepared in her role at the Division. *See id.* at ¶¶ 37–41. I will refer to that disclosure as the "August 15 disclosure." On December 26, 2013, Brown took the additional step of filing a whistleblower complaint with the Auditors in accordance with Conn. Gen. Stat. § 4–61dd, in which she disclosed alleged corruption, unethical practices, and violations of state and federal law. *See* Whistleblower Compl., Doc. No. 189-9, at 1. Brown made additional disclosures to the Auditors on January 16 and 26, 2014, and met with the Auditors in her office on January 28, 2014. Brown Decl., Doc. No. 195-5, at ¶¶ 109–11. There are no facts in the record regarding the nature or content of those two January 2014 disclosures and the January 28, 2014 meeting.

### 5. *Refusal to Make False Statement to the IRS*

Brown also believes that her supervisors compelled her to make false statements regarding information required for various IRS filings; if Brown had made those false statements, Brown claims that she might have been subject to criminal penalty. Brown worked (informally) with Ice Miller, outside counsel to the Commission until September 2013,[7] on tax issues related to retirement plans. *See* 56(a)1 Stmnt., Doc. No. 189-2, at ¶ 17. Through her job, Brown had discovered that the OSC was allowing "certain retirees, including politically connected retirees, to be [illegally] re-employed by the State." *See* Brown Decl., Doc. No. 195-5, at ¶ 62. Brown believed that that fact was a retirement plan failure that required reporting to Ice Miller. However, Halpin told Brown not to disclose to Ice Miller the existence of such re-hired retirees. *See id.* Brown refused Halpin's pressure and, instead, told Ice Miller of her

---

[7] Ice Miller resigned in September 2013. Brown explains that that was because of a related disagreement between Ice Miller and the Commission. Ice Miller wanted to submit materials to the IRS for a determination letter regarding whether the retirement plans were still "qualified" under 26 U.S.C. § 401(a). But the Commission did not permit Ice Miller to submit such materials. *See* Brown Decl., Doc. No. 195-5, at ¶¶ 98–107.

findings; Ice Miller agreed with Brown that that plan failure "required disclosure." *See id.* at ¶ 63.  Brown knew that lying to Ice Miller might result in the filing of false documents with the IRS, which would be perjurious.  *See id.* at ¶ 64.

Separately, Halpin asked Brown to withhold from the IRS the existence of a "special list" of retirees whom Yelmini—illegally, in Brown's view—wanted transferred from one state retirement plan to another.  *See id.* at ¶ 94.  However, Brown did disclose the existence of the "special list" because that information was vital to making sure that SERS did not lose its qualified status under the tax code.  *See id.* at ¶ 96.  Before Brown disclosed that information, Brown discussed the matter (with Halpin's knowledge) with legal counsel at the OSC's Healthcare Policy and Benefits division, who agreed that the existence of such a "special list" needed to be disclosed to the IRS.  *See id.* at ¶ 97.

Finally, one of Brown's supervisors (Brown does not recall which supervisor)[8] asked Brown to lie to both a retiree and the Commission about the Division's non-compliance with a provision of the tax code that provides limits for retiree benefits under defined benefit plans.  *See* 26 U.S.C. § 415(b); Brown Decl., Doc. No. 195-5, at ¶ 65.  In particular, Brown claimed that misrepresentations were being made to a particular retiree whose benefits had been reduced improperly, in Brown's view, and who had thus hired counsel to contest that reduction.  *See* Brown Decl., Doc. No. 195-5, at ¶ 66.  When Brown brought those misrepresentations to her supervisors' attention in July 2013, someone "instructed" Brown to "make false statements to the retiree regarding the actual calculation method [used to determine his benefits] and to represent that the retiree's benefit had been determined by actuaries, which was not true."  *See id.*; 56(a)1 Stmnt., Doc. No. 189-2, at ¶ 52.

---

[8]  *See* Brown Depo. Tr., Ex. 3 to Defs.' Mem. in Supp. Mot. for Summ. J., Doc. No. 189-6, at 207:5–20.

6. *Retaliation*

Brown claims that throughout her employment at the Division—which lasted until

December 2, 2014[9]—she was retaliated against in various ways for raising her concerns. *See*

56(a)2 Stmnt., Doc. No. 195-1, at ¶ 94.  The earliest retaliation that Brown alleges was in

February 2013, when, in response to Brown's hesitations, Halpin told Brown "this is how it

works in politics," and asked Brown "can you do this – seriously, can you do this?"  *See* Brown

Decl., Doc. No. 195-5, at ¶ 113.  In February 2013, too, Halpin told Brown that Division

employees either "play[ed] [her] way" or did "not play at all."  *Id.* at ¶ 114.  Beginning in

February 2013, and continuing throughout Brown's employment, Halpin excluded Brown from

meetings related to her core job duties and "systematically stripped" Brown of her core job

duties.  *See id.* at ¶¶ 114, 122; 56(a)2 Stmnt., Doc. No. 195-1, at ¶¶ 102, 105.  In March 2013,

Halpin told Brown that she wished she had fired Brown's predecessor—who also filed a

whistleblower complaint[10]—sooner.  *See* Brown Decl., Doc. No. 195-5, at ¶ 115.  Also in March

2013, Halpin told Brown that she "would have to do what they were telling [Brown] to do, and

that [Brown] would not have a job if [Brown] did not do what [Brown's supervisors] told

[Brown] to do."  *See id.* at ¶ 116.  Although unclear when it began, Brown claims that she was

isolated from her colleagues, some of whom were told not to speak with Brown or were

disciplined for speaking with her.  *See* 56(a)2 Stmnt., Doc. No. 195-1, at ¶¶ 102–05.

In a September 2013 meeting between Halpin and Brown, Halpin "suddenly and without

warning leaned across the table and repeatedly banged her open hands on the table directly in

front of [Brown] in a physically threatening manner as she was yelling."  Brown Decl., Doc. No.

195-5, at ¶ 119.  On October 21, 2013 (and September 29, 2014), Brown believes that Halpin

---

[9]  *See* Lay-off Letter, Ex. S to Pl.'s Opp'n to Mot. for Summ. J., Doc. No. 195-20.
[10]  That was Helen Kemp.  *See* Brown Decl., Doc. No. 195-5, at ¶ 142.

gave Brown unjustly negative service ratings.  *See id.* at ¶¶ 121, 131; Service Ratings, Ex. L to

Pl.'s Opp'n to Mot. for Summ. J. ("Service Ratings"), Doc. No. 195-13.  In July 2014, Halpin

also issued Brown a letter of counseling that chastised Brown for unprofessional behavior.  *See*

Letter of Counseling, Ex. M to Pl.'s Opp'n to Mot. for Summ. J. ("Letter of Counseling"), Doc.

No. 195-14.  That letter of counseling was not placed in Brown's official personnel file, but was

retained in Halpin's personal supervisory file, such that Halpin could consider it "in connection

with any subsequent personnel decisions regarding Ms. Brown."  Halpin Depo. Tr., Ex. B to Pl.'s

Opp'n to Mot. for Summ. J., Doc. No. 195-3, at 214:3–215:20; *see also* Service Ratings, Doc.

No. 195-13, at 3.  For some period of time, other OSC employees monitored Brown and sent

each other emails about things big—"The Auditors came and spoke with V. for aprox 10

m[i]n."—and small—"Josh just gave Virginia his coat rack…………"  *See* Emails, Ex. K to

Pl.'s Opp'n to Mot. for Summ. J. ("Monitoring Emails"), Doc. No. 195-12, at 2–3.

　　　Finally, in November 2014, the OSC eliminated Brown's position (Staff Attorney II)

"due to lack of work."  *See* Lay-off Letter, Ex. S to Pl.'s Opp'n to Mot. for Summ. J. ("Lay-off

Letter"), Doc. No. 195-20, at 2.  Brown contests that characterization and says there was plenty

of work for her to do.  *See* Job Status Report, Ex. O to Pl.'s Opp'n to Mot. for Summ. J. ("Job

Status Report"), Doc. No. 195-16, at 3–4.  In any event, pursuant to the operative collective

bargaining agreement, Brown was offered bumping options, and she elected to accept the option

to bump into a Staff Attorney II position within the Office of Governmental Accountability.  *See*

Lay-off Letter, Doc. No. 195-20, at 3.  Although Brown's salary did not immediately decrease,

Brown had been eligible for automatic promotion at the OSC on September 21, 2015 (after three

years of employment); Brown lost those two years of credited employment when she bumped

into her new role.  *See* 56(a)1 Stmnt., Doc. No. 189-2, at ¶ 63; 56(a)2 Stmnt., Doc. No. 195-1, at ¶ 63.

## III.   Discussion

In this case, Brown makes two claims: (1) a section 1983 claim against Halpin based on alleged violations of the First Amendment, and (2) a state-law claim against the State of Connecticut based on an alleged violation of Conn. Gen. Stat. § 31–51q, which requires a predicate violation of the First Amendment or the Connecticut Constitution.  First, I consider whether Brown engaged in some speech protected by the First Amendment.  Second, because a reasonable jury could conclude that Brown did engage in speech protected by the First Amendment, I consider whether qualified immunity protects Halpin.  Finally, regardless of whether Brown's speech was protected by the First Amendment, I examine the State's potential liability under section 31–51q.

The Defendants argue first that Brown's speech was not protected by the First Amendment because Brown's complaints were akin to a disagreement between lawyer-colleagues over the meaning of a difficult statute.  The Defendants explain that both Brown's affirmative complaints to the Auditors and her refusals to make what she considered to be false statements were made pursuant to Brown's official duties and thus are unprotected under *Garcetti v. Ceballos*, 547 U.S. 410 (2006).  The Defendants further argue that Halpin cannot be liable under section 1983 because she was not personally involved in violating Brown's constitutional rights, and, in any event, Halpin is protected by qualified immunity.  Even if qualified immunity did not apply, the Defendants argue that Halpin did not retaliate against Brown within the meaning of the First Amendment.  Finally, the Defendants argue that Brown's section 31-51q state law claim fails both because Brown's speech did not regard "official

17

dishonesty" or other "serious wrongdoing" (and thus did not violate the Connecticut

Constitution) and because Brown was not subject to "discipline or discharge" within the meaning

of the statute.

In opposition, Brown argues that there exists a genuine issue of material fact with respect

to each of the Defendants' claims.  Brown claims that her affirmative reports to the Auditors, her

refusals to alter her legal materials, and her refusals to submit inaccurate information to the IRS

were protected speech under the First Amendment because she made them as a citizen rather

than pursuant to her official duties.  Brown next argues that Halpin was personally involved in

violating her constitutional rights and that Halpin is not entitled to qualified immunity.  Brown

finally argues that, as required under section 31-51q, her speech regarded "official dishonesty" or

other "serious wrongdoing" and that she was subject to discipline as a result.

### A.   Whether Brown's Speech was Protected Under the First Amendment

A defendant will be liable under section 1983 for a First Amendment violation if the

defendant took adverse action against a plaintiff on account of the plaintiff's speech that is

protected by the First Amendment.  The first question is whether Brown's speech was protected

by the First Amendment.  It is well established that the government, as an employer, has

substantial ability to control the words and actions of its employees.  *See Jackler v. Byrne*, 658

F.3d 225, 234 (2d Cir. 2011).  The Supreme Court has held that government employers "need a

significant degree of control over their employees' words and actions" to maintain "the proper

performance of governmental functions."  *Garcetti*, 547 U.S. at 418–19.  Nevertheless, a

government employee retains his or her First Amendment right to speak out, as a citizen, against

the government.  *See Jackler*, 658 F.3d at 234–35.  "So long as employees are speaking as

citizens about matters of public concern, they must face only those speech restrictions that are

necessary for their employers to operate efficiently and effectively."  *Id.* at 235 (quoting *Garcetti*, 547 U.S. at 419) (internal quotation marks and citations omitted).  In the Second Circuit, courts analyze separately a government employee's affirmative speech and that employee's refusal to be compelled into delivering certain statements.  *See id.* at 241.

### 1.  *Brown's Affirmative Speech – Complaints to the Auditors*

A public employee receives the full protections of the First Amendment if she speaks as a citizen on a matter of public concern.[11]  *See Garcetti*, 547 U.S. at 417.  The Court has explained that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens" and thus are not protected by the First Amendment.  *Id.* at 421; *see also Lane v. Franks*, 573 U.S. 228, 234 (2014).  In analyzing whether an employee makes affirmative speech as a citizen or an employee, the Second Circuit has focused on two questions: "(A) did the speech fall outside of the employee's official responsibilities, and (B) does a civilian analogue exist?"  *Matthews v. City of New York*, 779 F.3d 167, 173 (2d Cir. 2015) (*Matthews I*) (internal quotation marks and citations omitted).

### a.  The Law on Official Duties

In the Second Circuit, the determination whether a public employee speaks pursuant to her official duties is "not susceptible to a bright-line rule":

> Courts must examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two.  Other contextual factors, such as whether the complaint was also conveyed to the public, may properly influence a court's decision.

---

[11]  Speech is considered "on a matter of public concern" if it relates to "any matter of political, social, or other concern to the community."  *Jackler*, 658 F.3d at 236.  The Defendants do not argue that Brown's speech was not on a matter of public concern, and, in any event, it clearly was.  *See, e.g.*, Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J., Doc. No. 195, at 9 n.9.

*Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012) (internal citations omitted).  The Second

Circuit has stated that the inquiry into "[w]hether the employee spoke solely as an employee and

not as a citizen is . . . *largely* a question of law for the court."  *Jackler*, 658 F.3d at 237 (emphasis

added); *see also Garvey v. Town of Clarkstown, New York*, 2018 WL 1026379, at *9 (S.D.N.Y.

Feb. 22, 2018); *Williams v. New York City Dep't of Correction*, 2020 WL 509180, at *7

(S.D.N.Y. Jan. 30, 2020).  Because of the use of the adverb "largely," it is not entirely clear

whether that inquiry is a pure question of law or a mixed question of law and fact.  *See*

*O'Connor v. Huntington U.F.S.D.*, 2014 WL 1233038, at *7 n.4 (E.D.N.Y. Mar. 25, 2014).  I

interpret *Jackler*'s instruction to mean that summary judgment is appropriate only when there is

no genuine dispute of material fact regarding factors relevant to the question whether a plaintiff

spoke as a citizen or an employee.  *See id.*

When evaluating the nature of an employee's job responsibilities, the court is not

confined to an analysis of the employee's job description, and the relevant inquiry is a "practical

one."  *See Garcetti*, 547 U.S. at 424.  An employee may speak pursuant to her official duties

even if the speech is outside the scope of her technical job description.  *Id.* at 425; *see also*

*Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York*, 593 F.3d 196, 203 (2d Cir.

2010).  Moreover, an employee may be speaking as a citizen even though the speech is made to a

supervisor, relates to her employment, or was spoken in the workplace.  *See Ross*, 693 F.3d at

307.  Courts have noted the importance of permitting public employees to speak regarding

matters to which only they are privy by virtue of their employment.  *See Griffin v. City of New*

*York*, 880 F. Supp. 2d 384, 400 (E.D.N.Y. 2012) ("The interest at stake is as much the public's

interest in receiving informed opinion as it is the employee's own right to disseminate it.")

(internal quotation marks and citations omitted).  The unique nature of public employees'

positions enables those employees to have access to information that other citizens lack.  *See id.*

Although relevant inquiries, neither the form of a public employee's communication nor

to whom the communication was directed is dispositive of whether the communication was made

pursuant to the employee's official duties.  *See Matthews v. Lynch*, 2011 WL 1363783, at *4–5

(D. Conn. Apr. 11, 2011), *aff'd*, 483 F. App'x 624 (2d Cir. 2012) (*Matthews II*).  In particular,

though a complaint outside the chain of command may be evidence that the employee was not

speaking pursuant to her official duties, some courts have held such speech unprotected.

*Compare Griffin*, 880 F. Supp. 2d at 400 (protected) *with Anemone v. Metropolitan Transp.*

*Authority*, 629 F.3d 97, 116 (2d Cir. 2011) (unprotected).

In *Weintraub*, the Second Circuit helpfully distinguished between citizen and employee

speech with respect to public employees.  The *Weintraub* Court held that a teacher's union

grievance regarding his school's decision not to discipline one of his students was unprotected

speech because the grievance "was a means to fulfill and undertaken in the course of performing

his primary responsibility of teaching."  *Weintraub*, 593 F.3d at 203 (internal citations and

quotation marks omitted).  The teacher's core job responsibilities included maintaining

classroom discipline; he filed the union grievance to help ensure proper discipline.  *See id.*  The

*Weintraub* Court contrasted such a grievance with another teacher who "internally aired her

grievances regarding the placement of black people working in the cafeteria," which she

complained operated to reinforce racial stereotypes.  *Id.* (citing *Givhan v. Western Line*

*Consolidated School District*, 439 U.S. 410 (1979)).  The latter teacher's speech was protected

because—even though she aired her complaint internally—the nature of her complaint was not

sufficiently related to her core responsibilities as a teacher.  *Id.*; *see also Matthews I*, 779 F.3d at

175 (police officer did not speak as employee when he voiced concerns about a broad policy issue—racial quotas—because, though he had a duty to identify individual violations of the law, his concerns merely "express[ed] an opinion on a policy which he believed [could lead to violations of the law]").

> b. The Law (and Analysis) on Civilian Analogue

In the Second Circuit, the existence of a civilian analogue is typically a prerequisite to holding that a public employee spoke as a citizen. *See Matthews I*, 779 F.3d at 176. A civilian analogue exists so long as an employee spoke through "a path that was available to ordinary citizens." *Id.* The fact that the employee might have better access to that path than would an ordinary citizen does not weigh against finding a civilian analogue. *Id.* For instance, in *Matthews I*, the Second Circuit explained that a police officer's complaint to the Precinct commander had a civilian analogue because ordinary citizens could also raise grievances with the commander regarding police department policy. *See id.* The fact that Matthews had better access to the Precinct commander, though it might weigh in the analysis of whether his speech was undertaken pursuant to his official duties, was not relevant to the civilian analogue inquiry. *Id.*

In ruling on the defendants' motions to dismiss in this case, I held that Brown's speech to the Auditors had a civilian analogue because "any person" may file a whistleblower complaint regarding public misconduct to the Auditors under Conn. Gen. Stat. § 4–61dd. *See* Order, Doc. No. 127, at 15 (citing *Matthews I*, 779 F.3d at 176). The parties have not disputed that conclusion, and there is no question that there was a civilian analogue to Brown's complaints to the Auditors.

c.   The Parties' Arguments

The Defendants argue that Brown's speech to the Auditors was unprotected because Brown was simply an employee fulfilling her job duties.  Defs.' Mem. of Law in Supp. Mot. for Summ. J. ("Defs.' Mem."), Doc. No. 190, at 7–8.  The Defendants analogize to three cases and argue that Brown is just like the plaintiff in each.  In *Looney v. Black*, the plaintiff—a town's Building Official—became concerned about the public health effects of the smoke coming from wood-burning boilers and stoves.  *See* 702 F.3d 701, 712 (2d Cir. 2012).  The plaintiff thus voiced his concerns to a town resident, and, in the plaintiff's view, he was impermissibly retaliated against for doing so.  *See id.* at 704.  The court explained that the plaintiff spoke as an employee when he warned the town resident because it was the plaintiff's job to ensure the safety of the townspeople.  *See id.* at 712.  The plaintiff "spoke on these issues *because* he was in an official position that required, or at least allowed, him to do so."  *See id.*  In *D'Olimpio v. Crisafi*, a state employee reported his supervisor's misdeeds—including criminal activity and fraud—to the Inspector General of New York.  462 F. App'x 79, 80 (2d Cir. 2012).  The court held that the employee's reports were unprotected because New York law instructed state employees such as the plaintiff to report that kind of information to the Inspector General or risk termination.  *See id.*  And in *Matthews v. Lynch,* a member of the Internal Affairs unit of the Connecticut State Police ("CSP") reported CSP cover-ups first up the CSP's chain of command and then to the Connecticut Attorney General's Office, the Auditors, and the New York State Police.  483 F. App'x 624, 626 (2d Cir. 2012) (*Matthews III*).  The court held that the plaintiff spoke as an employee because he had a "broad responsibility to investigate and report police misconduct."  *See id.*

The Defendants argue that Brown is just like the plaintiffs in *Looney*, *D'Olimpio*, and *Matthews III*.  The July 30 meeting began as a "routine" audit that the Auditors initiated.  The

July 30 meeting took place in Brown's office during the workday, and Parent also met with other employees that day.  Although Brown says that the second "part" of the July 30 meeting was distinct from the audit, *see* 56(a)1 Stmnt., Doc. No. 189-2, at ¶¶ 26–27, the topics discussed during that part of the meeting—SERS, CMERS, re-hired retirees—concerned the core duties of Brown's job.  *See* Defs.' Mem., Doc. No. 190, at 10–11.  During that second "part" of the July 30 meeting, Brown even showed Parent legal materials that Brown had prepared for her supervisors.  *See id.* at 11–12.  The Defendants conclude that "[l]ike *Looney, D'Olimpio* and *Matthews* [*III*], plaintiff reported on what she perceived to be violations of state and federal law to the auditors because it was her job to make sure that the Division and [the Commission] were in compliance with state and federal law."  *Id.* at 12.

In contrast, Brown argues that she spoke with the Auditors as a citizen.  Brown explains that her "ordinary" job duties did not include communicating with the Auditors—in fact, she had never communicated with them before the July 30 meeting.  *See* Pl.'s Mem. of Law in Opp'n to Mot. for Summ. J. ("Pl.'s Mem."), Doc. No. 195, at 11.  Brown emphasizes that the July 30 meeting had two parts.  The second part—after Parent "put away her audit questionnaire"— began with Parent asking Brown "if there was any other information that [Brown] wanted to share with [Parent] outside of the audit."  *See id.* at 13.  Then Brown disclosed her concerns regarding SERS and CMERS.  Brown notes that just because her speech to the Auditors bore some indicia of official work duties—in her office, during work hours, related to her employment—does not mean that she was necessarily speaking pursuant to her official duties. *See id.* at 14–15 (citing *Lane*, 573 U.S. at 239–40).  Brown also distinguishes *Looney*, *D'Olimpio*, and *Matthews III* on the ground that the plaintiffs in each were enforcement officers with duties to report misconduct.  *See id.* at 16.  In contrast, Brown was merely a lawyer whose

"job duties mostly involved providing legal guidance to her client." *See id.* Finally, Brown

points out that—even if her speech to the Auditors at the July 30 meeting was unprotected—her

whistleblower complaint is plainly protected speech because it is logically impossible for a

whistleblower complaint to be part of one's official duties. *See id.* at 17.[12]

### d. Discussion regarding Official Duties

It is a close question whether Brown's speech to the Auditors was made pursuant to her

official duties. Looking at the evidence in the light most favorable to Brown, I hold that some of

Brown's speech to the Auditors was made pursuant to her official duties, and some was not.

Specifically, I hold that Brown's speech to the Auditors at the July 30 meeting was made

pursuant to her official duties and so is unprotected speech. However, Brown's speech to the

Auditors in the form of the whistleblower complaint was not made pursuant to her official duties

and so is protected speech. Brown alleges several other discrete instances of affirmative speech

to the Auditors: disclosures on (1) August 15, 2013, (2) January 16, 2014, and (3) January 26,

2014, and a meeting on January 28, 2014. *See* 56(a)1 Stmnt., Doc. No. 189-2, at ¶ 37; Brown

Decl., Doc. No. 195-5, at ¶¶ 108–10. Although the record is remarkably devoid of facts

regarding the three disclosures, I hold that the August 15 disclosure was unprotected speech

because it was made pursuant to Brown's official duties. I hold that—again, looking at the

evidence in the light most favorable to Brown—the other two disclosures and the January 28,

2014 meeting are protected speech because those communications took place after Brown filed

her whistleblower complaint on December 26, 2013 and appear intimately related to it. Indeed,

---

[12] For the first time in their Reply, the Defendants disagreed with Brown's reasoning regarding the whistleblower complaint because "[a] fair reading of the whistleblower retaliation complaint demonstrates that the plaintiff complained about the same things about which she complained to the Auditors. Thus, just as in the case of the speech to the Auditors, the speech in the whistleblower retaliation complaint was tied to her job duties and is employee speech." Defs.' Reply, Doc. No. 198, at 6.

Brown supplemented her whistleblower complaint on January 29, 2014, the day after the January 28 meeting with the Auditors.  *See* Brown Decl., Doc. No. 195-5, at ¶ 108.

The July 30 meeting and the August 15 disclosure were unprotected speech.  It is true that Brown had no normal duty to speak with the Auditors—she had never spoken with them before July 30—and that the Auditors initiated the July 30 meeting.  It is also true that the July 30 meeting had two "parts," and, in the second part, Brown discussed with the Auditors the same subject matter that she included in her whistleblower complaint.  *See* 56(a)1 Stmnt., Doc. No. 189-2, at ¶ 27.  Despite those facts, Brown's speech at the July 30 meeting was made pursuant to her official duties.  The July 30 meeting took place in Brown's office, during work hours, and on the same afternoon that the Auditors interviewed other OSC employees.  In other words, for employees at the OSC, part of their job on July 30 was to meet with the Auditors, if the Auditors asked to meet with them.  Further, even though the July 30 meeting may have been split into two parts, the two parts were not hermetically sealed from one another:  They both occurred as part of the same conversation.  In addition, although civilians certainly may communicate with the Auditors either by filing a whistleblower complaint, or, perhaps, calling the Auditors or showing up at their offices, there is no perfect civilian analogue for the July 30 meeting because the Auditors came to Brown's office as part of a routine audit of a government agency.

The August 15 disclosure was also made pursuant to Brown's official duties.  In the August 15 disclosure, Brown produced various legal materials "in response to [Parent's] request for such production during a routine audit."  *See* 56(a)1 Stmnt., Doc. No. 189-2, at ¶¶ 37, 39.  Thus, Brown sent the Auditors materials that the Auditors had requested.  Just as part of OSC employees' job on July 30 was to meet with the Auditors, if requested to do so, part of their job post-July 30 was to comply with the Auditors' requests for further compliance.  And, just as

there is no perfect civilian analogue for the July 30 meeting, there is no perfect civilian analogue for the August 15 disclosure because the Auditors requested such a disclosure as a follow-up to the July 30 meeting.  Finally, and crucially, Brown made the August 15 disclosure *with Halpin's permission*.  *See id.* at ¶ 38.

Viewing the evidence in the light most favorable to Brown, Brown's whistleblower complaint—filed on December 26, 2013—was protected speech because it was not made pursuant to Brown's official duties.  In the normal course, employees file whistleblower complaints to shine a light on misbehavior within a particular organization and, thus, to subject that organization to discipline.  That was exactly the case here.  Although such a whistleblower complaint might, under certain circumstances, be made pursuant to one's official duties,[13] it is almost the paradigm of citizen speech.  *Cf. Garcetti*, 547 U.S. at 425 (noting that "[e]xposing governmental inefficiency and misconduct is a matter of considerable significance" and pointing out "the powerful network of legislative enactments—such as whistle-blower protection laws . . . —available to those who seek to expose wrongdoing"); *Moonin v. Tice*, 868 F.3d 853, 862 (9th Cir. 2017).

There are important differences between the whistleblower complaint in this case and the July 30 meeting and August 15 disclosure.  The Auditors initiated the July 30 meeting and requested the August 15 disclosure.  Brown's supervisors knew that she was meeting with the Auditors on July 30 and Halpin explicitly sanctioned the August 15 disclosure.  In contrast, the facts in the record indicate that Brown filed the whistleblower complaint secretly, and Brown's supervisors did not know that she had done so.  *See* Brown Decl., Doc. No. 195-5, at ¶ 111; Hr'g Tr., Doc. No. 201, at 5:1–6 (attorney for the Defendants acknowledging that disclosure of "the

---

[13]  For instance, whistleblower complaints by enforcement officers may be made pursuant to those officers' official duties.  *See Matthews III*, 483 F. App'x at 626.  That situation is dissimilar from this case.

whistleblower . . . complaint is when the [OSC] . . . first knew that it was Virginia Brown who went to the auditors").

Similarly, looking at the evidence in the light most favorable to Brown, Brown's additional disclosures to the Auditors on January 16 and 26, 2014 were protected speech because they were not made pursuant to her official duties.  There is no evidence regarding the substance of those disclosures.  However, no evidence suggests that Brown made those disclosures with Halpin's permission.  Logically, because those disclosures followed close on the heels of Brown's having filed the whistleblower complaint, Brown made those disclosures to help substantiate her whistleblower complaint.  Because the whistleblower complaint was protected speech, those additional disclosures are also protected speech.  The same goes for the January 28, 2014 meeting, although that is a closer call because that meeting took place in Brown's office at work.  *See* Brown Decl., Doc. No. 195-5, at ¶ 110.  Plainly, the January 28 meeting was intimately related to Brown's whistleblower complaint.  The meeting followed the filing of the whistleblower complaint and two further document disclosures.  And, Brown supplemented her whistleblower complaint the day after the January 28 meeting.  *See* Brown Decl., Doc. No. 195-5, at ¶ 108.  For those reasons, Brown's speech during the January 28 meeting was also protected.

2.   *Refusal to be Compelled to Make False Statements*

a.   The law

The Second Circuit differentiates between an employee's affirmative speech—typically in the form of a complaint—and an employee's refusal to be compelled to speak in a certain manner.  *Ross*, 693 F.3d at 307–08 (holding that a refusal to make false statements that no misconduct occurred is a "very different circumstance[]" than an affirmative statement of

misconduct); *see also Jackler*, 658 F.3d at 238.  "[I]n the context of protected speech," there is

no difference between "compelled speech and compelled silence."  *Jackler*, 658 F.3d at 238

(citing *Riley v. Nat'l Fed'n of the Blind of North Carolina, Inc.*, 487 U.S. 781, 796–97 (1988)).

The First Amendment protects both the "right to speak freely and the right to refrain from

speaking at all."  *Id.* (citing *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)).  Such a right

includes the "right to reject governmental efforts to require [the employee] to make statements he

believes are false."  *Id.* at 241.  No entity has the "authority to require a witness to retract his true

statements and make statements that are false."  *Id.* at 240.  Accordingly, making compelled false

statements—which often are prohibited by law—can never be part of a public employee's

official duties, and thus the refusal to make false statements is protected by the First

Amendment.  *See id.* at 241.

In *Jackler*, a probationary police officer was terminated because he refused to make false

statements in a report related to another officer's alleged use of excessive force against an

arrestee.  *Id.* at 229.  The court held that the officer had a First Amendment right to refuse to alter

his report as requested by his commanding officer, notwithstanding the fact that the report was

made pursuant to his official duties.  *Id.* at 240.  In explaining the difference between an

affirmative statement and a refusal to speak dishonestly, the court highlighted the fact that a

refusal to speak dishonestly could never be part of Jackler's job responsibilities.  *Id.* at 241–42.

Furthermore, the court pointed out that an employee who accedes to such demands might subject

himself to criminal liability.  *Id.* at 240.  Surely, an employer does not have a protectable interest

in forcing its employees to commit a crime.  Accordingly, the court held that Jackler had a First

Amendment right "to refuse to retract a report to the police he believes is true, to refuse to make

a statement that he believes is false, and to refuse to engage in unlawful conduct by filing a false

report with the police." *Id.* at 241.

       b.  The Parties' Arguments

The Defendants argue that Brown's alleged refusal to make false statements is

unprotected speech.  First, the Defendants explain that *Garcetti* mandates that outcome.  In

*Garcetti*, a lawyer at a district attorney's office discovered what he considered to be

misrepresentations in a search warrant affidavit and wrote a disposition memorandum suggesting

that the charges be dismissed.  *See* 547 U.S. at 414.  The Court held that that memorandum was

unprotected speech because the lawyer was simply doing his job and "fulfilling a responsibility

to advise his supervisor about how best to proceed with a pending case."  *See id*. at 421.

Similarly here, the Defendants say, Brown "prepared legal memoranda, setting forth her legal

conclusions, in her role as a compliance attorney."  Defs.' Mem., Doc. No. 190, at 13.

The Defendants also argue that *Jackler* is inapposite.  Recall that in *Jackler* the Second

Circuit held that a probationary police officer's refusal to alter a truthful crime report was

protected speech.  *See* 658 F.3d at 241.  The Defendants point out that, in *Jackler*, the

probationary police officer's supervisors asked him to *commit a crime* (filing a false witness

statement).  *See* Defs.' Mem. Doc. No. 190, at 13–14.  In contrast, here, Carlson's instructing

Brown to change her legal materials to support the "own occupation" instead of the "any

occupation" standard was merely a supervisor requesting that "an employee revisit an opinion

about a complex legal issue."  *See id.*  Further, the Defendants argue that Halpin's instructing

Brown to lie to Ice Miller—such as by saying that there were no rehired retirees—was simply "a

discussion between a client and her attorney about [tax] compliance issues," which was part and

parcel of Brown's job.  *See id.* at 15–16.  The Defendants emphasize that tax compliance for

retirement plans is "a very complicated legal question," disagreements about which are entirely unlike superiors asking a probationary police officer to alter an eyewitness account. *See id.* Finally, the Defendants point out that there is no civilian analogue to a compliance attorney's difference of opinion with her superior. *See id.* at 14 (citing *Chatel v. Carney*, 2012 WL 1439051, at *6 (D.N.H. Apr. 26, 2012)).[14]

Brown responds first that *Garcetti* is not controlling in this context because *Garcetti* regards First Amendment protection for an employee's *affirmative* speech and so is inapplicable to Brown's claims regarding retaliation for her refusal to make false statements. *See* Pl.'s Mem., Doc. No. 195, at 21; *see also Ross*, 693 F.3d at 307–08. Brown next counters that *Jackler* is on point because, like the probationary officer in *Jackler*, she, too, would have been in danger of committing crimes if she succumbed to Carlson and Halpin's efforts to compel her to alter her legal materials and to withhold certain factual information when under a duty to disclose it.

More specifically, Brown argues that making a false statement to the Commission would have defrauded a public community and subjected her to a potential state larceny charge. *See* Pl.'s Mem., Doc. No. 195, at 18–19 & n.11 (citing Conn. Gen. Stat. §§ 53a-119(6), which says that a person is guilty of defrauding a public community if she "authorizes . . . a claim for benefits or reimbursement from a . . . state . . . agency which [s]he knows is false"); *see also* Brown Decl., Doc. No. 195-5, at ¶ 49 (indicating Brown knew that this penalty had been enforced against another individual). Thus, Brown explains that advocating for the incorrect legal standard with respect to SERS and CMERS might have been a crime.

---

[14] I have already explained that I do not credit *Chatel* for this point. *See* Order, Doc. No. 127, at 19 n.5 ("An employee who refuses to accede to a governmental demand to make false statements to a public body is no different from a private citizen who refuses to do the same.") (citing *Jackler*, 658 F.3d at 241)).

Brown also believes that had she acceded to Halpin's demands with respect to disclosures to Ice Miller, Brown might have been liable for perjury.  Recall that Halpin asked Brown to conceal from Ice Miller the fact that the OSC "allow[ed] certain retirees, including politically connected retirees, to be re-employed by the State in violation of the terms of the retirement plans, state laws, and federal tax laws."  Brown Decl., Doc. No. 195-5, at ¶ 62.  That is, Halpin told Brown "to exclude information and falsely represent to Ice Miller that there were not any instances of non-compliance with re-employment rules," even though Brown knew that information was "necessary to disclose to the IRS."  *See* Brown Decl., Doc. No. 195-5, at ¶¶ 60– 64; Pl.'s Mem., Doc. No. 195, at 22.  Brown knew that certified submissions to the IRS must be true, accurate, and complete on penalty of perjury and under the general false statement statute (18 U.S.C. § 1001).  *See* Pl.'s Mem., Doc. No. 195, at 22–23.  Brown makes essentially the same argument with respect to Halpin's attempts to compel Brown not to disclose in response to an IRS audit the existence of a "special list" of employees that were going to be transferred between retirement plans.  Brown Decl., Doc. No. 195-5, at ¶¶ 94–97.

    c.   Discussion

Although another close question, I hold that, looking at the evidence in the light most favorable to Brown, she engaged in protected speech when she refused to alter the legal materials she had prepared for the Commission.  I also hold that Brown engaged in protected speech when she refused to make false statements to Ice Miller and to the IRS.  However, Brown did not engage in protected speech when she refused to lie to a particular retiree regarding the computation of his benefits under section 415(b) of the tax code.

Although the Defendants are correct that the legal standards to be applied to the SERS and CMERS retirement benefit determination represented thorny legal questions,[15] Brown has created a genuine dispute of material fact with respect to whether her supervisors instructed her to make intentional misrepresentations to the Commission. As described above, according to Brown, all of Brown's relevant supervisors (Halpin, Carlson, Braswell, and Lembo) *agreed* that the correct legal interpretation of the SERS 24-month retirement disability standard was "any occupation," which was not the standard that the MEB was applying. *See* 56(a)1 Stmnt., Doc. No. 189-2, at ¶ 42. Although not clear when, Brown had attended a Commission meeting and delivered that opinion to the Commission. *See* Yelmini Aff., Doc. No. 189-7, at ¶ 11. In the aftermath of that opinion, Carlson told Brown that her legal materials would not be submitted to the full Commission again unless Brown changed them to support the "own occupation" standard and stated that the Commission's applying the wrong standard "was 'their problem' as long as the twenty-four (24) month disability Standard supported the Union's interests." *See* Brown Decl., Doc. No. 195-5, at ¶¶ 39–40. Even though Carlson directed Brown to change her legal materials, Halpin was aware of what Carlson was doing. *See* Schwarzkopf Decl., Doc. No. 195-6, at ¶ 22. Like the probationary police officer in *Jackler*, Brown knew that submitting a false statement to the Commission might have exposed her to a potential criminal charge. *See* Brown Decl., Doc. No. 195-5, at ¶ 49.

It is even clearer that the Defendants are not entitled to summary judgment regarding Halpin's alleged demands that Brown conceal relevant information from Ice Miller and the IRS,

---

[15] With respect to SERS, the power to define the "comparable and suitable job" standard was outside the OSC's purview and was to be determined as a matter of collective bargaining. *See* Lembo Letter, Doc. No. 195-10, at 3; Mem. of Understanding, Ex. 8 to Defs.' Mem. in Supp. Mot. for Summ. J., Doc. No. 189-11, at 2. With respect to CMERS, the Attorney General wrote to the Commission that both "any occupation" and "own occupation" seemed to be permissible interpretations. *See* AG's Letter, Doc. No. 189-13, at 7.

who had requested such information.  Brown has presented sufficient evidence to establish that

Halpin asked her directly to withhold truthful factual information from Ice Miller, *see* 56(a)1

Stmnt., Doc. No. 189-2, at ¶ 54 (rehired retirees), and from the IRS, *see* Brown Decl., Doc. No.

at ¶¶ 94–97 ("special list").  Brown believed that withholding the existence of the rehired retirees

and of the "special list" would violate the law and, potentially, subject her personally to criminal

penalties, such as perjury and larceny.  *See* Brown Decl., Doc. No. 195-5, at ¶¶ 49, 62, 64, 94;

*see also* Layman Criminal Docket, Ex. W to Pl.'s Opp'n to Mot. for Summ. J., Doc. No. 195-24,

at 2.  Ice Miller agreed with Brown that the existence of the rehired retirees required disclosure.

*See* Brown Decl., Doc. No. 195-5, at ¶ 63.  And an uninvolved third party—legal counsel for the

Comptroller's Healthcare Policy and Benefits division—agreed that Brown was under an

obligation to disclose the existence of the "special list."  *See id.* at ¶ 97.

However, Brown's refusal in 2013 to lie to a particular retiree regarding how his

retirement benefits had been determined was unprotected speech.  *See* 56(a)1 Stmnt., Doc. No.

189-2, at ¶ 52.  Brown explains that in July 2013 and September 2013 she "reported" and

"disclosed" to Halpin, Carlson, Braswell, and Lembo that the Commission was not properly

applying section 415(b) of the tax code.  *See* Brown Decl., Doc. No. 195-5, at ¶¶ 65–66.  And,

when Brown was later "instructed" to make "false statements" to a particular retiree—that his

retirement benefits had been determined by actuaries—Brown refused.  *See id.* at ¶ 66.

Brown's actions in this episode are not protected speech and are markedly different from

her refusals to make false statements to Ice Miller and the IRS.  In this instance, Brown makes no

claim that she faced a criminal penalty for making a false disclosure; indeed, she claims only that

some indeterminate supervisor instructed her to lie to a particular retiree.  *See id.*  Brown's

concern was not that she would face punishment for lying, but that the Commission might lose

its qualified status under the tax code.  *See id.* at ¶ 65.  Further, although perhaps not dispositive, there is no civilian analogue for this speech:  It was simply a public employee communicating with a single private citizen.  Finally, the "speech" that Brown alleges in this episode is difficult to identify.  Brown mentions that she "reported" and "disclosed" the relevant issue to her supervisors, but the manner of that reporting and disclosure is entirely unclear.  For all the above reasons, Brown's refusal to make false statements to a particular retiree regarding the improper application of the tax code with respect to that retiree is far afield from the situation in *Jackler* (and the instances of Brown's protected speech in this case).  Thus, Brown's "speech" in this instance was not protected by the First Amendment.

In sum, the Defendants are not entitled to summary judgment regarding Brown's refusal to make false statements to the Commission and to Ice Miller and the IRS because Brown has shown that there is a genuine issue of material fact regarding whether her refusal to speak falsely was protected by the First Amendment.  But the Defendants are entitled to summary judgment with respect to Brown's refusal to make false statements to a particular retiree regarding the calculation of his benefits under the tax code because that speech was unprotected.

### B.  Causal Connection and Adverse Actions

A defendant will be liable under section 1983 for a First Amendment violation if the defendant took adverse action against a plaintiff on account of the plaintiff's First Amendment-protected speech.  That inquiry proceeds in two parts: (1) whether Halpin took an adverse employment action against Brown, and (2) if so, whether there was a causal connection between the retaliation and Brown's protected speech.  The Defendants argue that Brown did not suffer an adverse employment action, and that, even if she did, it was not causally connected to her protected speech.  *See* Defs.' Mem., Doc. No. 190, at 21–25.  Brown retorts that she was

subjected to numerous adverse employment actions that were causally connected to her protected speech, both to the Auditors and in her refusal to make false statements. *See* Pl.'s Mem., Doc. No. 195, at 25–36. I hold that—viewing the evidence in the light most favorable to Brown— Halpin did take at least one adverse employment action against Brown in retaliation for her protected speech, and so the Defendants are not entitled to summary judgment on this ground.

      1. *Adverse Employment Actions*

          a. The law

Adverse action is "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Zelnik v. FIT*, 464 F.3d 217, 225 (2d Cir. 2006) (internal quotation marks and citations omitted). Under section 1983, the standard for adverse action is relatively low and is less demanding than the standard for Title VII actions. *Id.*; *Oliphant v. Connecticut Dep't of Transp.*, 2006 WL 3020890, at *9 (D. Conn. Oct. 23, 2006); s*ee also O'Neill v. City of Bridgeport Police Dep't*, 719 F. Supp. 2d 219, 229 (D. Conn. 2010) (temporary assignment to less desirable shift, denial of requests for reassignment, and other "petty harassment and discipline" sufficient to deny summary judgment). Adverse action may include "negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods . . . [or] transfer from library to classroom teaching as an alleged demotion . . . ." *Zelnik*, 464 F.3d at 226 (internal quotation marks and citation omitted). An allegation of "significantly diminished material responsibilities" is the type of employment action that is "sufficiently disadvantageous to constitute an adverse employment action" under Title VII, *see Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (citing *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)), and therefore it meets the standard for retaliation under section 1983. *See Zelnik*, 464 F.3d at 225; *Oliphant*,

2006 WL 3020890, at *9.  "[I]n determining whether conduct amounts to an adverse

employment action, the alleged acts of retaliation need to be considered both separately and in

the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be

actionable."  *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (citing *Zelnik*, 464 F.3d at 227).

"One way a plaintiff can establish a causal connection is by 'showing that protected

activity was close in time to the adverse action.'"  *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir.

2019) (citing *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009)).  The Second Circuit "has

declined to draw a bright line as to how close in time the events must be" and instead has "called

on courts to exercise 'judgment about the permissible inferences that can be drawn from

temporal proximity in the context of particular cases.'"  *Id.* (citing *Espinal*, 558 F.3d at 129).

Courts have held that "only six months" can be sufficient to support a temporal causal

connection.  *See Espinal*, 558 F.3d at 129.  Importantly, plaintiffs may establish causation

through more than just temporal proximity, including by showing that a defendant was motivated

by retaliatory animus.  *See, e.g.*, *Kinter*, 938 F.3d at 41.  A plaintiff can survive summary

judgment by demonstrating contradictions in an employer's explanation for an adverse

employment action that suggest the action was a "pretext for a prohibited reason."  *See Zann

Kwan v. Andalex Group LLC*, 737 F.3d 834, 846 (2d Cir. 2013) (Title VII context).

b.   The parties' arguments

The Defendants argue first that several of the actions that Brown relies upon are not

actually adverse employment actions.  *See* Defs.' Mem., Doc. No. 190, at 22–25.  First, the

Defendants point out that Brown's October 2013 service rating was issued late and was removed

from Brown's personnel file.  *See id.* at 22–23.  Similarly, the Defendants note that, on her

September 2014 service rating, Brown received an overall rating of "good or better" and

received her annual salary increment.  *See id.* at 23.[16]  Next, the Defendants claim that a single monitoring email that Halpin received from another employee does not rise to the level of an adverse employment action.  *See id.* at 24 (citing *Castro v. New York City Bd. of Educ. Personnel*, 1998 WL 108004, at *7 (S.D.N.Y. Mar. 12, 1998) (Title VII context); *Fahrenkrug v. Verizon Servs. Corp.*, 652 F. App'x 54, 57 (2d Cir. 2016) (Title VII context)).  Finally, the Defendants state that Brown's claimed isolation at work does not rise to the level of an adverse employment action.  *See id.*

The Defendants further argue that nothing that happened to Brown—even if it rose to the level of an adverse employment action—was causally connected to Brown's protected speech. The Defendants first explain that Brown's formal duties with respect to the Commission were eliminated because the Commission—not the Defendants—decided to hire its own counsel, and, in any event, that decision occurred in November 2012—before Brown spoke with the Auditors or was asked to make false statements.  *See id.* at 22.  The Defendants further claim that Brown's protected speech to the Auditors ceased in January 2014 and that she was last asked to make false statements in fall 2013.  Thus, the Defendants argue that Brown's final service review in September 2014 and her being laid off in November 2014 were both too far removed temporally from Brown's claimed protected speech to be causally connected to it.  *See id.* at 23–24.

Brown responds that, in the aggregate, the diminution in her responsibilities and the increased hostility, isolation, and monitoring that she experienced in the run-up to her being laid off easily amount to adverse employment action.  Brown first points out that the Second Circuit has held a large variety of employer actions to be "adverse," including numerous that Brown

---

[16]  Indeed, the Second Circuit has remarked, in the Title VII context, that service ratings that are worse than the previous year's—but which are still overall positive—are not necessarily adverse employment actions.  *See, e.g.*, *Moy v. Perez*, 712 F. App'x 38, 40–41 (2d Cir. 2017); *Byrne v. Telesector Res. Grp., Inc.*, 339 F. App'x 13, 17 (2d Cir. 2009).

considers more trivial that the alleged retaliatory acts here. *See* Pl.'s Mem., Doc. No. 195, at 27–

28 (citing, *inter alia*, *Ragusa v. Malverne Union Free School Dist.*, 381 F. App'x 85, 90 (2d Cir.

2010), which held to be "adverse" an employer's granting a teacher a too-difficult teaching

assignment because a reasonable jury could find that that assignment "guarantee[d] her failure").

Brown argues that her position's being eliminated was not the Defendants' only retaliatory act,

but simply the culmination of numerous retaliatory acts, which include: (1) the elimination of

Brown's job duties, (2) Brown's isolation from other employees, (3) inaccurately negative

service ratings, (4) a disciplinary letter of counseling, (5) close monitoring and scrutiny, (6) acts

of intimidation, and (7) verbal abuse and hostility. *See id.* at 28–29. Regarding the Defendants'

causal connection arguments, Brown claims that the retaliatory acts must be viewed in the

aggregate and, thus viewed, clearly establish a line of protected activity stretching through

Brown's position being eliminated in November 2014. *See id.* at 29–36.

   c.  Discussion

     i.  Adverse Employment Action

   I hold that the Defendants are not entitled to summary judgment on this ground

because—looking at the evidence in the light most favorable to Brown—a reasonable jury could

conclude that the Defendants retaliated against Brown based on her protected speech. Brown has

alleged several actions that rise to the level of adverse employment actions under the

circumstances. Most importantly, Brown alleges that her position was eliminated in November

2014 in retaliation for her protected speech and, as a result, she lost two years of credited service

towards promotion. *See* Brown Decl., Doc. No. 195-5, at ¶¶ 136–41. I have already held—and

the Second Circuit specifically affirmed—that the loss of such benefits and concomitant

prevention of being eligible for a promotion was "discipline" within the meaning of Conn. Gen.

Stat. § 31-51q.  *See* Order, Doc. No. 127, at 36; *Brown*, 885 F.3d at 118–19.  For the same

reasons, I also hold that the elimination of Brown's position in November 2014 qualifies as an

adverse employment action in the context of Brown's First Amendment retaliation claim.  *See*

*Moskowitz v. Coscette*, 3 F. App'x 1, 2 (2d Cir. 2001) (explaining that denial of promotion, in

combination with other factors, would allow jury to conclude that plaintiff suffered adverse

employment action); *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 91 (2d Cir.

2015) (Title VII context).

　　　　I held above that Brown's refusal to make false statements to Ice Miller was protected

speech.  That refusal occurred in April 2013.  *See* Brown Decl., Doc. No. 195-5, at ¶ 61.

Because that is the earliest instance of Brown's protected speech,[17] only actions between April

2013 and November 2014 could be material adverse employment actions.  A reasonable jury

could conclude that Brown suffered several adverse employment actions during that time period,

especially when considered in the aggregate.  *See Hicks*, 593 F.3d at 165.

　　　　Certain facts indicate that Halpin tried to intimidate Brown.  In a September 2013

disciplinary meeting between Halpin and Brown, Halpin "suddenly and without warning leaned

across the table and repeatedly banged her open hands on the table directly in front of [Brown] in

a physically threatening manner as she was yelling."  *See* Brown Decl., Doc. No. 195-5, at ¶ 119.

Brown also claims that her core job duties were eliminated even though there was plenty of work

to do: after September 2013, Brown was prohibited from working any further with the MEB.

*See id.* at ¶¶ 117–18.  Brown was also isolated from numerous meetings and individuals that had

previously been part of her job duties.  For example, Brown's job duties explicitly included

working with the Division's internal investigator, but beginning in October 2013, Halpin

---

[17]  Brown's legal materials were likely presented to the Commission before April 2013, but, because the facts are not clear on that point, I must rely on April 2013 at the earliest date of protected speech.

prevented Brown from working with the Division's internal investigator.  *See* 56(a)1 Stmnt., Doc. No. 189-2, at ¶ 17, Brown Decl., Doc. No. 195-5, at ¶ 123; Schwarzkopf Decl., Doc. No. 195-6, at ¶¶ 23–35.  Throughout 2014, several other employees were instructed not to work with Brown or even speak to her.  *See* Brown Decl., Doc. No. 195-5, at ¶¶ 125–29 (April to October 2014).  From January 2014 to August 2014, an OSC employee closely monitored Brown and sent Halpin numerous emails detailing Brown's activities.  *See* Monitoring Emails, Doc. No. 195-12.

The progression of Brown's service ratings, taken in context, might also be an adverse employment action.  In March 2013, after six months of employment, Brown's rating across all four categories of evaluation was the top score: Excellent.  *See* Service Ratings, Doc. No. 195-13, at 5.  In October 2013, Halpin's service rating for Brown had dipped to two "excellents," one "superior," and one "satisfactory," and Halpin noted that Brown had sometimes "circumvented the chain of command and made inappropriate comments" and should "accept decisions made by management."  *Id.* at 2.[18]  Brown's September 2014 service review was the worst of all: two "superiors," one "satisfactory," and one "fair."  *See id.* at 3.  Additionally, Halpin's July 2014 letter of counseling, which formally chastised Brown for her "unprofessional and disrespectful behavior," was maintained in Halpin's supervisory file and helped form the basis for Brown's poor September 2014 service review.  *See* Letter of Counseling, Doc. No. 195-14, at 3.

## ii.  Causal Connection

A reasonable jury could conclude that the retaliation that Brown alleges was causally connected to her protected speech.  The Defendants believe otherwise.  They point out that

---

[18]  Although Brown's October 2013 service review was removed from Brown's personnel file, Halpin was still entitled to rely on the service review in her supervisory file.  *See* Cady Depo. Tr., Ex. P to Pl.'s Opp'n to Mot. for Summ. J., Doc. No. 195-17, at 65:6–66:23.

Brown's protected speech to the Auditors had concluded by January 2014, and they argue that Brown's protected speech in refusing to make false statements concluded in September 2013. The Defendants note that the ultimate adverse employment action (elimination of Brown's position) did not occur until November 2014.  Because that was at least ten months later than the latest instance of protected speech, the Defendants argue, they are not temporally proximate enough to be causally connected.

But a reasonable jury could disagree.  Most importantly, Brown alleges that her termination was the *culmination* of a string of retaliatory events, detailed above, throughout 2013 and 2014.  *Cf. Martinez v. Connecticut Dep't of Corrections*, 125 F. Supp. 3d 397, 424 (D. Conn. 2015) ("Given that the plaintiff is alleging a string of retaliatory incidents over the course of that year . . . it would not be unreasonable for a fact-finder to view the later incidents as temporally related to the [plaintiff's] . . . complaint, even though the timing of any single one of the later incidents, viewed in isolation, might not reasonably permit an inference of causation.").  As detailed above, Brown lays out instances of retaliatory action stretching from September 2013 through November 2014.  September 2013 is five months after April 2013, which is the earliest instance of Brown's protected speech.  The Second Circuit has held that the passage of six months between protected activity and an alleged retaliatory action is sufficiently brief to support an inference of a causal connection.  *See Espinal*, 558 F.3d at 129.

Even if the temporal connection were not as snug, a reasonable jury could find a causal connection between the retaliatory actions and Brown's protected speech based on a reasonable inference of retaliatory animus.  That is, a reasonable jury could find that the alleged reason for the elimination of Brown's position—that it had "become necessary due to lack of work"—was pretext and was, in fact, retaliatory in nature.  *See* Lay-off Letter, Doc. No. 195-20, at 2.  Brown

points out that she had plenty of work to do.  For instance, just two months before she was laid

off, Brown detailed 17 projects that she thought she could be working on.  *See* Job Status Report,

Doc. No. 195-16, at 3–4.  Further, in her deposition, Halpin could not articulate the basis for her

conclusion that Brown had little work to do.[19]  Finally, Halpin admitted that she emailed Brown

in July 2014 and said: "We have plenty of work that needs to be completed."  *See* Halpin Depo.

Tr., Ex. B to Pl.'s Opp'n to Mot. for Summ. J., Doc. No. 195-3, at 262:3–23.  For the reasons

above, a reasonable jury could find that the Defendants' actions towards Brown between April

2013 and her lay off in November 2014 were adverse employment actions undertaken in

retaliation for Brown's protected speech.

### C.  Personal Involvement

Personal involvement in alleged constitutional deprivations is a prerequisite to successful

section 1983 claims.  *See Colon*, 58 F.3d at 873; *Huaman v. Sirois*, 2015 WL 5797005, at *6 (D.

Conn. Sept. 30, 2015).  To establish individual liability under section 1983, a plaintiff must show

that a particular defendant (a) "is a 'person' acting 'under the color of state law,'" and (b)

"caused the plaintiff to be deprived of a federal right."  *Back v. Hastings on Hudson Union Free*

*Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004) (citing *Monroe v. Pape*, 365 U.S. 167 (1961)).

There is no dispute that Halpin acted under color of state law, so the only issue is whether she

was personally involved in the alleged deprivation.

A plaintiff must demonstrate a "causal connection between the defendant's action and the

plaintiff's injury[.]"  *Back*, 365 F.3d at 125 (quoting *Gierlinger v. Gleason*, 160 F.3d 858, 872

---

[19]  Halpin explained that, first, "things were changing within the division."  *See* Halpin Depo. Tr., Ex. B to Pl.'s Opp'n to Mot. for Summ. J., Doc. No. 195-3, at 222:22–23.  But Halpin could identify only a single specific change—regarding "implementation of the pension module"—and could not articulate how that change would have affected the work of a Staff Attorney II.  *See id.* at 223:2–224:10.  In addition, Halpin stated that "[m]ore and more was being handled by the [Commission's] legal counsel."  *See id.* at 222:24–223:1.  But by Halpin's own admission, Brown was not responsible for working with the Commission in 2014.  *See id.* at 224:11–17.

(2d Cir. 1998)).  "Ordinary principles of causation apply to this inquiry into proximate cause."
*Id.* (internal quotation marks and alterations omitted).  Personal involvement of a supervisory
defendant can arise through (1) participating directly in the violation; (2) failing to remedy a
wrong after learning of it; (3) creating a policy or custom under which the violation occurred; (4)
being grossly negligent in supervising the bad actor; or (5) exhibiting deliberate indifference to
the plaintiff's rights.  *See Colon*, 58 F.3d at 873.  A party may directly participate in the alleged
infraction even if that party was not responsible for the ultimate adverse action; the defendant
will be liable so long as she "played a meaningful role in the [employment decision]."  *Back*, 365
F.3d at 125–26 (internal citations and quotation marks omitted).

Halpin was personally involved in all aspects of Brown's retaliation claim.  Consider first
Brown's protected affirmative speech to the Auditors.  Halpin, Brown's supervisor, was directly
involved in several retaliatory acts between March 2014 (the latest date on which the OSC
learned that Brown had filed the whistleblower complaint)[20] and November 2014.  For instance,
in July 2014, Halpin issued Brown a letter of counseling, and in November 2014, Halpin laid off
Brown.  Of course, direct participation in an alleged constitutional violation satisfies the personal
involvement requirement of section 1983.  *See Colon*, 58 F.3d at 873.  Consider next the
compelled false speech portion of Brown's claim.  According to Brown, Halpin instructed
Brown directly not to disclose (1) the existence of rehired retirees to Ice Miller and (2) the
existence of a "secret list" of transferees to the IRS.  *See* 56(a)1 Stmnt., Doc. No. 189-2, at ¶ 54
(rehired retirees); Brown Decl., Doc. No. at ¶¶ 94–97 ("special list").  Thus, Halpin directly
participated in those two instances of compelled false speech.

---

[20] *See* Halpin Letter to Commission, Ex. R to Pl.'s Opp'n to Mot. for Summ. J., Doc. No. 195-19, at 1.

Halpin was less obviously involved in compelling Brown to make false statements in her legal materials because it was Carlson—not Halpin—who instructed Brown to alter those legal materials. However, Halpin was still personally involved in that alleged violation of Brown's constitutional rights. Halpin was aware of Carlson's demands on Brown. *See* Brown Decl., Doc. No. 195-5, at ¶¶ 45, 48 (noting that Halpin was present at a February 2013 meeting during which Carlson urged Brown to alter her legal materials). A reasonable jury could conclude that Halpin retaliated against Brown based on Brown's refusals to accede to Carlson's demands. For instance, in September 2013, Halpin banged her hands on a table in front of Brown and yelled at her. In October 2013, Halpin delivered Brown a more unfavorable service rating than Brown had previously received. According to Brown, Halpin also was responsible for gratuitously eliminating Brown's core job duties throughout 2013 and 2014.

### D. Qualified Immunity

At the motion to dismiss phase in this case, I held that Halpin was not entitled to qualified immunity with respect to Brown's claims because—taking Brown's allegations as true—Brown had clearly established rights both to speak as a citizen on matters of public concern and to refuse to make false statements, and no reasonable official would have believed that he or she could retaliate against an employee for exercising those rights. *See* Order, Doc. No. 127, at 24–27. The Defendants appealed my decision on that basis, and the Second Circuit concluded that it lacked jurisdiction to consider Halpin's appeal because the qualified immunity analysis was not yet a pure question of law. *See Brown*, 885 F.3d at 114, 117–18. I hold again that Halpin is not entitled to qualified immunity on Brown's surviving claims.

a.   The law

The doctrine of qualified immunity enables governmental officials who perform

discretionary functions to be shielded from liability for civil damages so long as "their conduct

does not violate clearly established statutory or constitutional rights of which a reasonable person

would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The defendant bears the

burden of establishing that he or she is entitled to qualified immunity.  *Garcia v. Does*, 779 F.3d

84, 92 (2d Cir. 2015) (citing *Vincent v. Yelich,* 718 F.3d 157, 166 (2d Cir. 2013)).  "Because

qualified immunity is an immunity from suit rather than a mere defense to liability it is

effectively lost if a case is erroneously permitted to go to trial."  *Pearson v. Callahan*, 555 U.S.

223, 231 (2009) (internal citations and alterations omitted).  A defendant is entitled to qualified

immunity if either "(a) the defendant's action did not violate clearly established law, or (b) it was

objectively reasonable for the defendant to believe that his action did not violate such law."

*Garcia*, 779 F.3d at 92 (quoting *Russo v. City of Bridgeport,* 479 F.3d 196, 211 (2d Cir. 2007)).

"To be clearly established, a right must be sufficiently clear that every reasonable official

would have understood that what he is doing violates that right."  *Taylor v. Barkes*, 135 S. Ct.

2042, 2044 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)); *see also McGowan

v. United States*, 825 F.3d 118, 124 (2d Cir. 2016).  The right must be evaluated in the context of

Supreme Court and Second Circuit precedent "as it existed at the time of the challenged

conduct."  *McGowan*, 825 F.3d at 124 (quoting *Garcia*, 779 F.3d at 92).  That said, "the absence

of a decision by [the Second Circuit] or the Supreme Court directly addressing the right at issue

will not preclude a finding that the law was clearly established so long as preexisting law clearly

foreshadows a particular ruling on the issue."  *Id.* (quoting *Garcia*, 779 F.3d at 92 (internal

quotation marks, alterations, and citations omitted)).  Though there need not be a case directly on

point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Taylor*, 135 S. Ct. at 2044 (internal quotation marks and citations omitted).

Even if a court determines that a right is clearly established, qualified immunity will protect a government official "if it was objectively reasonable for the official to believe that his acts did not violate those rights." *Tellier v. Fields*, 280 F.3d 69, 84 (2d Cir. 2000) (quoting *Russell v. Coughlin*, 910 F.2d 75, 78 (2d Cir. 1990)) (alterations omitted). It was "objectively reasonable" for a defendant to believe his or her actions did not violate clearly established law when "officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context." *Southerland v. City of New York*, 680 F.3d 127, 141 (2d Cir. 2012) (internal quotation marks and citation omitted). The inquiry is "not whether the [official] *should have* acted as he did . . . [i]t is instead whether *any* reasonable [official], out of the wide range of reasonable people . . . *could have* determined that the challenged action was lawful." *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016). To determine whether it was objectively reasonable for an employer to believe that her actions did not violate the plaintiff's First Amendment rights, the court must ask "not what a lawyer would learn or intuit from researching case law," but what a "reasonable person" in the defendant's position would have known about the constitutionality of her conduct. *McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 278 (2d Cir. 1999). "When properly applied, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Taylor*, 135 S. Ct. at 2044.

   b.  Discussion

      i.  Reports to the Auditors

The Defendants argue that Halpin is entitled to qualified immunity regarding Brown's affirmative speech to the Auditors because reasonable officers in Halpin's position could have

disagreed about whether Halpin's actions violated Brown's rights and, even if not, it was objectively reasonable for Halpin to believe that her actions did not violate Brown's rights. The Defendants emphasize that clearly established law must be defined with particularly—not at a high level of generality—and that "no case in existence in 2014 [] would have put Halpin on notice that when plaintiff was speaking about the state's retirement plans, she was speaking as a citizen." *See* Defs.' Mem., Doc. No. 190, at 18; *see also City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019). Further, the Defendants point out that in 2014 "the existence of a civilian analogue was not determinative" in First Amendment retaliation cases. *See* Defs.' Mem., Doc. No. 190, at 19 (citing *Matthews II*, 2011 WL 1363783, at *4). Thus, "reasonable retirement division directors like Halpin could disagree over whether Brown spoke as a citizen or employee because she had better access to the state auditors." *Id.* at 20.

Brown, citing *Weintraub* and *Jackler*, responds that by 2014 it was clearly established law that an employer could not retaliate against an employee for affirmative speech made outside the course of her official duties if that speech regarded matters of public concern. *See* Pl.'s Mem., Doc. No. 195, at 25. Further, regarding the citizen analogue consideration, Brown explains that in 2014 it was clearly established in the Second Circuit that the presence of a civilian analogue was a relevant consideration in applying *Garcetti*. *See id.* (citing, again, *Weintraub* and *Jackler*). Finally, Brown points out that the Defendants' argument does not address Brown's December 2013 whistleblower complaint. *See id.* at 26.

By March 2014,[21] it was clearly established that an employer could not retaliate against an employee who spoke as a citizen—that is, not pursuant to her official duties—on a matter of public concern. *See Garcetti*, 547 U.S. at 421. Further, it was clearly established that an

---

[21] March 2014 is, again, the latest Halpin could have learned that Brown had authored the whistleblower complaint. *See* Halpin Letter to Commission, Ex. R to Pl.'s Opp'n to Mot. for Summ. J., Doc. No. 195-19, at 1.

employee may have been speaking as a citizen even when the speech was made to a supervisor, related to her employment, and was spoken in the workplace.  *See Ross* 693 F.3d at 307.  With respect to Brown's affirmative speech to the Auditors, I have already held that Brown's whistleblower complaint in December 2013 (and two subsequent disclosures and one meeting) was protected.  I also remarked that a whistleblower complaint is nearly the paradigmatic case of an employee's speech made *not* pursuant to her official duties.  *Cf. Garcetti*, 547 U.S. at 425 (citing statutes meant to protect whistleblowers); *Moonin*, 868 F.3d at 862.  Indeed, the Defendants apparently do not even argue that Halpin is entitled to qualified immunity for retaliating against Brown based on Brown's whistleblower complaint.

Thus, although there is not, so far as I am aware, a case with exactly parallel facts to this case holding that the employee engaged in protected speech, "preexisting law clearly foreshadows a particular ruling on the issue."  *McGowan*, 825 F.3d at 124 (quoting *Garcia*, 779 F.3d at 92 (internal quotation marks, alterations, and citations omitted)).  By March 2014, "existing precedent" had "placed the . . . constitutional question beyond debate."  *Taylor*, 135 S. Ct. at 2044 (internal quotation marks and citations omitted).  And it was not objectively reasonable for Halpin to retaliate against Brown as she (allegedly) did.  No reasonably competent official in Halpin's position could have thought that it would be lawful to take adverse action against a public employee simply because that employee engaged in protected speech by filing a whistleblower complaint with state auditors.

## ii.  Refusal to Make False Statements

The Defendants argue that, with respect to Brown's refusal to make false statements, the law was not clearly established, and a reasonable official in Halpin's position might not know that "when a compliance attorney spoke about a retirement plan's compliance with the plan

terms and the law, she was speaking as a citizen." Defs.' Mem., Doc. No. 190, at 21. Thus, the Defendants assert that the question was not "beyond debate" in 2014 and so Halpin is entitled to qualified immunity. *See id.* (citing *Lane*, 573 U.S. at 246 (2014)).

Brown argues that the law was clearly established—through *Jackler* and *Ross*—when Halpin acted: Brown had a First Amendment right not to make false statements under circumstances when truthfulness was required. *See* Pl.'s Mem., Doc. No. 195, at 24. Brown contends that that formulation of the law encompasses her right not to be forced to make false statements regarding (1) the correct legal standard in documents prepared for the Commission, (2) the existence of rehired retirees in submissions to Ice Miller, and (3) the existence of a "special list" of transferred retirees in submission to the IRS. *See id.* at 25.

By April 2013,[22] it was clearly established law in the Second Circuit that a citizen could "refuse to retract a report to the police that he believes is true, to refuse to make a statement that he believes is false, and to refuse to engage in unlawful conduct by filing a false report with the police." *Jackler*, 658 F.3d at 241. In formulating that First Amendment protection, the Second Circuit relied heavily on the fact that Jackler could have been liable for criminal punishment had he followed his superiors' directions. Thus, after *Jackler*, it was also clearly established law that the First Amendment protected a citizen from being forced to retract true statements and to make false statements when doing so would subject that citizen to potential criminal liability. *See id.* at 238–40.

Halpin is not entitled to qualified immunity for her participation in compelling Brown to make false statements regarding (1) legal materials submitted to the Commission, (2) the existence of a list of rehired retirees, and (3) the existence of a "special list" of retirees. In all

---

[22] As described above, this was the earliest date on which Brown engaged in protected speech by refusing to make false statements to Ice Miller. *See* Brown Decl., Doc. No. 195-5, at ¶¶ 61–62.

three instances, making a knowingly false statement could have subjected Brown to criminal

liability.  *See* Brown Decl., Doc. No. 195-5, at ¶ 49 (legal materials); *id.* at ¶ 64 (filings to IRS).

Again, the absence of explicitly, factually on-point precedent does not indicate, under these

circumstances, that the law as stated above was not clearly established.  It was, and no

reasonable official could have believed it was permissible to retaliate against a public employee

because that employee refused to retract a true statement and submit a false one when doing so

would subject that employee, potentially, to criminal liability.  Thus, Halpin is not entitled to

qualified immunity.

### E.   Claims against the State of Connecticut

In addition to the section 1983 claim against Halpin, Brown also brings a Conn. Gen.

Stat. § 31–51q claim against the State of Connecticut.  Section 31–51q provides a cause of action

for violation of the right to free speech under both the United States and Connecticut

Constitutions.  It reads, in relevant part:

> Any employer . . . who subjects any employee to discipline or discharge on account
> of the exercise by such employee of rights guaranteed by the first amendment to
> the United States Constitution or section 3, 4, or 14 of article first of the
> Constitution of the state, provided such activity does not substantially or materially
> interfere with the employee's bona fide job performance or the working relationship
> between the employee and the employer, shall be liable to such employee . . . .

Conn. Gen. Stat. § 31–51q.  To succeed on a claim under this statute, a plaintiff must

demonstrate that

> (1) [S]he was exercising rights protected by the First Amendment to the United
> States Constitution (or an equivalent provision of the Connecticut Constitution); (2)
> [s]he was fired [or otherwise disciplined] on account of [her] exercise of such
> rights; and (3) [her] exercise of [her] First Amendment rights did not substantially
> or materially interfere with [her] bona fide job performance or with [her] working
> relationship with [her] employer.

*Ozols v. Town of Madison*, 2012 WL 3595130, at *3 (D. Conn. Aug. 20, 2012) (internal citations and quotation marks omitted).  The Defendants do not contest the third element.  Accordingly, the only questions are whether Brown was exercising rights protected by the First Amendment or Connecticut Constitution, and whether she was "disciplined or discharged" as a result of the exercise of such rights.

       1.   *Exercising rights protected by First Amendment or Connecticut Constitution*

      The Connecticut Constitution protects more speech than does the First Amendment.  *See Trusz v. UBS Realty Investors, LLC*, 319 Conn. 175, 192–93 (2015); *Ozols*, 2012 WL 3595130, at *4.  Under the Connecticut Constitution, a public employee's speech is protected if the employee "speaks on a matter of unusual importance and satisfies high standards of responsibility in the way [s]he does it."  *Trusz*, 319 Conn. at 204.  Thus, even when an employee speaks pursuant to her official duties, the employee's speech will be protected so long as it is a "comment on official dishonesty, deliberately unconstitutional action, other serious wrongdoing, or threats to health and safety . . . ."  *Id.* at 211 (quoting *Garcetti*, 547 U.S. at 435 (Souter, *J.*, dissenting)).  "[W]hether speech concerns official dishonesty or serious wrongdoing is a question of law," but it depends on "a fact-intensive inquiry."  *Trusz v. UBS Realty*, 2016 WL 1559563, at *9 (D. Conn. Apr. 18, 2016) ("*Trusz II*") (citing *Wrobel v. Cty. of Erie*, 692 F.3d 22, 29 (2d Cir. 2012)).  "Where there are substantial disputed facts that are essential to a legal conclusion, summary judgment would be improper."  *Id.*

      Examples of official dishonesty and/or serious wrongdoing include: "when . . . a public auditor speaks on his discovery of embezzlement of public funds, when a building inspector makes an obligatory report of an attempt to bribe him, or when a law enforcement officer expressly balks at a superior's order to violate constitutional rights he is sworn to protect."

*Trusz*, 319 Conn. at 199 (quoting *Garcetti*, 547 U.S. at 433 (Souter, *J.*, dissenting)). "Official dishonesty or serious wrongdoing" need not rise to the level of criminal wrongdoing. *See Trusz II*, 2016 WL 1559563, at *9 ("At least in certain situations, regulatory or civil wrongs could constitute serious wrongdoing.") (citing *Trusz*, 319 Conn. at 215 (pointing out that employee complaints about illegal or dangerous workplace conditions are protected)).

The Defendants argue that "official dishonesty" and "serious wrongdoing" under *Trusz* require intentional misconduct and criminal activity. *See* Defs.' Mem., Doc. No. 190, at 28. The Defendants point to Justice Souter's dissent in *Garcetti* (which *Trusz* essentially adopted), and claim that Souter's three examples—the auditor revealing embezzlement of public funds, the building inspector reporting an attempt to bribe him, and the police officer's refusal to intentionally violate a suspect's constitutional rights—all rise to the level of criminal wrongdoing. *See id*. The Defendants note also that courts in some other contexts and jurisdictions have defined "serious wrongdoing" to mean intentional misconduct or criminal activity. *See id.* at 28–29.[23] Brown's speech, according to the Defendants, did not regard intentional misconduct or criminal activity: It regarded simple policy disagreements with her superiors. The Defendants emphasize again that Brown's job involved engaging with complicated legal questions. In the Defendants' view, a letter from the Auditors to the Governor in June 2015 concluded that the Defendants did not engage in intentional misconduct and noted

---

[23] Specifically, the Defendants point to a Second Circuit case construing the fiduciary duty of loyalty. *See Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1316 (2d Cir. 1993) (equating "serious charges of wrongdoing" with a violation of the duty of loyalty, rather than the duty of care). The Defendants also cite two cases from the Tenth Circuit, one from the District of New Mexico, and one from the District of Delaware. *See Lytle v. City of Haysville, Kan.*, 138 F.3d 857, 865 (10th Cir. 1998); *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1309 (10th Cir. 2009); *Lobato v. New Mexico*, 838 F. Supp. 2d 1213, 1229 (D.N.M. 2011); *Johnson v. George*, 2007 WL 1697276, at *6 (D. Del. June 11, 2007).

the complexity of this regulatory area.  *See* Defs.' Mem., Doc. No. 190, at 31; Auditors' Report,

Ex. A to Pl.'s Opp'n to Mot. for Summ. J. ("Auditors' Report"), Doc. No. 195-2, at 7.[24]

Brown disagrees because her speech (and her refusal to be compelled to make false

statements) related to corruption, violations of state and federal law, intentional misapplication of

a legal standard to curry political favor with unions, and a gross waste of taxpayer funds.  *See*

Pl.'s Mem., Doc. No. 195, at 37; Whistleblower Compl., Doc. No. 189-9, at ¶ 9.  Brown asserts

that the Defendants are wrong to believe that "serious wrongdoing" is limited to intentionally

criminal conduct.  *See* Pl.'s Mem., Doc. No. 195, at 37.  In any event, Brown claims that she has

shown that the subjects of her speech *did* relate to criminal wrongdoing in that she would have

been subject to criminal penalty for lying to the Commission or the IRS.  *See id.*

All Brown's speech I found protected under the First Amendment is also protected under

the Connecticut Constitution because it regards "official dishonesty" and "serious wrongdoing."

In addition, as a matter of logic, such speech must be protected under the Connecticut

Constitution because the Connecticut Constitution's protections for employee speech are

intended to be broader than the First Amendment's.  *See Trusz*, 319 Conn. at 192–93.  The only

question is whether instances of Brown's speech that I found unprotected under the First

Amendment—the July 30 meeting, the August 15 disclosure, and the refusal to make false

statements to an individual retiree—constitute protected speech under section 31-51q.

I hold that—viewing the evidence in the light most favorable to Brown—a reasonable

jury could conclude that most of those instances of speech do constitute protected speech under

---

[24]  That is a twisted reading of the Auditors' report.  The report was undertaken in the first place only because the Auditors "consider[ed] these matters to constitute a potential breakdown in the safekeeping of SERS resources" that could "have resulted in millions of dollars of payments to retirees who were no longer entitled to a disability retirement."  Auditors' Report, Doc. No. 195-2, at 2.  The Auditors also expressed concern about rehired retirees and the Commission's reluctance to conduct an internal investigation.  *See id.* at 3–5.  Finally, the report makes clear that its "review of the whistleblower complaint is continuing."  *See id.* at 7.  The most natural reading of the Auditors' report, then, is that it concerns serious wrongdoing and official dishonesty.

section 31-51q.  Brown's speech during the second part of the July 30 meeting and the August 15 disclosure related to official dishonesty and serious wrongdoing.  In both instances, Brown sought to bring to the Auditors' attention what she perceived to be her superiors' intentional disregard for the law, which resulted in enormous losses to taxpayers.  Dissenting in *Garcetti*, Justice Souter specifically mentioned "a public auditor speak[ing] on his discovery of embezzlement of public funds" as a case in which a public employee spoke on an issue "of substantial concern to the public."  *Garcetti*, 547 U.S. at 433 (Souter, *J.*, dissenting).  The Connecticut Supreme Court adopted that reasoning and that specific example.  *See Trusz*, 319 Conn. at 199.  Although Brown was not an auditor, the example maps almost perfectly onto the situation in this case.  In the July 30 meeting and the August 15 disclosure, Brown reported to the Auditors her discovery of misappropriated public funds.  Thus, at the least, a reasonable jury could conclude that Brown's speech in the July 30 meeting and the August 15 disclosure regarded "official dishonesty" and "serious wrongdoing."

However, no reasonable jury could find that Brown's refusal to make a false statement to a particular retiree regarding the "actual calculation method" of his retirement benefits concerned "official dishonesty" or "serious wrongdoing."  First, the protected speech Brown alleges relates only to an individual retiree.  Even though the underlying issue, in Brown's view, concerned underpayment of many more state employees' retirement benefits, there is no indication that Brown "blew the whistle" on this conduct.  Instead, it appears from Brown's own declaration that the disagreement was purely internal and "neither the retiree nor the full Commission" was informed of Brown's views.  *See* Brown Decl., Doc. No. 195-5, at ¶ 68.  That situation is far afield from the misdeeds that Justice Souter contemplated in dissent in *Garcetti* and that the

Connecticut Supreme Court adopted in *Trusz*. Thus, neither the First Amendment nor the Connecticut Constitution protects this portion of Brown's speech.

### 2. *Discipline or Discharge*

Brown's claim under section 31-51q can proceed only if Brown was either "discharged" or "disciplined" in retaliation for making protected speech. The proper interpretation of section 31-51q is a question of state law, but the Connecticut Supreme Court (and appellate courts) have so far been silent on the definition of "discharge" and "discipline." Most courts begin their analysis with *Bombalicki v. Pastore*, 2000 WL 726839 (Conn. Super. Ct. May 10, 2000).[25] The court in *Bombalicki* held that "the language of [section] 31–51q, which . . . is restrictive even by Connecticut standards, simply cannot compare with the expansive texts of these asserted federal counterparts." *Id.* at *5. Rather, under section 31–51q, the term "discipline" contemplates "an affirmative act of deprivation that diminishes the status or happiness of the recipient rather than a failure to enhance that status or happiness." *See Burdick v. Clouet*, 2011 WL 2739557, at * 7 (Conn. Super. Ct. June 14, 2011) (citing *Bombalicki*, 2000 WL 726839, at *3). (There is no need to consider the law regarding "discharge" because the parties agree that Brown was not discharged.[26])

However, an important recent decision authored by now-Justice Steven D. Ecker indicated that *Bombalicki* interpreted "discipline" under section 31-51q too narrowly. *See Browne v. State Dep't of Correction*, 2017 WL 5243854, at *3 (Conn. Super. Ct. Oct. 10, 2017).

---

[25] *See, e.g.*, *Weinstein v. Univ. of Conn.*, 2018 WL 2222131, at *4–7 (Conn. Super. Ct. Apr. 25, 2018) ("There is no appellate authority that establishes the linguistic contours of the words 'discipline or discharge.' However, any well considered analysis must begin with *Bombalicki v. Pastore* . . . which has influenced all subsequent treatment of the topic."); *Avedisian v. Quinnipiac Univ.*, 387 F. App'x 59, 61 (2d Cir. 2010) (citing *Bombalicki*); *Brown*, 885 F.3d at 118 (same).

[26] Brown's position at the Division was eliminated, and she was offered the opportunity to transfer to another state agency—an offer which she accepted. *See* Lay-off Letter, Doc. No. 195-20, at 2–3.

Indeed, then-Superior Court Judge Ecker noted that "it is unclear why Connecticut would adopt a less protective statutory standard than that developed by federal courts in [F]irst [A]mendment retaliation cases." *See id.* at *3 n.8 (citing *Zelnik*, 464 F.3d at 226). Brown argues that Connecticut courts must adopt the more capacious standard because "[a]ny rule which falls short of [it] will necessarily permit employers to engage in some retaliatory actions that are sufficient to dissuade a reasonable employee from exercising her constitutional speech rights." *See* Pl.'s Mem., Doc. No. 195, at 40. I agree with Brown's and Justice Ecker's skepticism of the narrow interpretation of the statute in *Bombalicki*, and I hold that a reasonable jury could conclude that Brown has been subjected to "discipline" within the meaning of section 31-51q for the same reasons that I concluded Brown had been retaliated against within the meaning of the First Amendment.[27]

However, even under the *Bombalicki* standard—which is more stringent than the First Amendment's standard for retaliation—a reasonable jury could conclude that the Defendants "disciplined" Brown. "Discipline" can include a change in an employee's salary or fringe benefits. *See Burdick*, 2011 WL 2739557, at *7 (holding that transfer was not discipline because it altered neither salary nor fringe benefits). Put differently, a transfer will generally not be considered discipline if it results in no "loss of rank or base pay[.]" *D'Angelo v. McGoldrick*, 1995 WL 476843, at *4 (Conn. Super. Ct. Aug. 3, 1995). On the other hand, a transfer "to a position that is so objectively undesirable it could be considered a demotion" could qualify as discipline. *Matthews v. Dep't of Pub. Safety*, 2013 WL 3306435, at *14 (Conn. Super. Ct. May 31, 2013) (*Matthews IV*). Unlike a transfer that does not affect the plaintiff's rank, salary, or

---

[27]  Although I have held that the Connecticut Constitution protects two more instances of Brown's speech than does the First Amendment—the July 30 meeting and the August 15 disclosure—my analysis from above would apply to them, too, because the retaliatory acts may be considered in the aggregate. *See Hicks*, 593 F.3d at 165.

fringe benefits, a transfer that inhibits the plaintiff's ability to receive certain benefits or takes away her eligibility for future promotions and/or pay raises may very well diminish the plaintiff's state of happiness.  *See id.* (though mere denial of promotion was not discipline, affirmative act depriving plaintiff of fair chance of promotion was discipline).  Unlike a mere withholding of a future benefit, such as a denial of tenure[28] or a promotion,[29] a transfer is an affirmative act that, under certain circumstances, can "diminish the happiness and status of an employee."  *Id.*

I have already held that—if Brown's allegations were proven true—Brown's transfer from the Division to the Office of Governmental Accountability was "discipline" pursuant to section 31-51q because the transfer caused Brown a loss of benefits and prevented her from being eligible for a promotion.  *See* Order, Doc. No. 127, at 36.  In this very case, the Second Circuit agreed and held that, if Brown indeed "lost two credited years of service" for purposes of a promotion, that transfer would be "sufficient to constitute an act of 'discipline' under" section 31-51q.  *See Brown*, 885 F.3d at 118–19.

Discovery has proven true Brown's claims regarding her transfer.  On November 4, 2014, Brown learned that her position as a Staff Attorney II at the Division was being eliminated as of December 16.  *See* Lay-off Letter, Doc. No. 195-20, at 2.  "In accordance with the terms of the collective bargaining agreement," she was offered bumping options to another Staff Attorney II position within the Office of Government Accountability.  *See id.*  On December 2, Brown exercised her bumping option.  *See id.* at 3.  Although Brown did not lose pay when she transferred, she did lose future earnings to which she would have been entitled sooner had she

---

[28]  *See, e.g.*, *McIntyre v. Fairfield Univ.*, 2003 WL 1090690, at *3 (Conn. Super. Ct. Mar. 3, 2003); *Avedisian*, 387 F. App'x at 60–61.
[29]  *See, e.g.*, *Bombalicki*, 2000 WL 726839, at *4.

been permitted to stay at the Division.  That is, Brown would have advanced to a Staff Attorney

III position at the Division on September 21, 2015 (three years after starting); when she

transferred to the Office of Governmental Accountability, she lost the two years of credited

service she had as a Staff Attorney II at the Division and so was not eligible to become a Staff

Attorney III until December 2017.  *See* 56(a)2 Stmnt., Doc. No. 195-1, at ¶ 63.  The change from

Staff Attorney II to Staff Attorney III carries a concomitant increase in salary.  *See id.*  That

delay "will also impact Plaintiff's salary in terms of future salary increases and calculation of

retirement benefits."  *See id.*  The transfer thus constituted "discipline" under section 31-51q.

I also agree with lower Connecticut courts that hold that lesser acts, which may not on

their own be "discipline" under section 31-51q, can amount, in the aggregate, to discipline.  *See,

e.g.*, *Matthews IV*, 2013 WL 3306435 at *14 ("[S]ome of the conduct might not be discipline on

its own, but when all the alleged conduct is aggregated and viewed in a light most favorable to

the plaintiff, it can be inferred that the defendant was disciplining the plaintiff for speaking out

on certain matters."); *Charron v. Town of Griswold*, 2009 WL 5511272, at *11 (Conn. Super. Ct.

Dec. 14, 2009) ("[A]dverse employment actions may include . . . lesser affirmative acts of

punishment or deprivation taken by the employer which leave an employee less well off and

which in combination and in their totality, create a working environment that is unreasonably

inferior, hostile or adverse to the employee when compared to a typical or normal, not ideal or

model, workplace."); *Lynch v. Ackley*, 2014 WL 4782812, at *24 (D. Conn. Sept. 24, 2014),

*rev'd and remanded on other grounds*, 811 F.3d 569 (2d Cir. 2016) (holding that "a series of

actions taken over a period time . . . , when viewed in the aggregate, could amount to

'discipline'").  Thus, even assuming without deciding that the elimination of job duties, isolation

from colleagues and staff, poor service ratings, letter of counselling, and monitoring of activities

do not themselves rise to the level of "discipline" under section 31-51q, a reasonable jury could conclude that they do in the aggregate.  That conclusion is buttressed by the fact that Brown's lay off, by itself, constituted "discipline."

**IV.     Conclusion**

For the foregoing reasons, the Defendants' motion for summary judgment, doc. no. 189, is **denied in substantial part and granted in part**.


So ordered.

Dated at Bridgeport, Connecticut, this 23d day of April 2020.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge